**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

STATE OF FLORIDA and the FLORIDA AGENCY
FOR HEALTH CARE ADMINISTRATION,

     *Plaintiffs*,

v.                                    Case No. _____

CHIQUITA BROOKS-LaSURE, in her
official capacity as Administrator for the
Centers for Medicare & Medicaid Services;
THE CENTERS FOR MEDICARE &
MEDICAID SERVICES; XAVIER
BECERRA, in his official capacity as
Secretary of the United States Department of
Health and Human Services; the UNITED
STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and the UNITED
STATES OF AMERICA.

     *Defendants*.

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Medicaid is a program established by the Social Security Act (the "Act") for funding vital healthcare for low-income and disabled people.  Using a combination of non-federal and federal funds, states pay providers that furnish healthcare services to Medicaid beneficiaries. Unfortunately, the Medicaid program often pays less than the actual cost of Medicaid care, resulting in shortfalls for hospitals.

2.     To increase available Medicaid funding—and thus to expand healthcare services for those in need—the Act allows state and local governments to raise revenue through a healthcare-related tax and then obtain federal matching funds on that revenue.

1

3.      The State of Florida created the hospital Directed Payment Program ("DPP") to raise additional Medicaid funding for private hospitals.  Under the DPP, localities may impose a uniform special assessment, under Florida county special assessment laws, on all private hospitals within their jurisdiction, pooling the revenue in a dedicated account—a Local Provider Participation Fund ("LPPF")—before transmitting those funds to the Florida Agency for Health Care Administration ("AHCA").  AHCA, the state Medicaid agency, then obtains federal matching funds on that revenue and disburses the combined funds to hospitals that provide Medicaid healthcare services through the state's contracted Medicaid managed care organizations.  CMS must approve Florida's DPP on an annual basis.

4.      So far, twenty-one Florida localities have established an LPPF to support the DPP, generating billions of dollars in Medicaid payments—about $2.1 billion in the 2022-23 fiscal year and $3.4 billion in the 2023-24 fiscal year—the majority of which is federal matching funds (67.2% in FY21-22, 66.2% in FY22-23, and 57.9% in FY23-24).  These funds help make hospitals whole for the services they provide to some of Florida's most vulnerable and enable them to continue providing such services.

5.      Additional local hospital special assessments fund other Medicaid supplemental payment programs designed to support hospitals that provide charity care and graduate medical education.

6.      Although the Act permits this arrangement, it reduces federal matching "if there is in effect a hold harmless provision … with respect to the tax."  42 U.S.C. § 1396b(w)(1)(A)(iii).[1]

---

[1] Under Floria law, the special assessments imposed by counties and municipalities are not taxes.  The Social Security Act, however, defines "tax" to include an "assessment."  42 U.S.C. § 1396b(w)(7)(F).  Use of the word "tax" throughout this Complaint tracks the federal statute but is not meant to characterize special assessments as a tax under Florida law.

The Act carefully delineates the circumstances under which a hold-harmless provision is deemed to be "in effect."  As relevant here, a hold-harmless provision is "in effect" if "[t]he State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax."  *Id.* § 1396b(w)(4)(C)(i).  By its express terms, then, the Act disallows matching funds only when the governmental unit that imposes the tax also indemnifies the taxpayers.  And that was the position long held by the U.S. Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS").

7.     In February 2023, however, CMS changed course.   Without engaging in rulemaking—or providing any notice or an opportunity for public comment—CMS issued an "informational bulletin" entitled "Health Care-Related Taxes and Hold Harmless Arrangements Involving the Redistribution of Medicaid Payments."  Ex. A (the "Bulletin").  The Bulletin explains that "CMS has become aware of" private agreements among hospitals to redistribute Medicaid payments once received from a State.  *Id.* at 2.  The Bulletin explains why these agreements may exist:

> [H]igh-percentage Medicaid hospitals are willing to participate because they still financially benefit from the tax program (even net of the redistribution payments they make to the lower Medicaid service volume hospitals), and the redistribution enables broad support for the tax program from all hospitals, ensuring constituent support for the state law authorizing the tax program.

*Id.* at 4.

8.     Despite recognizing that these arrangements enhance support of broad-based private assessments, CMS states that an "arrangement that involves the taxpaying providers redistributing Medicaid payments after receipt to ensure that all taxpaying providers receive all or a portion of their tax costs back" "appear[s] to [be] a hold harmless arrangement."  Ex. A at 2.  In

other words, according to the Bulletin, CMS will deny and claw-back federal matching funds if the private hospitals independently agree among themselves to redistribute some of the Medicaid payments they later receive.[2]  *Id.* at 3.

9.      The Bulletin dictates that, even though States "may not be parties to the redistribution agreements," they still must "learn the details of how health care-related taxes are collected and take steps to curtail these [redistribution] practices if they exist."  Ex. A at 5.

10.     A few days after issuing the Bulletin, CMS began a financial review focused on Florida's LPPF tax programs.  *See* Ex. B (the "Financial Review Letter").  CMS asserted that private hospitals in Florida paying into the LPPFs might have agreed to redistribute their Medicaid payments, which, consistent with the Bulletin, CMS would deem impermissible hold-harmless provisions—regardless of whether the taxing localities or any other governmental unit promised the redistribution or otherwise participated in the redistribution arrangement.  *Id.* at 1.  CMS demanded that AHCA answer a series of detailed questions about the LPPFs in Florida and threatened to defer or disallow federal matching funds for Florida if AHCA refused.  *Id.* at Attachment 1-3.

