**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | |
|---|---|
| STATE OF FLORIDA and the FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION, | |
| *Plaintiffs*, | |
| v. | |
| CHIQUITA BROOKS-LaSURE, in her official capacity as Administrator for the Centers for Medicare and Medicaid Services; THE CENTERS FOR MEDICARE AND MEDICAID SERVICES; XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and the UNITED STATES OF AMERICA, | Case No. 23-cv-61595-WPD  **HEARING REQUESTED** |
| *Defendants*. | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**REQUEST FOR HEARING**

Pursuant to Local Civil Rule 7.1(b)(2), Plaintiffs respectfully request a hearing on this motion.  This motion presents an important question of federal law that will affect the provision of healthcare at hundreds of hospitals for millions of Floridians.  Plaintiffs submit that argument on the questions presented will help inform the Court's adjudicatory process.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

    I.    THE MEDICAID SHORTFALL AND SUPPLEMENTAL MEDICAID FUNDING IN FLORIDA ................................................................................................................ 2

    II.    THE FEDERAL PROHIBITION ON HOLD-HARMLESS PROVISIONS ....................... 4

        A.  The Social Security Act ........................................................................... 4

        B.  HHS's Longstanding Position that Independent Arrangements Among Private Providers Are Not Hold-Harmless Provisions .............................. 4

        C.  CMS's Abandoned Attempt to Expand the Hold-Harmless Rule to Cover Private Arrangements ............................................................................... 6

        D.  CMS Reverses Its Longstanding View and Adopts a New Policy Through an "Informational Bulletin" ................................................................... 7

    III.    CMS'S "FINANCIAL MANAGEMENT REVIEW" OF FLORIDA'S LPPFs ............... 8

    IV.    THE PRELIMINARY INJUNCTION OF CMS'S NEW POLICY AND IMPLEMENTING ACTIONS IN TEXAS ....................................................................... 9

ARGUMENT .................................................................................................................... 10

    I.    FLORIDA IS LIKELY TO SUCCEED ON THE MERITS. .......................................... 10

        A.  CMS's New Policy Is Contrary to Law .............................................. 10

        B.  The Bulletin's Unexplained Policy Change Is Arbitrary and Capricious ............. 14

        C.  The Policy Announced in the Bulletin Is Procedurally Invalid ............................ 17

    II.    FLORIDA WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION ................................................................................................... 18

    III.    THE PUBLIC INTEREST AND THE EQUITIES FAVOR PRELIMINARY INJUNCTIVE RELIEF ........................................................................................ 20

CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

Page(s)

## Cases

*Azar v. Allina Health Servs.*,
   139 S. Ct. 1804 (2019) ............................................................................................................ 17

*Benning v. Georgia*,
   391 F.3d 1299 (11th Cir. 2004) .............................................................................................. 12

*City & County of San Francisco v. U.S. Citizenship & Immigration Servs.*,
   981 F.3d 742 (9th Cir. 2020) .................................................................................................. 20

*City of Boca Raton v. State*,
   595 So. 2d 25 (Fla. 1992) ......................................................................................................... 3

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   140 S. Ct. 1891 (2020) ............................................................................................................ 14

*Dream Defs. v. Governor of the State of Fla.*,
   57 F.4th 879 (11th Cir. 2023) ................................................................................................. 10

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ................................................................................................................ 14

*Georgia v. President of the United States*,
   46 F.4th 1283 (11th Cir. 2022) ............................................................................................... 19

*Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
   653 F.3d 1 (D.C. Cir. 2011) .................................................................................................... 18

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ............................................................................................................ 17

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .................................................................................................... 20

*Nat'l Council for Adoption v. Blinken*,
   4 F.4th 106 (D.C. Cir. 2021) ............................................................................................ 17, 18

*New York v. United States Dep't of Homeland Security*,
   969 F.3d 42 (2d Cir. 2020) ..................................................................................................... 20

*Odebrecht Const., Inc. v. Sec., Fla. Dep't of Transp.*,
   715 F.3d 1268 (11th Cir. 2013) .............................................................................................. 19

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) .................................................................................. 14

*Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*,
    699 F.3d 962 (7th Cir. 2012) ................................................................... 20

*Protestant Mem'l Med. Ctr., Inc. v. Maram*,
    471 F.3d 724 (7th Cir. 2006) ............................................................. 4, 11

*State of Fla. v. Dep't of Health & Hum. Servs.*,
    19 F.4th 1271 (11th Cir. 2021) ................................................................ 17

*Tallahassee Mem'l Reg'l Med. Ctr. v. Cook*,
    109 F.3d 693 (11th Cir. 1997) ................................................................... 2

*Texas v. Brooks-LaSure*,
    __ F. Supp. 3d. __, 2023 WL 4304749 (E.D. Tex. June 30, 2023) ........... 5, 9, 11, 14

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ................................................................ 20

*United States v. Weaver*,
    275 F.3d 1320 (11th Cir. 2001) ................................................................ 12

*Utility Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014) .................................................................................. 12

*W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*,
    59 F.4th 1124 (11th Cir. 2023) ................................................................ 13

## Statutes

42 U.S.C. § 1396 ......................................................................................... 2

42 U.S.C. § 1396b(d) ............................................................................. 8, 16

42 U.S.C. § 1396b(w) .................................................................................. 4

42 U.S.C. § 1396b(w)(1) ................................................................... 1, 4, 20

42 U.S.C. § 1396b(w)(4) .............................................. 1, 4, 5, 9, 11, 12, 13

42 U.S.C. § 1396b(w)(7) ......................................................................... 3, 13

5 U.S.C. § 553 ............................................................................................ 17

5 U.S.C. § 702 ............................................................................................ 19

5 U.S.C. § 706 ............................................................................... 11, 13, 14

Laws of Fla. Ch. 2021-36, § 3, Ln. 209 (2021) ................................................................. 3

*Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991*,
Pub. L. No. 102-234, 105 Stat. 1793 (1991)................................................................. 4

## Regulations

42 C.F.R. § 433.68(f)(3) ................................................................................. 4, 5, 7, 13

42 C.F.R. § 433.70(b) ........................................................................................... 20

42 C.F.R. § 433.74(a)............................................................................................. 9

42 C.F.R. § 433.74(d) ......................................................................................... 9, 20

*Medicaid Program; Health Care-Related Taxes*,
73 Fed. Reg. 9,685 (Feb. 22, 2008) ....................................................... 5, 11, 15, 16

*Medicaid Program; Medicaid and Children's Health Insurance Program (CHIP)
Managed Care Access, Finance, and Quality*, 88 Fed. Reg. 28,092 (May 3, 2023)............... 18

*Medicaid Program; Medicaid Fiscal Accountability Regulation*,
84 Fed. Reg. 63,722 (Nov. 18, 2019) ................................................... 6, 15, 18

*Medicaid Program; Medicaid Fiscal Accountability Regulation*,
86 Fed. Reg. 5,105 (Jan. 19, 2021) ............................................................... 6

## Other Authorities

AHCA, *Comments on proposed Medicaid Fiscal Accountability Regulation* [CMS-2393-
P] (Jan. 31, 2020) ................................................................................................. 6