11.     Complying with the Bulletin's oversight requirements and CMS's financial review will be burdensome and costly for AHCA, which currently lacks the personnel to police private agreements—potentially secret or unwritten agreements—among hundreds of private hospitals around the State.

12.     And AHCA should not have to comply with CMS's diktat because the policy announced in the Bulletin and the Financial Review Letter—that a purely private redistribution

---

[2] The Social Security Act uses the term "disallow" to describe the act of requiring States to return already-disbursed Medicaid funds.  *See* 42 U.S.C. § 1396b(d)(5).

arrangement is an impermissible hold-harmless provision—is unlawful.  That policy contravenes the plain language of the Act and is unreasonable.  Moreover, CMS's failure to explain its departure from its prior position renders its new position arbitrary and capricious.  And CMS's failure to issue the Bulletin through notice-and-comment rulemaking renders the new policy procedurally invalid.

13.    A federal district court has already held that the statutory interpretation set forth in the Bulletin is inconsistent with the Act's plain text.  The court concluded that CMS's new policy contravenes the Act's "tight grammatical link between *the government*, as the actor providing for something, and *a guarantee*, as the thing provided for."  Mem. Op. and Order Granting Texas's Mot. for Preliminary Injunction at 23, *Texas v. Brooks-LaSure, et al.*, No. 23-cv-161, ECF No. 31 (E.D. Tex. June 30, 2023).  Accordingly, the court preliminarily enjoined "the federal government from taking any actions with respect to the State of Texas that depend on the legal interpretation articulated in the informational bulletin," Order Denying Mot. to Clarify at 1, *Texas v. Brooks-LaSure, et al.*, No. 23-cv-161, ECF No. 40 (E.D. Tex. Aug. 3, 2023), including "enforcing the Bulletin through any ongoing or future Medicaid-related audits, oversight activities related to the Medicaid program, or review of state payment proposals in the State of Texas" and using the Bulletin's interpretation "as a basis to defer or disallow any reimbursement payments," Mem. Op. and Order Granting Texas's Mot. for Preliminary Injunction at 29.

14.    This Court should reach the same conclusion, declare unlawful the policy announced in the Bulletin and implemented in the Financial Review Letter, and enjoin CMS from relying on that interpretation against Florida.

## PARTIES

15.     Plaintiff the State of Florida is a sovereign State and has the authority and responsibility to protect its public fisc and the health, safety, and welfare of its citizens.  Plaintiff Florida Agency for Health Care Administration is an executive-branch agency organized under the laws of Florida.  It is the state agency designated under 42 C.F.R. § 431.10 to administer Florida's Medicaid program.[3]

16.     Defendants are the agencies and appointed officials of the U.S. Department of Health and Human Services and its subagency, the Centers for Medicare & Medicaid Services, responsible for enforcing the challenged Bulletin.

17.     Defendant United States Department of Health and Human Services is a cabinet-level federal executive branch agency organized under the laws of the United States.

18.     Defendant Xavier Becerra is the Secretary of HHS.  He is sued in his official capacity.

19.     Defendant CMS is a federal agency organized under the laws of the United States and a component of HHS.  It is responsible for administering Medicaid.

20.     Defendant Chiquita Brooks-LaSure is the Administrator for CMS.  She is sued in her official capacity.

21.     Defendant United States of America is the federal sovereign.

## JURISDICTION AND VENUE

22.     This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*  This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this suit concerns

---

[3] Hereinafter, the State and AHCA are collectively referred to as "Florida."

the legality under federal law of actions taken by federal agencies and federal officers in their official capacities.

23.     Pursuant to 5 U.S.C. § 702, defendants have waived sovereign immunity for purposes of this suit.

24.     Florida's claims for declaratory and injunctive relief are authorized by 5 U.S.C. §§ 702-706, 28 U.S.C. §§ 2201-2202, Federal Rules of Civil Procedure 57 and 65, and the Court's inherent powers.

25.     The Bulletin is a final action subject to judicial review under 5 U.S.C. § 704.

26.     Venue lies in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e)(1) because Defendants are the United States, two of its agencies, and two of its officers in their official capacities are defendants, Plaintiff Florida resides in this judicial district (and no real property is involved), and a substantial part of the events or omissions giving rise to Florida's claims occurred in this district.  In particular, the State of Florida resides in every judicial district in the State.  And Broward County has established a Local Provider Participation Fund ("LPPF") that is the subject of the Bulletin.

## FACTUAL ALLEGATIONS

### I.    FLORIDA'S DIRECTED PAYMENT PROGRAM FOR MEDICAID

#### A.    Medicaid's Cooperative Federalism Framework

27.     Medicaid is a cooperative federal-state program that has provided joint federal and state funding of medical care for millions of low-income and disabled people since 1965.  *See* 42 U.S.C. § 1396 *et seq*.  At the federal level, Medicaid is administered by the Secretary of Health and Human Services through CMS.  At the state level, participating States designate a single agency to administer their Medicaid program pursuant to a CMS-approved plan.  *See* 42 U.S.C.