Commonwealth of Massachusetts Executive Office of Health and Human Services Office
of Medicaid, *Comments on Medicaid Program: Medicaid Fiscal Accountability
Regulation* [CMS-2393-P] (Jan. 27, 2020) ................................................................. 6

Opening Brief for Appellant, *Kindred Hosps. E., LLC v. Sebelius*,
2012 WL 248356 (8th Cir. Jan. 9, 2012) ................................................................. 5

## INTRODUCTION

Florida hospitals that accept Medicaid provide vital healthcare services for millions of Floridians.  Unfortunately, the Medicaid program often pays less than the actual cost of Medicaid care, resulting in shortfalls for hospitals.  To reduce the shortfall, the State of Florida created the Directed Payment Program ("DPP").  Under the DPP, localities may impose a uniform special assessment on private hospitals and transmit those funds to the Florida Agency for Health Care Administration ("AHCA").  AHCA then obtains federal matching funds on that revenue and disburses the combined funds to hospitals that provide Medicaid healthcare services.  So far, twenty-one Florida localities, including Broward County, support the DPP, generating billions of dollars in additional Medicaid funding annually.

Although the Social Security Act permits this arrangement, it reduces federal matching "if there is in effect a hold harmless provision … with respect to the tax."  42 U.S.C. § 1396b(w)(1)(A)(iii).  The Act carefully delineates the circumstances under which a hold-harmless provision is deemed to be "in effect."  As relevant here, a hold-harmless provision is "in effect" if "[t]he State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax."  *Id.* § 1396b(w)(4)(C)(i).  By its express terms, then, the Act reduces matching funds only if the governmental unit that imposes the tax also promises to indemnify the taxpayers.  For many years, the Centers for Medicare & Medicaid Services ("CMS") endorsed and applied this plain meaning of section 1396b(w)(4)(C)(i).

In February 2023, however, CMS reversed course and adopted a new policy through an "informational bulletin."  The Bulletin announced that "an arrangement in which providers receive Medicaid payments from the state …, then redistribute those payments such that taxed providers are held harmless for all or any portion of their cost of the tax, would constitute a prohibited hold harmless provision."  In other words, CMS now deems independent arrangements among *private* parties to constitute the "State or other unit of government … guarantee[ing] to hold taxpayers harmless"—merely because the arrangement results in "a reasonable expectation that [the taxpayer] will receive all or a portion of their tax cost back."  The Bulletin dictates that, even if States are "not … parties to the redistribution agreements," they still must "make available all requested documentation regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments" and "take steps to curtail these practices if they

1

exist."  Indeed, a few days after issuing the Bulletin, CMS began a "Financial Management Review" focusing on the DPP and threatening billions in associated federal matching funds.

AHCA seeks a preliminary injunction to bar CMS from enforcing the policy announced in the Bulletin and continuing with the financial review in Florida.  On the merits, CMS's new policy exceeds its statutory authority, which, again, plainly limits prohibited hold-harmless arrangements to ones in which the taxing entity provides the guarantee.  The policy also violates the procedural protections of the Administrative Procedure Act, which requires notice-and-comment rulemaking for a legislative rule of this nature.  As for irreparable harm, complying with the Bulletin's oversight requirements will impose significant burdens and unrecoverable costs on the State.  And enforcement of the illegal policy jeopardizes billions in Medicaid funding for the State and, in turn, for the millions of Floridians who rely on Medicaid.

A federal district court in Texas has already held that the policy announced in the Bulletin exceeds CMS's statutory authority and that enforcement of the illegal policy would cause irreparable harm.  Accordingly, that court preliminarily enjoined enforcement of the Bulletin's new policy in Texas.  This Court should reach the same conclusion, declare unlawful the policy announced in the Bulletin and implemented in the Financial Review Letter, and preliminary enjoin CMS from enforcing that policy in or against Florida.

## BACKGROUND

### I.    THE MEDICAID SHORTFALL AND SUPPLEMENTAL MEDICAID FUNDING IN FLORIDA

Authorized under the Social Security Act, 42 U.S.C. § 1396 *et seq.*, Medicaid "is a cooperative federal-state program designed to allow states to receive matching funds from the federal government to finance medical services to certain low-income persons," sometimes called federal financial participation ("FFP").  *Tallahassee Mem'l Reg'l Med. Ctr. v. Cook*, 109 F.3d 693, 698 (11th Cir. 1997).  The federal matching rate, or federal medical assistance percentage ("FMAP"), specifies the percentage of eligible costs covered by federal funding.  Declaration of Thomas Wallace ¶ 6 ("Wallace Decl.").  Currently, more than five million Floridians receive healthcare through Medicaid.  *Id.* ¶ 5.  Florida annually disburses tens of billions of dollars in base Medicaid funds to Florida healthcare providers, about 60% of which is federal funds.  *Id.* ¶ 6.

Unfortunately, private hospitals generally suffer a Medicaid "shortfall" because their actual costs for Medicaid-eligible care exceed the base Medicaid payments.  Wallace Decl.  ¶ 8.  In

Florida, without supplemental payment programs including the Directed Payment Program discussed below, Medicaid payments cover less than 50% of hospitals' associated costs for eligible care. *Id.* ¶¶ 6, 15. Sustained shortfalls threaten the ability of private hospitals to provide care to the millions of low-income Floridians who rely on Medicaid for their healthcare. *Id.* ¶¶ 38-39.

To help reduce that shortfall, Florida has established the Directed Payment Program. *See* Laws of Fla. Ch. 2021-36, § 3, Ln. 209 (2021). To fund the DPP for private hospitals, Florida municipalities and counties may levy a special healthcare assessment on all private hospitals within their jurisdiction. Wallace Decl. ¶¶ 9-10.[1] The revenue raised by each locality is pooled in a locality-administered account called a Local Provider Participation Fund ("LPPF") and then transferred to AHCA, which administers Florida's Medicaid program. *Id.* ¶ 11. AHCA then obtains federal matching funds on that revenue and disburses the combined funds as supplemental hospital funding. *Id.* ¶ 12.

So far, twenty-one Florida localities have imposed such assessments and established associated LPPFs to fund the DPP. Wallace Decl. ¶¶ 16-17. The local laws implementing these special assessments specify that they are broad-based and uniform—i.e., they apply equally to all private hospitals within the locality—and that the locality does not hold any participating hospital harmless for the assessment. *See, e.g.*, Wallace Decl., Ex. C (Broward County Ordinance No. 2022-23) at 2. The State of Florida (including AHCA) does not direct or control these local assessments and does not promise to hold any participating hospitals harmless for their assessments. Wallace Decl. ¶¶ 19-20.

In the three years the DPP has existed, the program will have generated $1.8 billion, $2.1 billion, and $3.4 billion in supplemental Medicaid funding, about 60% of which was federal funds. Wallace Decl. ¶¶ 13-15. For fiscal year 2023-2024, the DPP will account for about 8.7% of the State's Medicaid budget. *Id.* ¶ 15. The funding raised through the DPP has become integral to Florida's ability to provide healthcare to Medicaid patients and compensate hospitals for doing so. *Id.* ¶¶ 13-15, 28, 38-39.