§ 1396a.  Florida designated AHCA to administer its Medicaid program, and that program provides critical healthcare for millions of Floridians.

28.     The federal government pays a share of each participating State's costs for providing covered medical services.  42 U.S.C. § 1396b; 42 C.F.R. § 430.30(a)(1).  This share is determined separately for each State based primarily on the federal medical assistance percentage ("FMAP").  *See* 42 U.S.C. § 1396b(a); 42 U.S.C. § 1396d(b).  The federal government pays each State an amount equal to the FMAP of the State's total medical assistance provided under its approved Medicaid plan.

29.     Currently, the FMAP for Florida is approximately 60%, meaning that federal funding covers about 60% of the costs of qualifying Medicaid healthcare services in Florida.

30.     To receive federal Medicaid funding, States must show they can pay their share of Medicaid expenses.  *See* 42 U.S.C. § 1396b; 42 C.F.R. Part 447.

31.     To pay their share, States and their subdivisions may impose taxes on healthcare providers to raise revenue.  *See* 42 C.F.R. § 433.68.  Such healthcare-related taxes are a critical source of funding for many States' Medicaid programs.

**B.     The Directed Payment Program**

32.     Hospitals generally suffer a Medicaid "shortfall," whereby the Medicaid payments received are less than the hospital's costs for providing services to Medicaid-enrolled patients.

33.     In Florida, one solution to help make up this shortfall is the Directed Payment Program, which allows hospitals obtain additional Medicaid assistance to cover otherwise uncompensated costs.  The Florida Legislature authorized the DPP during its 2021 session, and CMS approved it for use starting in the 2021-2022 fiscal year.

34.     Under the DPP, local governments—municipalities and counties—raise revenue through a special assessment on private hospitals.  The revenue is pooled in an LPPF and then transferred to AHCA.  AHCA then sends the monies to the federal government to receive the additional matching funds.  Through the Medicaid federal matching mechanism at Florida's current FMAP, every $1 collected under the DPP generates approximately $1.50 in additional federal Medicaid funds.

35.     The DPP is vital to Florida's ability to provide healthcare to Medicaid patients and to cover hospitals' costs for doing so.

36.     Currently, twenty-one Florida localities have established an LPPF and corresponding special assessments on private hospitals.  Some jurisdictions in Florida also use special assessments to fund programs supporting reimbursement for charity care and graduate medical education.

37.     In fiscal year 2021-22, 168 providers participated in 15 LPPFs, which generated about $1.8 billion in Medicaid assistance, about 67% of which came from the federal government.  That constituted about 4.95% of Florida's total Medicaid budget that year.

38.     In fiscal year 2022-23, 173 providers participated in 21 LPPFs, which again generated about $2.1 billion in Medicaid assistance, about 66% of which came from the federal government.  That constituted about 5.2% of Florida's total Medicaid budget that year.

39.     In fiscal year 2023-24, Florida expects 174 providers to participate in the same 21 LPPFs, generating about $3.4 billion in Medicaid assistance, with about 58% of those funds coming from the federal government.  That will constitute about 8.7% of Florida's total Medicaid budget this year.

40.     Under the DPP, once the federal matching funds are received, AHCA disburses the funds—federal and non-federal assistance combined—through a single, annual payment to Medicaid managed care organizations ("MCOs"), with which AHCA has contracted to manage healthcare services under Florida's Medicaid plan.  The MCOs, in turn, pay the hospitals.

41.     The special assessments for the DPP are imposed by local governments through an ordinance and resolution.  Consistent with the Social Security Act, each special assessment imposed by county ordinance is broad-based, uniform, and may not hold harmless any participating hospital.  *See, e.g.*, Broward County Ordinance No. 2022-23, Ex. C at 2 (creating LPPF in Broward County).

42.     Each locality, in consultation with its hospitals, decides whether to establish an LPPF.  The State neither requires localities to do so nor plays a role in this process.

## II.     CMS'S REGULATION OF HOLD-HARMLESS PROVISIONS

### A.     The Social Security Act's Hold-Harmless Prohibition

43.     In 1991, Congress passed the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments, Pub. L. No. 102-234, 105 Stat. 1,793 (codified as amended at 42 U.S.C. § 1396b(w)).  Under the 1991 law, "the total amount expended … as medical assistance under the State plan … shall be reduced by the sum of any revenues received by the State … from a broad-based health care related tax, if there is in effect a hold harmless provision … with respect to the tax."  42 U.S.C. § 1396b(w)(1)(A)(iii).

44.     Section 1396b(w) carefully delineates three scenarios in which "there is in effect a hold harmless provision with respect to a broad-based health care related tax."  Only the third scenario—paragraph (4)(C)—is relevant here.  It states: "The State or other unit of government

imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." 42 U.S.C. § 1396b(w)(4)(C)(i).

**B.**      **The Executive Branch's Longstanding Position That Independent Indemnification Arrangements Among Private Providers Do Not Create Hold-Harmless Provisions**

45.      After the enactment of the prohibition on hold-harmless provisions, the executive branch, including CMS, took the position that arrangements adopted by private entities—independent of the governmental taxing authority—do not implicate section 1396b(w)(4)(C)(i).