---

[1] These special assessments are not taxes under Florida law, *see City of Boca Raton v. State*, 595 So. 2d 25, 29 (Fla. 1992), but they are deemed "taxes" for purposes of the Social Security Act's hold-harmless prohibition, *see* 42 U.S.C. § 1396b(w)(7)(F). Accordingly, use of the word "tax" to refer to local assessments in this case merely reflects the governing federal legal regime and does not indicate that the assessments are a tax under Florida law.

## II.    THE FEDERAL PROHIBITION ON HOLD-HARMLESS PROVISIONS

### A.    The Social Security Act

In the late 1980s and early 1990s, states began making "payments to hospitals and collect[ing] the federal matching funds[,] … then recoup[ing] a portion of the state funding from the hospital, often in the form of a 'tax.'" *Protestant Mem'l Med. Ctr., Inc. v. Maram*, 471 F.3d 724, 726 (7th Cir. 2006).  In 1991, Congress prohibited this practice by enacting the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991, Pub. L. No. 102-234, 105 Stat. 1793 (codified at 42 U.S.C. § 1396b(w)).  As amended, the Act states that "the total amount expended … as medical assistance under the State plan … shall be reduced by the sum of any revenues received by the State" from a healthcare-related tax if the tax is not "broad-based" and "uniform," or "if there is in effect a hold harmless provision … with respect to the tax." *Id.* § 1396b(w)(1)(A)(ii)-(iii), (3)(B).  Section 1396b(w) then carefully defines when a hold-harmless provision is in effect.  At issue in this case is the third definition:

> The State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax.

*Id.* § 1396b(w)(4)(C)(i).  Further, Congress later narrowly defined "indirect guarantee" for purposes of section 1396b(w)(4)(C)(i): "a determination of the existence of an indirect guarantee shall be made under" a specified CMS regulation, *id.* § 1396b(w)(4)(C)(ii), which sets forth a "two prong" test based on the proportion of taxes paid that are received back by the taxpayers as Medicaid payments, 42 C.F.R. § 433.68(f)(3)(i).

### B.    HHS's Longstanding Position that Independent Arrangements Among Private Providers Are Not Hold-Harmless Provisions

After Congress enacted the prohibition on hold-harmless guarantees, the Department of Health and Human Services ("HHS") repeatedly took the position that arrangements adopted by private entities—independent of the governmental taxing authority—do not involve the direct guarantee of indemnification required to be a prohibited hold-harmless provision under section 1396b(w)(4)(C)(i).  In 2005, HHS determined that a prohibited direct guarantee exists only if there is "wording in the States' programs that could reasonably constitute an explicit or direct assurance of any payment to the provider taxpayer." *In re Hawaii Department of Human Services Board*, No. A-01-40, 2005 WL 1540188, at *3 (Dep't Appeals Bd., Appellate Div. June 24, 2005).

4

HHS elaborated that there must be a "legally enforceable" "guarantee" of indemnification by the governmental taxing authority.  *Id.* at *25.  Accordingly, the fact that a state payment to a private party had in fact reimbursed a taxpayer would not suffice.  *Id.*

In 2008, CMS amended its regulations to "clarif[y] existing Federal law related to … the hold harmless provisions."  *Medicaid Program; Health Care-Related Taxes*, 73 Fed. Reg. 9,685, 9,687:3-88:2-3 (Feb. 22, 2008).  As amended, CMS's regulation provides (as to the Act's third definition for hold-harmless provisions):

> The State (or other unit of government) imposing the tax provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount.

42 C.F.R. § 433.68(f)(3) ("Hold-Harmless Rule").  In the preamble to the final 2008 regulatory amendment, CMS explained that it was concerned with "hold harmless arrangement[s] that may be *implemented by States*" and that the revision was "intended to … prohibit[] [federal funding] for health care-related taxes *where the state* has implemented a hold harmless provision."  73 Fed. Reg. at 9,690:2 (emphasis added).  The preamble explained that although a direct guarantee "does not need to be an explicit promise or assurance of payment," payments merely "influenced by the state" would not suffice—that was "too broad" a standard.  *Id*. at 9,694:1-2.  Instead, payments would qualify only if the State "*requir[ed]* that the money be used to reimburse taxpayers for any portion of their health care related tax," which occurs only if the offset was at least "controlled or directed by the state."  *Id.* (emphasis added).  Thus, CMS reaffirmed the Department's view that private redistribution does not create a direct guarantee, whatever its effect.

Also in 2008, an official from HHS's Office of Inspector General testified that "'redistribution arrangement[s]' among providers do not violate any hold harmless definition codified at [42 U.S.C.] § 1396b(w)(4)."  *Texas v. Brooks-LaSure*, __ F. Supp. 3d. __, __, 2023 WL 4304749, at *8 (E.D. Tex. June 30, 2023) ("*Texas*") (quoting Opening Brief for Appellant, *Kindred Hosps. E., LLC v. Sebelius*, 2012 WL 248356, at *55 (8th Cir. Jan. 9, 2012)).

Finally, in early 2019, the Director of CMS's Financial Management Group informed healthcare providers that CMS "do[es] not have statutory authority to address" redistribution "agreements among providers [that] do not involve the state/local government and have not been shared with the state/local government," even if CMS does "not particularly like" them.  Declaration of Cameron Miller ("Miller Decl."), Ex. D at 1.  The Director confirmed that CMS

did "not expect states to seek information about these agreements or providers to disclose these agreements to the state/local government in connection with CMS' questions." *Id.*

### C.    CMS's Abandoned Attempt to Expand the Hold-Harmless Rule to Cover Private Arrangements

Despite CMS's uniform position for nearly fifteen years, in late 2019 CMS proposed to amend its regulatory definition of hold-harmless provisions in a way that might ensnare independent, private redistribution arrangements.  Specifically, CMS proposed to add that a "direct guarantee will be found to exist where, considering the totality of the circumstances, the net effect of an arrangement between the State (or other unit of government) and the taxpayer results in a reasonable expectation that the taxpayer will receive a return of all or any portion of the tax amount." *Medicaid Program; Medicaid Fiscal Accountability Regulation*, 84 Fed. Reg. 63,722, 63,778:2 (Nov. 18, 2019).  The proposal's preamble explained that such arrangements were impermissible even if "a private entity makes the redistribution" independent of any state or local control or direction, merely because that private agreement gives the taxpayers "a reasonable expectation to be held harmless for all or a portion of their tax amount." *Id.* at 63,734:3-35:1.