46.      In 2005, HHS's Departmental Appeals Board determined that a prohibited hold-harmless provision exists only if there is "wording in the States' programs that could reasonably constitute an explicit or direct assurance of any payment to the provider taxpayer." *In re Hawaii Department of Human Services Board*, No. A-01-40, 2005 WL 1540188, at *3 (Dep't Appeals Bd., Appellate Div. June 24, 2005). The Board elaborated that, to qualify under section 1396b(w)(4)(C)(i), there must be a "legally enforceable" "guarantee" by the governmental taxing authority. *Id.* at *25. Accordingly, the Board said, the fact that a state payment to a private party had been, in turn, used to reimburse a taxpayer would not alone suffice to qualify as an indemnification provision because it would lack a "guarantee" by the State. *Id.*

47.      In 2008, CMS amended its regulations to "clarif[y] existing Federal law related to … the hold harmless provisions." Medicaid Program; Health Care-Related Taxes, 73 Fed. Reg. 9,685, 9,687-88 (Feb. 22, 2008). As amended, CMS's regulation provides (as to the third statutory definition of a hold-harmless provision): "The State (or other unit of government) imposing the tax provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount." 42 C.F.R. § 433.68(f)(3). Like the statute, the regulation's plain text provides that the taxing entity must be the provider of the hold-harmless guarantee.

11

48.     In the preamble to the final rule, CMS confirmed this reading of the regulation. CMS explained that it was concerned with "hold harmless arrangement[s] that may be *implemented by States*" and that the new regulation was "intended to … prohibit[] [federal financial participation] for health care-related taxes *where the state* has implemented a hold harmless provision." 73 Fed. Reg. at 9,690 (emphasis added). Although CMS stated that a "direct guarantee will be found when a State payment is made available to a taxpayer … with the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax," and that a direct guarantee "does not need to be an explicit promise or assurance of payment," "*the element necessary* to constitute a direct guarantee is the *provision for payment by State statute, regulation, or policy*." 73 Fed. Reg. at 9,694 (emphasis added). Even payments "influenced by the state" would not suffice—CMS found that was "too broad" a standard. *Id*. Instead, payments would qualify only if the State "requir[ed] that the money be used to reimburse taxpayers for any portion of their health care related taxpayment," which occurs only if the payment was "controlled or directed by the state." *Id*.

49.     Thus, through the 2008 rulemaking, CMS reiterated that only state-controlled or state-directed indemnification triggered section 1396b(w)'s prohibition on hold-harmless provisions. That understanding lasted for more than a decade.

50.     In early 2019, Kristin Fan, then Director of CMS's Financial Management Group, agreed with counsel for healthcare providers that CMS is "aware that there may be arrangements" among providers that CMS may "not particularly like," but CMS "do[es] not have statutory authority to address" those arrangements. Ex. D at 1. Fan also agreed that CMS did "not expect states to seek information about these agreements or providers to disclose these agreements to the state/local government in connection with CMS' questions." *Id*.

**C.      CMS's Abandoned Attempt to Expand Its Rule to Cover Private Arrangements**

51.     Despite Director Fan's statement, later in 2019, CMS proposed to amend its regulatory definition of hold-harmless provisions in a way that might ensnare independent, private redistribution arrangements.

52.     In the proposed "Medicaid Program; Medicaid Fiscal Accountability Regulation," CMS proposed to amend 42 C.F.R. § 433.68(f)(3) to add:

> A direct guarantee will be found to exist where, considering the totality of the circumstances, the net effect of an arrangement between the State (or other unit of government) and the taxpayer results in a reasonable expectation that the taxpayer will receive a return of all or any portion of the tax amount …, regardless of whether the arrangement is reduced to writing or is legally enforceable by any party to the arrangement.

84 Fed. Reg. 63,722, 63,778 (Nov. 18, 2019).

53.     CMS explained that "the proposed rule would add clarifying language to the hold harmless definition in § 433.68(f)(3) to specify that CMS considers a 'net effect' standard in determining whether or not a hold harmless arrangement exists."  84 Fed. Reg. at 63,735.

54.     For a proposal that supposedly did "not reflect any change in policy or approach, but merely [would] codif[y] currently prohibited practices," 84 Fed. Reg. at 63,735, it triggered an extraordinary backlash.  Thousands of comments were submitted on the proposal, many of which explained that CMS "lacked statutory authority for its proposals and was creating regulatory provisions that were ambiguous or unclear and subject to excessive Agency discretion."  Medicaid Program; Medicaid Fiscal Accountability Regulation, 86 Fed. Reg. 5,105, 5,105 (Jan. 19, 2021).  CMS also received "significant comments on the proposed rule regarding its potential impact on states and their budgets, Medicaid providers and Medicaid beneficiary access to needed services."  *Id.*

55.     Many of these opposed commenters were States that administer Medicaid plans, including Florida.  *See* AHCA Comments on proposed Medicaid Fiscal Accountability Regulation [CMS-2393-P] (Jan. 31, 2020).