The novel proposal triggered a significant backlash.  More than ten thousand comments were submitted, many arguing that CMS "lacked statutory authority for its proposals and was creating regulatory provisions that were ambiguous or unclear and subject to excessive Agency discretion." *Medicaid Program; Medicaid Fiscal Accountability Regulation*, 86 Fed. Reg. 5,105, 5,105:3 (Jan. 19, 2021).  CMS also received "significant comments on the proposed rule regarding its potential impact on states and their budgets, Medicaid providers and Medicaid beneficiary access to needed services." *Id.*  Among these opposed commenters were many States, including Florida. *See* AHCA, *Comments on proposed Medicaid Fiscal Accountability Regulation* [CMS-2393-P] (Jan. 31, 2020), https://www.regulations.gov/comment/CMS-2019-0169-3615.  One such adverse comment was submitted by then-Assistant Secretary for MassHealth and Medicaid Director Daniel Tsai, who later became CMS's Associate Administrator and authored the Bulletin. *See* Commonwealth of Massachusetts Executive Office of Health and Human Services Office of Medicaid, *Comments on Medicaid Program: Medicaid Fiscal Accountability Regulation* [CMS-2393-P] (Jan. 27, 2020), https://www.regulations.gov/comment/CMS-2019-0169-1670.   In response, CMS abandoned the proposal and withdrew the rulemaking.  86 Fed. Reg. at 5,105:1.

### D.     CMS Reverses Its Longstanding View and Adopts a New Policy Through an "Informational Bulletin"

On February 17, 2023, CMS issued an "informational bulletin" entitled "Health Care-Related Taxes and Hold Harmless Arrangements Involving the Redistribution of Medicaid Payments."  Wallace Decl., Ex. A at 1 ("Bulletin").  Despite CMS's 2019 reaffirmation that it lacks statutory authority to address purely private redistribution arrangements, the Bulletin announced—without notice or an opportunity for comment—that CMS would now deem such arrangements impermissible hold-harmless provisions.

The Bulletin notes that "taxpayers appear to have entered into oral or written agreements (meaning explicit or implicit meeting of the minds, regardless of the formality or informality of any such agreement) to redirect or redistribute the Medicaid payments to ensure that all taxpayers receive all or a portion of their tax back."  Bulletin at 3.  "These redistribution payments may be made directly from one taxpaying provider to another, or the funds may be contributed first to an intermediary redistribution pool."  *Id.*  The Bulletin explains that such arrangements exist because "high-percentage Medicaid hospitals … still financially benefit from the tax program (even net of the redistribution payments they make to the lower Medicaid service volume hospitals), and the redistribution enables broad support for the tax program from all hospitals, ensuring constituent support for the state law authorizing the tax program."  *Id.* at 4.

The Bulletin then declares that such arrangements—"in which providers receive Medicaid payments from the state (or from a state-contracted managed care plan), then redistribute those payments such that taxed providers are held harmless for all or any portion of their cost of the tax"—"would constitute a prohibited hold harmless provision under section 1903(w)(4)(C)(i) of the Act and 42 C.F.R. § 433.68(f)(3)."  Bulletin at 5.  The Bulletin explains that such agreements are prohibited because they "result[] in a reasonable expectation that the taxpaying hospitals … are held harmless for at least part of their health care-related tax costs."  *Id.* at 1-2.  The Bulletin states that the existence of such an arrangement would require CMS to "reduce a state's medical assistance expenditures by the amount of health care-related tax collections that include hold harmless arrangements, prior to calculating the federal financial participation."  *Id.* at 5.

To enforce this new position, CMS "intends to inquire about potential redistribution arrangements and may conduct detailed financial management reviews of health care-related tax programs that appear to include redistribution arrangements or that CMS has information may include redistribution arrangements."  Bulletin at 5.  Consequently, CMS will "expect states to

have detailed information available regarding their health care-related taxes. Consistent with federal requirements, CMS expects states to make available all requested documentation regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments." *Id.* Brushing aside States' "cited challenges with identifying and providing details on redistribution arrangements because they may not be parties to the redistribution agreements," the Bulletin declares: "states should make clear to their providers that these arrangements are not permissible under federal requirements, learn the details of how health care-related taxes are collected, and take steps to curtail these practices if they exist." *Id.*

Finally, the Bulletin declares that "a failure to comply with reporting requirements may result in a deferral or disallowance of federal financial participation," and that if CMS "discovers the existence of impermissible financing practices related to health care-related taxes[,] CMS will take enforcement action as necessary." Bulletin at 5. Whereas deferral would delay the future disbursement of Medicaid funds, disallowance would entail CMS clawing back already-disbursed Medicaid funds. *See* 42 U.S.C. § 1396b(d).

## III.   CMS's "Financial Management Review" of Florida's LPPFs

Five days after releasing the Bulletin, CMS commenced a "Financial Management Review" of Florida's "LPPF tax program"—and demanded that Florida force compliance with the new policy announced in the Bulletin or else lose the associated federal matching funds. Wallace Decl., Ex. B at 1 ("Financial Review Letter" or "FR Letter"). According to CMS, "Florida's LPPF tax structure and media reports indicate that the Florida LPPF arrangement" may involve "pre-arranged agreements to redirect Medicaid payments away from Medicaid providers serving a high percentage of Medicaid beneficiaries to hospitals that do not participate in Medicaid or that serve a low percentage of Medicaid beneficiaries," and such arrangements "appear to violate federal requirements." *Id.*

CMS informed AHCA that its review will include "contact[ing] [AHCA's] staff to coordinate meetings, obtain information, and … hold any discussions relating to this review as it progresses." FR Letter at 2. And right off the bat, CMS demanded that AHCA answer an extensive series of questions regarding the LPPFs, including detailed questions about the amounts that each provider participating in an LPPF contributed to the LPPF and received in Medicaid assistance, each Medicaid payment financed through LPPF revenue, the existence of any redistribution arrangement among private providers, and communications between the State and those providers

or third parties.  FR Letter, Attachment at 1-3.  CMS also demanded that AHCA "describe what oversight the state conducts to ensure the use of LPPF revenue as a source of non-federal share meets federal requirements."  *Id.*, Attachment at 3.

CMS stated that AHCA "must … provide any … information requested by the Secretary related to any taxes imposed on health care providers" and "must present a complete, accurate, and full disclosure of all of their … tax programs and expenditures."  FR Letter, Attachment at 1 (quoting 42 C.F.R. § 433.74(a); alterations omitted).  CMS added that AHCA's failure to comply with CMS's requests "may result in a deferral or disallowance of federal financial participation." *Id.* (citing 42 C.F.R. § 433.74(d)).