56.     In response, CMS abandoned the formal rulemaking proposal.  86 Fed. Reg. at 5,105.

**D.     CMS's Reversal: The February 2023 "Informational Bulletin"**

57.     On February 17, 2023, CMS, through the Deputy Administrator and Director of the Center for Medicaid and CHIP Services, issued an "informational bulletin" entitled "Health Care-Related Taxes and Hold Harmless Arrangements Involving the Redistribution of Medicaid Payments."  Ex. A at 1.

58.     The Bulletin notes that "taxpayers appear to have entered into oral or written agreements (meaning explicit or implicit meeting of the minds, regardless of the formality or informality of any such agreement) to redirect or redistribute the Medicaid payments to ensure that all taxpayers receive all or a portion of their tax back."  Ex. A at 3.  "These redistribution payments may be made directly from one taxpaying provider to another, or the funds may be contributed first to an intermediary redistribution pool."  *Id.*

59.     The Bulletin explains that these private arrangements exist because "high-percentage Medicaid hospitals … still financially benefit from the tax program (even net of the redistribution payments they make to the lower Medicaid service volume hospitals), and the redistribution enables broad support for the tax program from all hospitals, ensuring constituent support for the state law authorizing the tax program."  Ex. A at 4.

60.     Despite CMS's affirmance in 2019 that it "do[es] not have statutory authority to address … these types of mitigation agreements," Ex. D at 1, the Bulletin announces precisely the opposite conclusion.  It states that "an arrangement in which providers receive Medicaid payments

from the state (or from a state-contracted managed care plan), then redistribute those payments such that taxed providers are held harmless for all or any portion of their cost of the tax, would constitute a prohibited hold harmless provision under section 1903(w)(4)(C)(i) of the Act and 42 C.F.R. § 433.68(f)(3)."  Ex. A at 5.

61.     The Bulletin announces that the existence of such private agreements would require CMS to "reduce a state's medical assistance expenditures by the amount of health care-related tax collections that include hold harmless arrangements, prior to calculating the federal financial participation."  Ex. A at 5.

62.     The Bulletin announces that CMS "intends to inquire about potential redistribution arrangements and may conduct detailed financial management reviews of health care-related tax programs that appear to include redistribution arrangements or that CMS has information may include redistribution arrangements."  Ex. A at 5.  Consequently, CMS will "expect states to have detailed information available regarding their health care-related taxes. Consistent with federal requirements, CMS expects states to make available all requested documentation regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments."  *Id.*

63.     Brushing aside States' "cited challenges with identifying and providing details on redistribution arrangements because they may not be parties to the redistribution agreements," the Bulletin declared: "states should make clear to their providers that these arrangements are not permissible under federal requirements, learn the details of how health care-related taxes are collected, and take steps to curtail these practices if they exist."  Ex. A at 5.

64.     CMS stated that "a failure to comply with reporting requirements may result in a deferral or disallowance of federal financial participation," and that if it "discovers the existence

of impermissible financing practices related to health care-related taxes[,] CMS will take enforcement action as necessary." Ex. A at 5.

65.     CMS issued the Bulletin without prior public notice or an opportunity to comment.

## III.   THE BULLETIN'S ADVERSE CONSEQUENCES FOR FLORIDA

### A.     Florida's Potential Lost Federal Funding

66.     Enforcement of the Bulletin will harm the safety net that Florida's Medicaid enrollees rely on for vital medical care.

67.     CMS is currently engaging in a financial review of Florida's Medicaid program based on the policies articulated in the Bulletin.  Unless Florida can affirmatively establish that no hospitals participating in the LPPFs have any private agreements that have the net effect of redistributing Medicaid assistance, CMS threatens to disallow the corresponding federal matching funds.

68.     As the Bulletin recognizes, such a disallowance would likely deprive the State of all the funding—federal and non-federal—generated through the LPPF, because support for such programs would evaporate.  Without the LPPF-associated funding, hospitals would abruptly lose access to nearly $2 billion in federal funds that currently sustain their mission of charity care, indigent care, and Medicaid provision.  This sudden loss would jeopardize Florida hospitals' ability to continue providing existing services.  Maternity care in particular would be threatened, because Medicaid is the primary payor for approximately 45% of all births statewide and is the primary payor for over 70% of births in many Florida counties.[4]

---

[4] *See* FL Health Charts, Births Covered by Medicaid, https://www.flhealthcharts.gov/ChartsDashboards/rdPage.aspx?rdReport=Birth.Dataviewer&cid=595 (last accessed August 18, 2023).

69.     Without the LPPF-associated funding, hospitals will be deprived of crucial funding necessary to continue serving Florida's most vulnerable residents.

**B.      Florida's Increased Compliance Costs**

70.     The Bulletin imposes significant compliance costs on Florida by requiring AHCA to identify the details of private redistribution arrangements and to "curtail" such arrangements if they exist.  Ex. A at 5.

71.     Florida currently has no means of conducting the Bulletin's required oversight with respect to such arrangements.   Florida's existing Medicaid oversight resources, skills, and experience relate primarily to determining whether MCOs are complying with their contractual requirements and whether providers have been overpaid.  Those resources, skills, and experiences would not be useful in policing private redistribution arrangements.