## IV.  THE PRELIMINARY INJUNCTION OF CMS'S NEW POLICY AND IMPLEMENTING ACTIONS IN TEXAS

After CMS issued the Bulletin, the State of Texas challenged it in federal court and sought a preliminary injunction.  *Texas*, 2023 WL 4304749.  Texas argued that the Bulletin (1) conflicted with the Act, (2) was arbitrary and capricious, and (3) violated the APA's notice-and-comment requirements.  *Id.* at *1.  On the motion, the district court concluded that Texas was likely to succeed on its first theory (and thus did not address the other two).  The court reasoned that "the statute includes a tight grammatical link between *the government*, as the actor providing for something, and *a guarantee*, as the thing provided for," but the Bulletin "decouples" that link by deeming a Medicaid payment a hold-harmless arrangement "where the *providers themselves* guarantee to hold one another harmless."  *Id.* at *10.  Thus, "the Bulletin conflicts with the statutory definition of 'hold harmless provision.'"  *Id.* at *12.  The court further found that "Texas's compliance costs are irreparable because CMS is immune from monetary damages," that enforcement was "imminent," and that the public's interest favored avoiding "unlawful agency action" and maintaining "state Medicaid programs."  *Id.* at *12-13.[2]

Consequently, on June 30, 2023, the court enjoined the federal government from "implementing or enforcing the Bulletin," "from otherwise enforcing an interpretation of the scope of 42 U.S.C. § 1396b(w)(4)(C)(i) found therein," and "from relying on the Bulletin for any purpose during the pendency of th[e] litigation."  *Id.* at *13.  On July 19, 2023, the federal defendants filed

---

[2] CMS also argued that the court "lack[ed] jurisdiction for five reasons: (1) Texas lacks [Article III] standing, (2) Texas's claims are not ripe, (3) the Bulletin is not final agency action, (4) Texas has an adequate alternative remedy under the statute, and (5) judicial review is barred." *Texas*, 2023 WL 4304749, at *5.  The court rejected each of those arguments.  *Id.* at *5-10.

a motion explaining that the order "could suggest that the Court intended its injunction to apply in other states" and asking the court to "clarify" that "the preliminary injunction [is] geographically limited to the State of Texas." Defs.' Conditional Mot. to Clarify at 2, *Texas*, No. 23-cv-161 (E.D. Tex. July 19, 2023), ECF No. 34. On August 3, the court denied the motion as "unnecessary" because "Plaintiffs do not appear to dispute" that the injunction is limited to Texas. Order Denying Mot. to Clarify at 1-2, *Texas*, No. 23-cv-161 (E.D. Tex. Aug. 3, 2023), ECF No. 40.

## ARGUMENT

A preliminary injunction is warranted if "the moving party shows: (1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 889 (11th Cir. 2023) (cleaned up). Florida satisfies each requirement and is therefore entitled to preliminary relief enjoining CMS from relying on the policy and underlying statutory interpretation established in the Bulletin, including to conduct an associated review of Florida or to defer, reduce, or disallow any Medicaid funding.

## I.     FLORIDA IS LIKELY TO SUCCEED ON THE MERITS.

### A.  CMS's New Policy Is Contrary to Law

CMS's new hold-harmless policy, established by the Bulletin and implemented through the financial review of Florida, contradicts the Social Security Act in two ways. First, the statute requires that the direct hold harmless guarantee come from the government, but CMS's policy extends the hold-harmless prohibition to redistribution by private parties acting without government control or direction.[3] Second, even if private redistribution could convert a governmental payment into the requisite guarantee, the statute requires that the guaranteeing entity and the taxing entity be the same. CMS's review of Florida disregards that requirement because localities impose the assessment, but the State makes the payments that allegedly constitute the guarantee. Therefore, CMS's policy and review must be held "unlawful," "set aside," and enjoined

---

[3] CMS has conceded that the arrangements targeted by the Bulletin targets are not "indirect guarantees." *See* Defs.' Opp. to Pls.' Mot. for Preliminary Injunction at 30 & n.12, *Texas*, No. 23-cv-161 (E.D. Tex. May 13, 2023), ECF No. 17 ("CMS does not contend that" an arrangement wherein "Medicaid funds are redistributed" to "honor" an agreement between hospitals "presents an indirect guarantee.").

because they are "not in accordance with law" and "in excess of [CMS's] statutory … authority." 5 U.S.C. § 706(2)(A), (C).

1.      The Social Security Act states that a prohibited hold-harmless provision exists if "[t]he State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." 42 U.S.C. § 1396b(w)(4)(C)(i).  As the *Texas* court explained, this statutory language "includes a tight grammatical link between *the government*, as the actor providing for something, and *a guarantee*, as the thing provided for."  2023 WL 4304749, at *10.  Indeed, "guarantee" means "to warrant or ensure that something will happen or has happened." *Guarantee*, *v.*, OXFORD ENGLISH DICTIONARY ONLINE.  The "unit of government … provid[ing] … payment" cannot warrant that something completely out of its control—a private arrangement—will happen or has happened.  Private parties may fail to honor redistribution agreements without the State's control, involvement, or even knowledge.  Thus, even when private redistribution arrangements exist, the *State's* payment provides no certainty—no guarantee—that the taxpayer will be held harmless.  CMS's new policy impermissibly contravenes the plain meaning of the statute by "decoupl[ing] the 'grammatical link' found in the statute, and condition[ing] a state's Medicaid funding on private agreements over which states have no knowledge or control."  2023 WL 4304749, at *10.

The *Texas* court is not alone in adopting the straightforward conclusion that the guarantee must be made by the government itself.  In 2005, HHS's Departmental Appeals Board held that, to be a direct guarantee that creates a hold-harmless provision, the government must supply "some sort of indemnification that is legally enforceable." *Hawaii Department*, 2005 WL 1540188, at *25.  In 2006, the Seventh Circuit recognized that such a guarantee exists only if "the state" or other governmental unit "promises to hold the taxpayer harmless for a portion of the cost of the tax." *Protestant Mem'l*, 471 F.3d at 727.  And in 2008, CMS itself recognized that private redistribution entails a direct guarantee only if a governmental unit "*requir[ed]* that the money be used to reimburse taxpayers for any portion of their health care related tax payment," which occurs only if the redistribution was "controlled or directed" by the government.  73 Fed. Reg. at 9,694:2.

In the Bulletin, CMS now argues that independent private redistribution arrangements constitute guarantees because they "result[] in a reasonable expectation that the taxpaying hospitals … are held harmless for at least part of their health care-related tax costs."  Bulletin at 1-2.  But a payment's downstream *effect*—or an independent private actor's *expectation* about the

11

downstream effect—cannot constitute a *guarantee* by the paying government absent some commitment by the government to indemnify.  As noted above, that is simply not what it means to provide a guarantee—i.e., "to warrant or ensure that something will happen or has happened." *Guarantee, v.*, OXFORD ENGLISH DICTIONARY ONLINE.

CMS's reading of the statute would also lead to absurd results.  *See United States v. Weaver*, 275 F.3d 1320, 1331 (11th Cir. 2001).  CMS's reading allows private entities acting independently of the State to determine the legality of the States' federal matching funds, and to do so anytime, even retroactively by forming a redistribution agreement after the matching funds were already obtained and disbursed.  Surely, Congress did not mean to leave the fate of States' Medicaid funding in the hands of private parties.

In the Bulletin, CMS emphasizes the possibility of "indirect payment."  Bulletin at 4.  The Bulletin explains that the government "need not be involved in the actual redistribution of Medicaid payments for the purpose of making taxpayers whole." *Id.*  That is irrelevant because it conflates the source of the guarantee with the mechanism for effectuating the guarantee.  For the hold-harmless provision to be implicated, the statute still requires that the government itself directly make the guarantee, i.e., promise, even if the government effectuates that guarantee by requiring private actors to pass along the offsetting funds.