72.     Therefore, compliance with the Bulletin would require Florida to establish and operate a new regulatory apparatus.  Florida would have to obtain necessary staffing—including professional auditors, financial examiners, financial analysts, and lawyers—by training and redeploying existing staff, hiring new staff, contracting with third parties, or some combination thereof.  And this new apparatus would likely need to have substantial size given the large number of private hospitals participating in the DPP through LPPFs and hospitals' vast and complex operational structures.  Thus, any approach to establishing and operating the necessary oversight apparatus would be very expensive.

73.     These compliance costs could not be recovered from the federal government because CMS is immune from monetary damages.

**C.      CMS's Financial Management Review of Florida's LPPFs**

74.     The harms that the Bulletin will cause Florida are not hypothetical.  Pursuant to the Bulletin, CMS has commenced an audit of Florida's Medicaid program—specifically, the

LPPFs—and demanded that Florida comply or else lose a significant amount of federal Medicaid matching funds.

75.     On February 22, 2023, CMS notified AHCA that CMS "will perform a Financial Management Review (FMR) … over the next several months."  Ex. B at 1.  The review, CMS stated, "will focus on Florida's use of revenues derived from its Local Provider Participation Program (LPPF) tax program as a source of the non-federal share of Medicaid payments."  *Id.*

76.     According to CMS, "Florida's LPPF tax structure and media reports indicate that the Florida LPPF arrangement" may involve "pre-arranged agreements to redirect Medicaid payments away from Medicaid providers serving a high percentage of Medicaid beneficiaries to hospitals that do not participate in Medicaid or that serve a low percentage of Medicaid beneficiaries," and such arrangements "appear to violate federal requirements."  Ex. B at 1.

77.     To conduct its review, CMS intends to "contact [AHCA's] staff to coordinate meetings, obtain information, and … hold any discussions relating to this review as it progresses." Ex. B at 2.  CMS will also "schedule an exit conference and provide the state the chance to respond to any potential findings or observations prior to development of a draft report."  *Id.*

78.     CMS commenced its review with an initial set of queries to AHCA.  Specifically, CMS has demanded that AHCA answer an extensive series of detailed questions regarding the LPPFs, including detailed questions about the amounts that each provider participating in an LPPF contributed to the LPPF and received in Medicaid assistance, each Medicaid payment financed through LPPF revenue, the existence of any redistribution arrangement among private providers, and communications between the State and those providers or third parties.  Ex. B at Attachment 1-3.  And CMS has demanded that AHCA "describe what oversight the state conducts to ensure

the use of LPPF revenue as a source of non-federal share meets federal requirements." *Id.* at Attachment 3.

79.     In posing these questions, CMS stated that AHCA "'must … provide any … information requested by the Secretary related to any taxes imposed on health care providers'" and that AHCA "must present a complete, accurate, and full disclosure of all of their … tax programs and expenditures." Ex. B at Attachment 1 (quoting 42 C.F.R. § 433.74(a); alterations omitted).

80.     CMS added that AHCA's failure to comply with its requests "may result in a deferral or disallowance of federal financial participation." Ex. B at Attachment 1 (citing 42 C.F.R. § 433.74(d)).

81.     Notably, a federal District Court in Texas recently considered the threat posed by the combination of the Bulletin and a pending audit in Texas. *See Texas v. Brooks-LaSure, et al.*, No. 23-cv-161 (E.D. Tex.).   In Texas, the HHS Office of the Inspector General ("OIG") is conducting the audit.   The OIG is not empowered to disallow Medicaid funds; it can merely make recommendations.   In Florida, by contrast, CMS is conducting the focused review of the State's Medicaid financing.   *See* Ex. B.   CMS is the agency with authority to disallow or deny funding based on the policies articulated in the Bulletin.   The risk to Florida's Medicaid programs from the combination of the Bulletin and the agency's Financial Management Review is direct and imminent.

82.     The local ordinances establishing the LPPFs uniformly provide that the assessments "may not hold harmless any" taxpaying hospital.

## IV.     THE BULLETIN HAS ALREADY BEEN ENJOINED IN TEXAS

83.     A federal District Court in Texas has preliminarily enjoined CMS's application of and reliance on the Bulletin in Texas, finding the Bulletin's extension of the hold-harmless prohibition to private agreements foreclosed by the Act.

84.     After CMS issued the Bulletin in February 2023, the State of Texas filed suit in U.S. District Court for the Eastern District of Texas and sought a preliminary injunction, arguing the Bulletin is unlawful under the APA.  *See* Plaintiffs' Mot. for Preliminary Injunction, *Texas v. Brooks-LaSure, et al.*, No. 23-cv-161, ECF No. 10 (E.D. Tex. April 24, 2023).  Texas argued the Bulletin (i) exceeded CMS's statutory authority, (ii) did not comport with the APA's notice-and-comment requirement, and (iii) was arbitrary and capricious.  *Id.* at 24–37.

85.     The federal court in Texas agreed with Texas's first argument, concluding that while section 1396b(w)(4)(C)(i) contained a "tight grammatical link between *the government*, as the actor providing for something, and *a guarantee*, as the thing provided for," the Bulletin uncoupled the link by threatening to withhold and claw-back Medicaid funds "where the *providers themselves* guarantee to hold one another harmless" and "a state provides no 'guarantee[]' at all." Mem. Op. and Order Granting Texas's Mot. for Preliminary Injunction at 23, *Texas v. Brooks-LaSure, et al.*, No. 23-cv-161, ECF No. 31 (E.D. Tex. April 24, 2023).