In effect, CMS is trying to "create and apply a new and broader indirect guarantee test, … and then … justify it under the guise of being a direct guarantee test." *Hawaii Department*, 2005 WL 1540188, at *3.  But as the Departmental Appeals Board said when CMS tried the same tactic in 2005, "CMS cannot" do that, *id.*, because Congress already defined the scope of "indirect guarantee" in section 1396b(w)(4)(C)(ii).  The issue here is the meaning of a *direct* guarantee.  CMS may be concerned that "state laws [are] rarely overt in requiring" indemnification, Bulletin at 4, but even *covert* guarantees must be made directly by the government to come within the statutory bar on hold-harmless provisions.  Although CMS might believe the bar would work better if it reached private redistribution, CMS "may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014).

Moreover, even if the statute were ambiguous, that would not save CMS's interpretation.  The Spending Clause of the U.S. Constitution requires that "when the recipient of [federal] funds is a state[,] the conditions imposed by Congress must be unambiguous." *Benning v. Georgia*, 391 F.3d 1299, 1305 (11th Cir. 2004).  This principle "is a binding constitutional command," not "a

12

precatory rule of construction to be used in as-applied challenges." *W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1142 (11th Cir. 2023). Thus, an ambiguous statutory condition imposed on a State's receipt of federal funds is substantively invalid, and a federal agency's enforcement of such a condition may be "enjoin[ed]." *Id.* at 1141; *see* 5 U.S.C. § 706(2)(B) (courts must "hold unlawful and set aside agency action … found to be … contrary to constitutional … power"). The upshot is this: Certainly, section 1396b(w)(4)(C)(i) does not express a clear congressional intent to treat purely private redistribution arrangements as a direct guarantee of indemnification, and therefore section 1396b(w)(4)(C)(i) either means what Florida says—i.e., the prohibition is limited to governmental promises of indemnification—or it is void under the Spending Clause. However one slices it, therefore, CMS's new policy is unlawful.

　　　　2.　　Even if CMS were right that a private redistribution arrangement could constitute a direct guarantee of indemnification, CMS's application of that interpretation in commencing the review of *Florida's* DPP and associated LPPFs would still contradict section 1396b(w)(4)(C)(i). The statute expressly requires that the "unit of government imposing the tax" and the "unit of government" that "provides … for" the guarantee be one and the same. 42 U.S.C. § 1396b(w)(4)(C)(i). Further, the statute expressly declares that, for purposes of section 1396b(w)(4)(C)(i), the State is a distinct unit of government from its political subdivisions. *See id*. § 1396b(w)(7)(D), (G) ("'State' means only the 50 States and the District of Columbia," and "'unit of local government' means, with respect to a State, a city, county, special purpose district, or other governmental unit in the State").

　　　　Yet the Financial Review Letter recognizes that, in Florida, "cities or counties impose [the] health care-related taxes," while the "payments" that allegedly constitute the requisite guarantee originate from the "state." FR Letter at 1-2. Accordingly, CMS's application of its new policy to Florida's DPP and LPPFs exceeds CMS's statutory authority for this additional reason.

　　　　3.　　Finally, CMS claims its policy is grounded in its own Hold-Harmless Rule. *See* Bulletin at 4. That rule states: "The State (or other unit of government) imposing the tax provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount." 42 C.F.R. § 433.68(f)(3). Thus, like the statute, the rule provides that to be a direct guarantee of indemnification, the guarantee must be provided by a governmental unit—and the same unit that imposed the tax. The Bulletin highlights the regulatory phrase "indirect payment,"

13

explaining that it "makes clear" that the governmental unit "imposing the tax itself need not be involved in the actual redistribution of Medicaid payments for the purpose of making taxpayers whole for the arrangement to qualify as a hold harmless." Bulletin at 4. As explained above, that may be correct but does not support the Bulletin's policy because it conflates the mechanism by which the indemnification may be effectuated—a pass-through or intermediary—with the source of the direct guarantee, which the regulation specifies must be the governmental taxing unit. Thus, the Bulletin's "interpretation [is] substantively invalid because it conflict[s] with the text of the regulation the agency purported to interpret," viz., the Hold-Harmless Rule. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 104-05 (2015); cf. *id.* at 101 ("[T]he APA … mandate[s] that agencies use the same procedures when they amend … a rule as they used to issue the rule.").[4]

**B.     The Bulletin's Unexplained Policy Change Is Arbitrary and Capricious**

"When an agency changes its existing position, it … must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Accordingly, it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020). CMS, however, failed even to recognize that the new policy announced in the Bulletin departed from prior policy, let alone explain the change or account for States' and providers' reliance interests in the prior policy. That failure renders CMS's abrupt policy change arbitrary and capricious, *id.* at 1913, and therefore requires that the new policy be held "unlawful" and "set aside," 5 U.S.C. § 706(2)(A).

The Bulletin states falsely that it "reiterates [CMS's] longstanding position." Bulletin at 1. As the *Texas* court recognized, HHS, including CMS, "on several [prior] occasions[] explicitly disclaimed any intention to disallow state funding for [the] private arrangements" that CMS now mandates that States investigate and curtail. 2023 WL 4304749, at *8. This history is detailed above: the Departmental Appeals Board's decision in 2005, CMS's 2008 Hold-Harmless Rule, and a CMS director's confirmation to healthcare providers in 2019 all acknowledged that a direct guarantee exists only if a governmental entity promises, controls, or directs the indemnification; purely private redistribution of government funding does not qualify. *Supra* pp.4-6. CMS

---

[4] If the Bulletin is correct about the Hold-Harmless Rule, then the rule is unlawful because it violates the plain meaning of the statute it implements.

confirmed that understanding in 2019 by attempting to *amend* the Hold-Harmless Rule to state—much as the Bulletin now states—that a direct guarantee exists if "the net *effect* of an arrangement between the State (or other unit of government) and the taxpayer *results in a reasonable expectation* that the taxpayer will receive a return of all or any portion of the tax amount." 84 Fed. Reg. at 63,778:2 (emphasis added). If CMS is right that its Hold-Harmless Rule already embodies the Bulletin's policy, then there was no need to attempt that amendment in 2019.