86.     The injunction is "geographically limited to the State of Texas" and "prohibit[s] the federal government from taking any actions with respect to the State of Texas that depend on the legal interpretation articulated in the informational bulletin."  Order Denying Mot. to Clarify at 1-2, *Texas v. Brooks-LaSure, et al.*, No. 23-cv-161, ECF No. 40 (E.D. Tex. Aug. 3, 2023).

## CLAIMS FOR RELIEF

### <u>Count I</u>
#### (Violation of 5 U.S.C. § 706(2)(A), (C))

87.     Under the APA, a court "shall … hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory … authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

88.     The Bulletin declares that a private "arrangement in which providers receive Medicaid payments from the state (or from a state-contracted managed care plan), then redistribute those payments such that taxed providers are held harmless for all or any portion of their cost of the tax, would constitute a prohibited hold harmless provision under section 1903(w)(4)(C)(i) of the Act and 42 C.F.R. § 433.68(f)(3)."  Ex. A at 5.

89.     The Social Security Act provides that a prohibited hold-harmless provision exists if: "The *State or other unit of government* imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax."  42 U.S.C. § 1396b(w)(4)(C)(i) (emphasis added).

90.     CMS's new policy, as announced in the Bulletin and implemented in the Financial Review Letter, is not in accordance with law and exceeds CMS's statutory authority because it contravenes the plain text of 42 U.S.C. § 1396b(w)(4)(C)(i) and is an unreasonable interpretation of the Act.

91.     First, under the Act, a hold-harmless provision does not exist where the hold-harmless guarantee arises from private contracts and not the "the State or unit of government['s] … payment, offset, or waiver."  42 U.S.C. § 1396b(w)(4)(C)(i).  Where private taxpayers agree to redistribute their Medicaid funds independently of any guarantee by "the State or other unit of

government imposing the tax," that agreement does not qualify as a hold-harmless provision under the Act but would qualify under the Bulletin.

92.     Second, for a hold-harmless guarantee to be prohibited, the Act requires that the taxing entity and the paying entity be one and the same.  In Florida, however, the taxing entities are local governments, and the paying entity is the State.  Because the subsection treats a State and its political subdivisions as distinct entities, *see* 42 U.S.C. § 1396b(w)(7); *id.* § 1396b(w)(C)(i), a prohibited hold-harmless under section 1396b(w)(4)(C)(i) does not exist in Florida.

93.     CMS's Permissible Health Care-Related Taxes rule states that a prohibited hold-harmless provision exists if: "The State (or other unit of government) imposing the tax provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount."  42 C.F.R. § 433.68(f)(3).

94.     CMS's new policy, as announced in the Bulletin and implemented in the Financial Review Letter, is not in accordance with law and exceeds CMS's authority because it contradicts the plain text of 42 C.F.R. § 433.68(f)(3) and is an unreasonable interpretation of that rule.

95.     First, under the rule, a hold-harmless provision does not exist where the hold-harmless guarantee arises from private contracts and not the "unit of government['s] … payment, offset, or waiver."  42 C.F.R. § 433.68(f)(3).  Where private taxpayers agree to redistribute their Medicaid funds independently of any guarantee by "[t]he State (or other unit of government) imposing the tax," that agreement does not qualify as a hold-harmless provision under the rule but would qualify under the Bulletin.

96.     Second, for a hold-harmless guarantee to be prohibited, the rule requires that the taxing entity and the paying entity be one and the same.  In Florida, however, the taxing entities

are local governments, and the paying entity is the State.  Because the subsection treats a State and its political subdivisions as distinct entities, *see* 42 U.S.C. § 1396b(w)(7); *id.* § 1396b(w)(C)(i), a prohibited hold-harmless under section 1396b(w)(4)(C)(i) does not exist in Florida.

<b><u>COUNT II</u></b><br>
<b>(Violation of 5 U.S.C. § 706(2)(A), (B),<br>
and the Spending Clause of the U.S. Constitution, Art. I, § 8, cl. 1)</b>

97.      Under the APA, a court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be" "not in accordance with law" or "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(A), (B).

98.      Under the Spending Clause of the U.S. Constitution, Congress must speak "unambiguously" and "with a clear voice" when it imposes conditions on federal funds disbursed to the States.  *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981).

99.      The prohibition on hold-harmless provisions in section 1396b(w)(4)(C)(i) is a condition imposed on Florida attached to the disbursement of supplemental federal Medicaid funding.

100.     As explained in Count I, this prohibition clearly does not reach private redistribution agreements.

101.     But if this prohibition is ambiguous, it is substantively invalid under the Spending Clause.

<b><u>COUNT III</u></b><br>
<b>(Violation of 5 U.S.C. § 706(2)(A))</b>

102.     Under the APA, a court "shall … hold unlawful and set aside agency action" that is "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A).

103.     CMS's interpretation of 42 U.S.C. § 1396b(w)(4)(C)(i) and 42 C.F.R. § 433.68(f)(3), as reflected in the Bulletin and implemented in the Financial Review Letter, is

23

arbitrary and capricious because it fails to recognize or state legitimate reasons for CMS's complete reversal of its policy.