The Bulletin disregards all this history except for the preamble to the 2008 rulemaking—and its treatment of that rulemaking ignores much. The preamble makes clear that the 2008 amendment was *not* meant to extend the Hold-Harmless Rule to purely private redistribution arrangements. CMS points to the preamble's statement that a "direct guarantee will be found when a state payment is made available to a taxpayer or a party related to the taxpayer with the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments)." 73 Fed. Reg. at 9,694:1-95:1, *quoted in* Bulletin at 4. Even standing alone, that statement does not support CMS's new policy because it does not indicate *who* has the expectation of indemnification. That statement is consistent with the expectation of offset being held by the *governmental entity*—which would be the case when that entity promises or directs indemnification. But even if that statement referred to the *taxpayer's* expectation, the preamble's broader context—which the Bulletin ignores—would confirm that the preamble treated that expectation as merely an indication of the requisite guarantee, not a sufficient condition for finding one. The preamble stated that the amendment was "intended to … prohibit[] [federal funding] for health care-related taxes where the *state* has *implemented* a hold harmless provision." 73 Fed. Reg. at 9,690:2 (emphasis added). The preamble explained that, on the one hand, a "direct guarantee does not need to be an explicit [or overt] promise or assurance of payment" (fine; Florida does not contend otherwise), but on the other hand, offsets merely "influenced by the state" would *not* constitute a direct guarantee—CMS deemed that "too broad" of a net to cast. *Id.* at 9,694:1-2. Instead, the preamble said, there would be a direct guarantee only if the government "*15equire[ed]* that the money be used to reimburse taxpayers for any portion of their health care related tax payment," which occurs only if the offset was at least "controlled or directed" by the government. *Id.* (emphasis added). The policy established by the Bulletin lacks such a requirement. If mere state influence was too broad of a standard in 2008,

then *a fortiori* the Bulletin—which does not require an active governmental role in the indemnification arrangement at all—is too broad.

The Bulletin also says that it is supported by the 2008 preamble's description of a case involving nursing homes. According to the Bulletin, the preamble treated the nursing-home arrangement as a covered hold-harmless provision "even though no state law typically required residents to use the grant funds to pay the increased nursing home fees." Bulletin at 4. The Bulletin's description is misleading. As the 2008 preamble explained, the indemnification in that case came *not* through a redistribution of State-provided *Medicaid funds*—as is the case under the Bulletin's new policy—but rather through a separate State-created "program[] that awarded grants or tax credits to" the private taxpayers that was specifically "designed by the States to compensate … for the costs of the tax" imposed by the State. 73 Fed. Reg. at 9,686:1. Such a credit is the epitome of a direct guarantee but is unlike the private redistribution arrangements targeted by the Bulletin. Indeed, the preamble explained that the nursing-home arrangement also illustrated how an "indirect payment" could be used to effectuate a direct guarantee: nursing homes would "pass[] down" the State-provided credits to the taxpaying residents—but the *guarantee* of indemnification still came directly from the State through the credit program. *Id.* at 9,686:3. Therefore, the fact that the 2008 amendment was intended to cover that nursing-home arrangement, *see id.* at 9,690:3, 9,694:3, does not mean it also was intended to cover private redistribution agreements.

Predictably, then, the Bulletin also ignored States' and providers' considerable reliance interests in CMS's prior policy. State and local governments, including in Florida, have imposed healthcare-related taxes on healthcare providers to raise supplemental Medicaid funding and then provided those Medicaid funds to the taxpaying providers, who, in turn, may have independently redistributed those funds to offset some of their healthcare-tax liability—all based on the understanding that such arrangements were not impermissible hold-harmless provisions. By now prohibiting such redistribution, the Bulletin would authorize CMS to claw back ("disallow") the federal matching funds already received by the State and paid to healthcare providers. Wallace Decl. ¶¶ 28, 39; *see* 42 U.S.C. § 1396b(d). Such clawbacks—potentially covering billions of dollars in Florida alone, *see infra* p.3—could substantially disrupt the healthcare sector and leave healthcare providers in the position of having paid assessments to which they had agreed only on the now-incorrect belief that such assessments would bring them supplemental federal funds, *see* Bulletin at 4 ("[T]he redistribution enables broad support for the tax program from all hospitals,

16

ensuring constituent support for the state law authorizing the tax program."); Wallace Decl. ¶¶ 28, 39.

### C.     The Policy Announced in the Bulletin Is Procedurally Invalid

In addition to being substantively invalid, the policy announced in the Bulletin must be set aside because CMS undeniably failed to adopt it through notice-and-comment rulemaking.  The APA "mandates that an agency use notice-and-comment procedures before issuing legislative rules," in contrast to "interpretive" rules and "general statements of policy," which need not undergo notice-and-comment procedures.  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019) (citing 5 U.S.C. § 553(b), (c)); *see State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1286 (11ᵗʰ Cir. 2021).  To determine whether a rule is legislative, "courts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*."  *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019).  In particular, a rule is legislative if it "impose[s] … legally binding requirements" or "forms the basis for an enforcement action."  *Kisor*, 139 S. Ct. at 2420.  "In contrast, an interpretive rule derives a proposition from an existing document, such as a statute, regulation, or judicial decision, whose meaning compels or logically justifies the proposition."  *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021).

The Bulletin—though labeled "informational"—establishes a legislative rule.  The Bulletin defines legally binding requirements for States, localities, and providers participating in Medicaid. It states that private redistribution arrangements "constitute a prohibited hold harmless provision[s]."  Bulletin at 5.  It tells States they "should … learn the details of how health care-related taxes are collected" and "take steps to curtail these practices if they exist."  *Id.*  And it announces that CMS "expect[s] states to have detailed information available regarding their health care-related taxes" and "to make available all requested documentation regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments."  *Id.* Those statements are not hortatory; they are backed by specific promises of enforcement.  The Bulletin declares that if CMS "discovers the existence of" such a private redistribution arrangement, "CMS will take enforcement action as necessary," including "reduc[ing] a state's medical assistance expenditures by the amount of health care-related tax collections that include hold harmless arrangements."  *Id.*  And it declares that a State's "failure to comply with reporting requirements may result in a deferral or disallowance of federal financial participation."  *Id.*  Thus, by "expressly prohibiting certain types of" arrangements and imposing affirmative duties on

Medicaid participants, with any "violations … expos[ing States] to enforcement actions," the Bulletin unmistakably establishes a legislative rule. *Nat'l Council for Adoption*, 4 F.4th at 114. *See also Elec. Priv. Info. Ctr. V. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 7 (D.C. Cir. 2011) ("It is enough for the agency's statement to purport to bind those subject to it, that is, to be cast in mandatory language so the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences.").

The Bulletin asserts that it merely "reiterates [CMS's] longstanding position" on the issue, Bulletin at 1, perhaps to suggest it is only an interpretive rule. That is incorrect. As explained above, *supra* pp.4-6, the longstanding position of HHS, including CMS, before the Bulletin was that provider-to-provider arrangements were *not* prohibited hold-harmless provisions; the Bulletin changed that. But at most, the issue was unresolved until the Bulletin resolved it. Certainly, for reasons explained above, the Bulletin's policy is not *compelled* by the Act or CMS's 2008 Hold-Harmless Rule. *See Nat'l Council for Adoption*, 4 F.4th at 114-15. CMS effectively acknowledged this conclusion in 2019 and in May 2023 by initiating notice-and-comment rulemaking to propose an amendment to the Hold-Harmless Rule for the purpose of codifying much the same policy now adopted by the Bulletin.[5]

## II.    FLORIDA WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

If the Bulletin is allowed to stand and CMS's financial review of Florida is allowed to continue while this case proceeds, the State and its businesses and residents will suffer irreparable harm through significant compliance costs, lost Medicaid funding, or both. These injuries are even more imminent here than in *Texas* because CMS itself has commenced a review of Florida, which can result in an adjustment of Florida's Medicaid funding.[6]

1.    The Bulletin and the review impose significant compliance obligations on Florida. The Bulletin directs States to "learn the details of how health care-related taxes are collected" and "make available [to CMS] all requested documentation regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments."   Bulletin at 5.