104.    In 2005, HHS's Departmental Appeals Board determined that the Act requires a "legally enforceable" "guarantee" by the governmental taxing authority to constitute a hold-harmless provision under the Act. *In re Hawaii*, 2005 WL 1540188, at *25.

105.    In 2008, CMS stated in a rule preamble that a redistribution agreement qualifies as a hold-harmless provision only if the governmental taxing entity "require[es] that the [payment] be used to reimburse taxpayers for any portion of their health care related tax." 73 Fed. Reg. at 9,694.

106.    In 2019, the Director of CMS's Financial Management Group affirmed the proposition that CMS "do[es] not have statutory authority to address" redistribution arrangements among private providers and accordingly that CMS would not "seek information about those agreements" from States. Ex. D at 1.

107.    Thus, CMS's longstanding position was that redistribution agreements among private providers acting independently of the taxing authority do not create hold-harmless provisions under the Act.

108.    In adopting and implementing the Bulletin, however, CMS did not acknowledge that prior statement or address any of those prior statements or their accompanying reasoning, even though they directly contradict the policy adopted by CMS in the Bulletin. This unreasoned reversal is arbitrary and capricious and thus unlawful.

### COUNT IV
### (Violation of 5 U.S.C. § 706(2)(D))

109.    Under the APA, the Court "shall … hold unlawful and set aside agency action" that is undertaken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

110.    The policy announced in the Bulletin, and implemented through the Financial Review Letter, was adopted without observing the required notice-and-comment rulemaking procedure.

111.    The APA requires that substantive or legislative rules be adopted through notice-and-comment rulemaking.  *See* 5 U.S.C. § 553.

112.    The Bulletin is a binding substantive or legislative rule but was adopted without notice-and-comment rulemaking.  The policy announced in the Bulletin is thus unlawful.

<u>COUNT V</u>
**(Violation of 5 U.S.C. § 706(2))**

113.    CMS's position is that its interpretation of the Act's hold-harmless provision, as reflected in the Bulletin and the commencement of the Financial Management Review of Florida, accords with 42 C.F.R. § 433.68(f)(3).  Ex. A at 4.

114.    As explained above, that interpretation of the rule is incorrect.

115.    If, however, the rule has the meaning CMS now ascribes to it, then application of that rule to Florida exceeds CMS's statutory authority and is not in accordance with law.

**PRAYER FOR RELIEF**

For the foregoing reasons, Florida respectfully requests that the Court enter judgment in its favor and:

a.   Declare that the policy announced in the Bulletin, and implemented in the Financial Review Letter, is unlawful;

b.   set aside the Bulletin and Financial Review Letter;

c.   enjoin defendants (and their officers, agents, employees, assigns, and all persons acting in concert or participating with them) from enforcing, implementing, or otherwise relying on the Bulletin and Financial Review Letter or the interpretation

25

of the scope of 42 U.S.C. § 1396b(w)(4)(C)(i) and the associated substantive policy regarding redistribution arrangements that are reflected in the Bulletin and the Financial Review Letter, including enjoining defendants from relying on that interpretation and policy as a basis to recoup, defer, or disallow any Medicaid reimbursement payments;

d.  compel defendants to conduct any Medicaid audit and oversight activities against Florida in accordance with the Social Security Act and any valid implementing regulations, without reliance on the Bulletin, Financial Review Letter, or the interpretation of 42 U.S.C. § 1396b(w)(4)(C)(i) and the associated substantive policy regarding redistribution arrangements reflected therein;

e.  award Florida its costs and attorney's fees and expenses; and

f.  award such other relief as the Court deems equitable and appropriate.

Dated:  August 18, 2023                          Respectfully submitted,

Ashley Moody                                     _s/ Jesse Panuccio_____
ATTORNEY GENERAL                                 Jesse Panuccio
                                                 Fla. Bar No. 31401
John Guard (FBN 374600)                          BOIES SCHILLER FLEXNER LLP
CHIEF DEPUTY ATTORNEY GENERAL                    401 East Las Olas Blvd., Ste. 1200
                                                 Fort Lauderdale, FL  33301
James H. Percival (FBN 1016188)                  (954) 356-0011
CHIEF OF STAFF
                                                 David M. Lehn (*pro hac vice* pending)
Henry C. Whitaker (FBN 1031175)                  Cameron C. Miller (*pro hac vice* pending)
SOLICITOR GENERAL                                BOIES SCHILLER FLEXNER LLP
                                                 1401 New York Ave, N.W.
_/s/ Natalie P. Christmas_____                   Washington, D.C. 20005
Natalie P. Christmas (FBN 1019180)               (202) 237-2727
COUNSELOR TO THE ATTORNEY GENERAL
                                                 Andrew T. Sheeran
Office of the Attorney General                   Fla. Bar No. 0030599
The Capitol, Pl-01                               GENERAL COUNSEL
Tallahassee, FL  32399-1050                      Agency for Health Care Administration
(850) 414-3300                                   2727 Mahan Drive, Mail Stop #3

(850) 410-2672 (fax)
natalie.christmas@myfloridalegal.com

*Counsel for the State of Florida*

Tallahassee, Florida 32308
(850) 412-3670
Andrew.Sheeran@ahca.myflorida.com

*Counsel for the Florida Agency for Health Care Administration*