---

[5]  *See* 84 Fed. Reg. at 63,734:3-35:2, 63,778:2; *Medicaid Program; Medicaid and Children's Health Insurance Program (CHIP) Managed Care Access, Finance, and Quality*, 88 Fed. Reg. 28,092, 28,128:3-32:3 (May 3, 2023).

[6]  Although in *Texas* the Office of the Inspector General had "begun auditing four Texas jurisdictions for compliance with the bulletin's pronouncements," Pls.' Mot. for Preliminary Injunction at 3, *Texas*, No. 23-cv-161 (E.D. Tex. Apr. 24, 2023), ECF No. 10, OIG cannot directly adjust Medicaid funding; it makes recommendations to CMS.

Accordingly, in its review of Florida, CMS has demanded that AHCA supply detailed information regarding the existence and structure of the LPPFs, the activity of the private hospitals participating in the LPPFs, and any redistribution arrangements among the hospitals (which could include through any intermediaries). FR Letter, Attachment at 1-3; *see supra* p.8. Further, the Bulletin directs States to "take steps to curtail these [redistribution] practices if they exist." Bulletin at 5.

Florida currently has no means of conducting that oversight. As the Bulletin recognizes, "identifying and providing details on redistribution arrangements" will be "challeng[ing] … because [Florida is] not [a] part[y] to [such] agreements." Bulletin at 5. That challenge will be especially great for Florida because its existing Medicaid oversight resources, skills, and experience relate primarily to determining whether providers and contracted intermediaries, e.g., managed-care organizations, have submitted fraudulent claims for reimbursement or have breached their contractual obligations. Wallace Decl. ¶¶ 33-34. Those resources, skills, and experience would not be useful in policing private redistribution arrangements. *Id*. Therefore, Florida would have to obtain necessary staffing—including professional auditors, financial examiners, financial analysts, and lawyers—by training and redeploying existing staff, hiring new staff, contracting with third parties, or some combination thereof. *Id.* ¶ 36.

This new oversight apparatus would likely need to have substantial size given that more than 200 private hospitals currently participate in the DPP through LPPFs and given that they have vast and complex operational structures. Wallace Decl. ¶¶ 35-36. Consequently, AHCA would need to assign additional personnel to this oversight. *Id.* ¶ 36. That would cost the State at least $1.5 annually. *Id*. Even if Florida's lawsuit ultimately prevailed, Florida could not recover these compliance costs because of CMS's sovereign immunity, 5 U.S.C. § 702, and it is a "rule that unrecoverable costs of compliance constitute irreparable harm," *Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022); *accord Odebrecht Const., Inc. v. Sec., Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013). Indeed, in the *Texas* litigation, the federal defendants recognized that such compliance costs constitute irreparable harm. *See* Miller Decl., Ex. E at 29-30 ("the compliance costs … perhaps … get[] them to the compliance injury").

2.     The Bulletin and review also threaten Florida with the irreparable loss of Medicaid funding in two ways: (1) if Florida does not perform the required oversight; and (2) if CMS finds a private redistribution arrangement. The Bulletin states that "a failure to comply with reporting requirements may result in a deferral or disallowance of federal financial participation." Bulletin

at 5 (citing 42 C.F.R. § 433.74(d)).  Similarly, in commencing the review, CMS stated that AHCA's failure to comply with CMS's information demands "may result in a deferral or disallowance of federal financial participation."  FR Letter, Attachment at 1.  Further, the Bulletin states that if CMS "discovers the existence of impermissible financing practices related to health care-related taxes, CMS will take enforcement action as necessary."  Bulletin at 5.  That includes denying Florida federal matching funds; as the Bulletin notes, the Act and the implementing regulations "require that CMS reduce a state's medical assistance expenditures by the amount of health care-related tax collections that include hold harmless arrangements."  *Id.* (citing 42 U.S.C. § 1396b(w)(1)(A)(iii) and 42 C.F.R. § 433.70(b)).

Thus, Florida could lose billions of federal matching dollars.  *See supra* p.3.  The sudden loss of these vital funds would impair private hospitals' ability to continue providing healthcare to the millions of low-income Floridians who depend on Medicaid.  Wallace Decl. ¶¶ 5, 38-39.  For example, maternal care would be threatened because Medicaid is the primary payor for approximately 45% of all births in Florida.  *Id.* ¶ 38.  These harms are irreparable.  *See, e.g.*, *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (irreparable injury where "the implementation of the Rule will result in reduced Medicaid revenue and federal funding"); *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 980-81 (7th Cir. 2012) (same); *City & County of San Francisco v. U.S. Citizenship & Immigration Servs.*, 981 F.3d 742, 762 (9th Cir. 2020) (same).

III.    **THE PUBLIC INTEREST AND THE EQUITIES FAVOR PRELIMINARY INJUNCTIVE RELIEF**

The public interest and balance of equities also favor a preliminary injunction.  There is "no public interest in the perpetuation of unlawful agency action."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also, e.g.*, *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).  Further, there is a strong public interest in maintaining funding for and thus access to important healthcare for the millions of low-income Floridians who rely on Medicaid.  *See* Wallace Decl. ¶¶ 5, 38-39.

## CONCLUSION

Plaintiffs respectfully request that the Court preliminarily enjoin the Defendants from enforcing, implementing, or otherwise relying on the Bulletin and the policy and interpretation it announces to conduct any audit or review, including the pending Financial Management Review of Florida, or to defer, reduce, or disallow any Medicaid funding for Florida.

20

Dated:  August 29, 2023

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

James H. Percival (FBN 1016188)
CHIEF OF STAFF

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

/s/ Natalie P. Christmas
Natalie P. Christmas (FBN 1019180)
COUNSELOR TO THE ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, FL  32399-1050
(850) 414-3300
(850) 410-2672 (fax)
natalie.christmas@myfloridalegal.com

*Counsel for the State of Florida*

Respectfully submitted,

s/ Jesse Panuccio
Jesse Panuccio
Fla. Bar No. 31401
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL  33301
(954) 356-0011

David M. Lehn (*pro hac vice*)
Cameron C. Miller (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, N.W.
Washington, D.C. 20005
(202) 237-2727

Andrew T. Sheeran
Fla. Bar No. 30599
GENERAL COUNSEL
Agency for Health Care Administration
2727 Mahan Drive, Mail Stop #3
Tallahassee, Florida 32308
(850) 412-3670
Andrew.Sheeran@ahca.myflorida.com

*Counsel for the Florida Agency for Health Care Administration*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 29th day of August, 2023, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF and that the foregoing document is being served by certified mail on counsel for Defendants:  Alexandra Saslaw, Trial Attorney, U.S. Department of Justice, Civil Division, Federal Programs Branch, (202) 514-4520, alexandra.r.saslaw@usdoj.gov.

*s/ Jesse Panuccio*
JESSE PANUCCIO