**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | | |
|---|---|---|
| **STATE OF FLORIDA**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 23-cv-61595-WPD |
| | ) | |
| **CHIQUITA BROOKS-LASURE**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

I.      Statutory and Regulatory Background .......................................................................... 2

     A.     The Medicaid Program ..................................................................................... 2

     B.     The Medicaid Voluntary Contribution & Provider-Specific Tax Amendments ........... 3

     C.     Implementing Regulations .................................................................................. 3

           i.     1992 Interim Final Rule and 1993 Final Rule ......................................... 3

           ii.     2008 Rule ............................................................................................. 4

           iii.     2019 Proposed Rule .............................................................................. 5

     D.     February 2023 Informational Bulletin ................................................................ 5

     E.     Proposed Rulemaking on State-Directed Payments ............................................. 6

II.     CMS's Interactions with the State of Florida .............................................................. 7

III.    This Litigation .......................................................................................................... 8

ARGUMENT ......................................................................................................................... 8

I.      Florida Has Not Shown a Substantial Threat of Irreparable Injury. .............................. 9

II.     Florida Has Not Shown a Substantial Likelihood of Success on the Merits ................... 12

     A.     The Court lacks jurisdiction to hear this case ..................................................... 12

           i.     Florida's challenge is not ripe. ............................................................. 12

           ii.     The informational bulletin and the financial management review are not final agency actions. ................................................................. 14

           iii.     Judicial review is barred by the Thunder Basin doctrine ......................... 15

     B.     The challenged bulletin and the financial management review do not violate the Administrative Procedure Act. ....................................................................... 16

           i.     CMS's interpretation of the statute and regulations is lawful. .................. 16

           ii.     The informational bulletin did not reverse prior agency interpretations ..................................................................................... 20

i

      iii.     The informational bulletin is an interpretive rule, for which notice and comment are not required...............................................................................23

III.    Florida has not shown that the balance of equities and the public interest favor preliminary injunctive relief. ......................................................................................................................25

CONCLUSION...........................................................................................................................................25

## TABLE OF AUTHORITIES

**CASES**

*Alabama v. U.S. Army Corps of Eng'rs,*
    424 F.3d 1117 (11th Cir. 2005) ........................................................................12

*Arlington Cent. School Dist. Bd. of Educ. v. Murphy,*
    548 U.S. 291 (2006) ...........................................................................................18

*Atkins v. Rivera,*
    477 U.S. 154 (1986) .............................................................................................2

*Barnhart v. Thomas,*
    540 U.S. 20 (2003) .............................................................................................20

*Bd. of Dental Examiners of Ala. v. FTC,*
    519 F. Supp. 3d 1033 (N.D. Ala. 2021) ........................................................ 14, 15

*Bennett v. Ky. Dep't of Educ.,*
    470 U.S. 656 (1985) ...........................................................................................19

*Bennett v. Spear,*
    520 U.S. 154 (1997) ...........................................................................................14

*Benning v. Georgia,*
    391 F.3d 1299 (11th Cir. 2004) ........................................................................19

*Brown Express, Inc. v. United States,*
    607 F.2d 695 (5th Cir. 1979) ............................................................................24

*Canal A Media Holding, LLC v. United States Citizenship & Immigr. Servs.,*
    964 F.3d 1250 (11th Cir. 2020) ........................................................................14

*Canal Authority v. Callaway,*
    489 F.2d 567 (5th Cir. 1974) ..............................................................................8

*Clayton Cnty., Ga. v. Fed. Aviation Admin.,*
    887 F.3d 1262 (11th Cir. 2018) .................................................................... 14, 15

*De La Fuente v. Kemp,*
    679 F. App'x 932 (11th Cir. 2017) ...................................................................12

*Doe v. FAA,*
    432 F.3d 1259 (11th Cir. 2005) .................................................................... 15, 16

*Elgin v. Dep't of the Treasury,*
    567 U.S. 1 (2012) ..............................................................................................15

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ...........................................................................................................14

*Frew ex rel. Frew v. Hawkins*,
  540 U.S. 431 (2004) .............................................................................................................2

*Hawaii Dep't of Human Servs. Bd.*,
  2005 WL 1540188 (DAB June 24, 2005) ....................................................................... 4, 21

*Hoop Culture, Inc. v. GAP, Inc.*,
  648 F. App'x 981 (11th Cir. 2016) ...................................................................................11

*Mayweathers v. Newland*,
  314 F.3d 1062 (9th Cir. 2002) .........................................................................................19

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) .......................................................................................24

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
  538 U.S. 803 (2003) ..........................................................................................................13

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
  896 F.2d 1283 (11th Cir. 1990) ..........................................................................................8

*Pennhurst State School & Hosp. v. Halderman*,
  451 U.S. 1 (1981) ..............................................................................................................18

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ............................................................................................................23

*POET Biorefining LLC v. EPA*,
  970 F.3d 392 (D.C. Cir. 2020) .........................................................................................24

*Rhea Lana, Inc. v. Dep't of Labor*,
  824 F.3d 1023 (D.C. Cir. 2016) .......................................................................................14

*Riverkeeper v. EPA*,
  806 F.3d 1079 (11th Cir. 2015) .......................................................................................14

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87 (1995) ............................................................................................................23

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) ..................................................................................... 9, 11

*State of Fla. v. Dep't of Health & Human Servs.*,
  19 F.4th 1271 (11th Cir. 2021) ..........................................................................................8

*Texas v. Brooks-LaSure,*
    ---F. Supp. 3d---, 2023 WL 4304749 (E.D. Tex. June 30, 2023) ......................................... 10, 17

*Texas v. United States,*
    523 U.S. 296 (1998) ..................................................................................................................... 13

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ..................................................................................................................... 15

*U.S. Steel Corp. v. Astrue,*
    495 F.3d 1272 (11th Cir. 2007) ................................................................................................. 18

*United States v. Jefferson Cty.,*
    720 F.2d 1511 (11th Cir. 1983) ................................................................................................... 8

*United States v. Lambert,*
    695 F.2d 536 (11th Cir. 1983) ..................................................................................................... 8

*W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury,*
    59 F.4th 1124 (11th Cir. 2023) .................................................................................................. 18

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008) ...................................................................................................................... 8, 9

*Wreal, LLC v. Amazon.com, Inc.,*
    840 F.3d 1244 (11th Cir. 2016) ................................................................................................. 12

**STATUTES**

5 U.S.C. § 553 ......................................................................................................................... 23, 24

5 U.S.C. § 704 ......................................................................................................................... 14, 16

28 U.S.C. § 2401 ............................................................................................................................ 18

42 U.S.C. § 1316 ............................................................................................................... 13, 15, 16

42 U.S.C. § 1396 .............................................................................................................................. 2

42 U.S.C. § 1396b .................................................................................................................*passim*

Fla. Stat. § 125.01(1) ...................................................................................................................... 20

Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991,
    Pub. L. No. 102-234, 105 Stat. 1793 (1991) .............................................................................. 3

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

Medicaid Program; Limitations on Provider-Related Donations and Health Care-Related Taxes;
  Limitations on Payments to Disproportionate Share Hospitals,
  57 Fed. Reg. 55,118-01 (Nov. 24, 1992) ..................................................................3

Medicaid Program; Limitations on Provider-Related Donations and Health Care-Related Taxes;
  Limitations on Payments to Disproportionate Share Hospitals,
  58 Fed. Reg. 43,156-01 (Aug. 13, 1993) ..................................................................3

Medicaid Program; Health Care-Related Taxes,
  73 Fed. Reg. 9,685-01 (Feb. 22, 2008) ...........................................................*passim*

Medicaid Program; Medicaid Fiscal Accountability Regulation,
  84 Fed. Reg. 63,722-01 (Nov. 18, 2019) .........................................................*passim*

Medicaid Program; Medicaid Fiscal Accountability Regulation,
  86 Fed. Reg. 5,105-01 (Jan. 19, 2021) ..................................................................5, 6

Medicaid Program; Medicaid and Children's Health Insurance Program (CHIP) Managed Care
  Access, Finance & Quality,
  88 Fed. Reg. 28,092 (May 3, 2023) ...........................................................6, 17, 24

## REGULATIONS

42 C.F.R. § 430.42 ..........................................................................................................13

42 C.F.R. § 433.68 ................................................................................................3, 4, 7, 17

42 C.F.R. § 433.74(a) ....................................................................................................24

42 C.F.R. § 438.6(c) .........................................................................................................6

## OTHER AUTHORITIES

*Federal Policy Guidance*, Medicaid.gov,
  https://www.medicaid.gov/federal-policy-guidance/index.html.......................................9

*Provide for*, Merriam Webster Online,
  https://www.merriam-webster.com/dictionary/provide%20for......................................17

Defendants, pursuant to Federal Rule of Civil Procedure 65, Local Rule 7.1(c), and the Court's September 7, 2023 Order (ECF No. 13), submit the following response in opposition to Plaintiffs' Motion for Preliminary Injunction (ECF No. 10) ("PI Mot.").

## INTRODUCTION

Medicaid is a cooperative federal-state program, where federal and state governments work in tandem to fund healthcare services for low-income Americans. A key feature of the Medicaid program is that each participating state must cover its assigned share of Medicaid costs to receive federal matching funds. The Medicaid statute and regulations set restrictions on the sources of the state's share of Medicaid funding, including on the use of revenue from health care-related taxes. To be used for Medicaid funding, a health care-related tax generally must be broad-based and uniform, and it may not hold any provider harmless—*i.e.*, a provider cannot be assured that it will recoup its tax contributions. Congress chose to put these restrictions in place over thirty years ago, to ensure that states are meaningfully contributing to this collaborative program. Over the intervening years, some states have tried to wriggle out from under these prohibitions by urging a narrow reading of the statute. But the law is clear—a state cannot use a healthcare-related tax as the state share of Medicaid funding "if there is in effect a hold harmless provision" with respect to the tax.

Earlier this year, the Centers for Medicare & Medicaid Services ("CMS") published an informational bulletin "reiterat[ing]" its "longstanding position" that the law prohibits arrangements in which the State imposes a tax on health care providers, uses the proceeds from that tax coupled with federal matching funds to provide higher Medicaid payments to some of those health care providers, who then redistribute some of that money to other providers to hold them harmless for the tax. The agency had previously said as much in the Federal Register in 2019, and it had warned Florida that it had concerns about its health care-related tax arrangements several months prior. In February 2023, CMS began a financial management review ("FMR") of the State's tax arrangements, which is currently ongoing.

Notwithstanding that this statutory provision has been in place for over thirty years, and that CMS expressly set forth its interpretation of that provision publicly in November 2019 and February

2023, and in correspondence with Florida in September 2022, the State now seeks a preliminary injunction, claiming that it will be irreparably harmed while the parties litigate this case absent an order enjoining Defendants from "enforcing, implementing, or otherwise relying on the bulletin and the policy and interpretation it announces to conduct any audit or review, including the pending Financial Management Review[,] of Florida, or to defer, reduce, or disallow any Medicaid funding for Florida." PI Mot. at 20.

But Florida has not met its burden to show that this extraordinary remedy is warranted. Accordingly, the Court should deny Florida's motion for preliminary injunction.

BACKGROUND

## I.   Statutory and Regulatory Background

### A.  The Medicaid Program

The Medicaid program, established under Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., is a "cooperative federal-state program that provides federal funding for state medical services to the poor." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433 (2004). "The Federal Government shares the costs of Medicaid with States that elect to participate in the program." *Atkins v. Rivera*, 477 U.S. 154, 156-57 (1986). "In return, participating States are to comply with requirements imposed by the Act and by the Secretary of Health and Human Services." *Id.* at 157.

The Medicaid statute allows states to raise their own funds in many ways.  In the early  days of  the program, that discretion was unfettered—and ultimately abused.  States discovered that they could raise money selectively from hospitals serving a large share of Medicaid beneficiaries (through donations or health care-related taxes), receive federal matching funds, and then pay those same hospitals more than was originally collected from them.[1]   This scheme allowed states to effectively claim federal Medicaid funds without contributing any state funds, because no entity within the state ultimately bore the funding burden, violating a fundamental premise of the Medicaid

---

[1] The chief vehicle for the selective payments was the Medicaid disproportionate share hospital (DSH) adjustment, which allows states to pay higher rates to hospitals serving a disproportionate number of low-income patients.  When these schemes became common, there was no cap on DSH adjustments.

program: federal matching funds are only available when states are spending their own money too.

### B.  The Medicaid Voluntary Contribution & Provider-Specific Tax Amendments

In the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991, Pub. L. No. 102-234, 105 Stat. 1793, Congress put an end to this scheme.  DSH payment adjustments were capped.  *Id.* § 3, 105 Stat. 1799–1804.  States remained free to accept donations from health care providers, but they would generally be deducted from a state's medical assistance expenditures and no longer matched with any federal funds. 42 U.S.C. § 1396b(w)(1)(A)(i).

Proceeds from taxes imposed on providers would be similarly deducted unless they were broad-based and free of any hold-harmless arrangements.  *Id.* § 1396b (w)(1)(A)(ii)–(iii).  The statute provided three definitions of a hold-harmless arrangement.  *Id.* § 1396b(w)(4).  As relevant here, the statute provided that a hold-harmless arrangement exists where: "The State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." *Id.*  § 1396b(w)(4)(C).

### C.  Implementing Regulations

#### i.    1992 Interim Final Rule and 1993 Final Rule

The statute authorized the Secretary to issue an interim rule, Pub. L. No. 102-234, § 5(a), 105 Stat. 1804, which he did. 57 Fed. Reg. 55,118 (Nov. 24, 1992).  The regulatory definition of a hold harmless arrangement was codified at 42 C.F.R. § 433.68(f), and included a statistical test for indirect guarantees, *id.* § 433.68(f)(3). CMS emphasized that the "use of any state payment . . . in a way that is guaranteed to repay the taxpayer for all or part of the cost of health care-related taxes, is a hold harmless situation." 57 Fed. Reg. at 55, 129.  CMS sought comment on the interim rule and published a final rule the following year with no changes relevant here. 58 Fed. Reg. 43,156 (Aug. 13, 1993).

In 2001, CMS concluded that five states had been collecting health care-related taxes that featured a hold harmless arrangement.  Those states taxed nursing facilities, which passed the tax burden along to their private patients; then the states provided grants or tax credits to the private patients, to effectively indemnify them against the rate increases.  CMS disallowed federal matching funds on the basis of those taxes, and the states appealed to the Departmental Appeals Board

("DAB"). As relevant here, the DAB concluded that this taxing scheme did not guarantee to hold the taxpayers harmless. *In re: Hawaii Dep't of Human Servs.*, 2005 WL 1540188 (DAB June 24, 2005).

### ii.   2008 Rule

CMS revised its hold harmless regulations in 2008, in part to make clear that the Board's conclusion was in error.   73 Fed. Reg. 9,685 (Feb. 22, 2008).  As relevant here, the revised regulations provide that a hold harmless arrangement exists if "[t]he State (or other unit of government) imposing the tax provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount."  42 C.F.R. § 433.68(f)(3).

The 2008 preamble emphasized that, to be effective, the hold harmless prohibitions must be applied with awareness of both the health care related tax and all "associated financial arrangements as a whole , including any non-Medicaid payments." *Id.* at 9,691.  As CMS explained, "in the years since we first endeavored to implement Congress's prohibitions on taxes with hold harmless arrangements" the agency had learned "that it is simply impossible to anticipate every hold harmless arrangement that may be implemented by States." *Id.* at 9,690; *see id.* at 9,691 (regulations "cannot address every specific circumstance and nuance").  CMS concluded that "to achieve the statutory purpose of ending hold harmless arrangements that result in shifting a disproportionate burden to the federal government, the test" set out at 42 C.F.R. § 433.68(f)(1), and the hold harmless prohibitions more broadly, "must be applied flexibly." 73 Fed. Reg. at 9,691. "Otherwise, financing arrangements will be structured to meet the letter but not the underlying purpose of the statutory limitations." *Id.*

CMS explained that its revisions were intended as "clarifications," *id.* at 9,687, and not "to expand the test for determining when an impermissible hold harmless arrangement exists," *id.* at 9,690.  CMS also clarified that the arrangements at issue in the 2005 DAB decision were indeed hold harmless arrangements. *Id.* at 9,691 & 9,694. CMS further explained that "[a] direct guarantee will be found when a State payment is made available to a taxpayer or a party related to the taxpayer with the reasonable expectation that the payment would result in the taxpayer being held harmless

4

for any part of the tax (through direct or indirect payments)." *Id.* at 9,694.

### iii.   2019 Proposed Rule

In 2019, CMS published a proposed rule discussing hold harmless arrangements, among other Medicaid fiscal responsibility concerns. 84 Fed. Reg. 63,722 (Nov. 18, 2019). In that proposed rule, CMS explained that it had "become aware of impermissible arrangements" in which "[t]he taxpayers enter into an agreement, which may or may not be written, to redistribute these Medicaid payments to ensure that taxpayers, when accounting for both the original Medicaid payment (from the state, unit of local government, or [managed care organization]) and any redistribution payment from another taxpayer or taxpayers, receive all or any portion of their tax amount back." *Id.* at 63,734. CMS emphasized that such arrangements are "inconsistent with existing statutory and regulatory requirements prohibiting hold harmless arrangements." *Id.* The agency was concerned that, "[d]espite the statutory and regulatory prohibitions, . . . states, local units of government, and/or providers continue to design and execute hold harmless practices that are antithetical to federal law and regulation," and so proposed "clarifying language to the hold harmless definition." *Id.* at 63,735.

The proposal was not finalized, but instead withdrawn on January 19, 2021. 86 Fed. Reg. 5,105 (Jan. 19, 2021). CMS made clear, however, that "[t]his withdrawal action does not affect CMS' ongoing application of existing statutory and regulatory requirements." *Id.*

### D.  February 2023 Informational Bulletin

On February 17, 2023, CMS published an informational bulletin affirming this interpretation of the statute and regulations. *See* Decl. of Tom Wallace Ex A. ("Bulletin"), ECF No. 10-2. The bulletin, which was prompted by inquiries from states regarding potential hold-harmless arrangements, "reiterate[d]" the agency's "longstanding position on the existing federal requirements." *Id.* It explained that CMS had "become aware of some health care-related tax programs that appear to contain a hold harmless arrangement that involves the taxpaying providers redistributing Medicaid payments after receipt to ensure that all taxpaying providers receive all or a portion of their tax costs

back (typically ensuring that each taxpaying provider receives at least its total tax amount back)." *Id.* at 2; *see also id.* at 2-3 (describing arrangements in more detail).

Turning to the statute and regulations, the bulletin explained that "the state or other unit of government imposing the tax itself need not be involved in the actual redistribution of Medicaid payments for the purpose of making taxpayers whole for the arrangement to qualify as a hold harmless." *Id.* at 4. Instead, "[i]t is possible for a state to indirectly provide a payment within the meaning of section 1903(w)(4)(C)(i) of the Act that guarantees to hold taxpayers harmless for any portion of the costs of the tax, if some or all of the taxpayers receive those payments at issue through an intermediary (for example, a hospital association or similar provider affiliated organization) rather than directly from the state or its contracted managed care plan." *Id.* The bulletin further explained, "hold harmless arrangements . . . can be based . . . on reasonable expectations that certain actions will take place among participating entities that will result in taxpayers being held harmless for all or a portion of their health care-related tax costs." *Id.*

Finally, the bulletin encouraged states to "make clear to their providers that these arrangements are not permissible under federal requirements, learn the details of how health care-related taxes are collected, and take steps to curtail these practices if they exist." *Id.* at 5. The bulletin also committed CMS "to work with states that may have existing questionable arrangements to ensure compliance with federal statutory and regulatory requirements." *Id.* at 2.

### E. Proposed Rulemaking on State-Directed Payments

In May 2023, CMS published a proposal to amend the regulations governing state-directed payments (SDPs), which appear at 42 C.F.R. § 438.6(c). 88 Fed. Reg. 28,092 (May 3, 2023). As relevant here, states that operate their Medicaid programs through managed care plans may, with the Secretary's approval, direct those plans to make additional payments—that is, SDPs—to hospitals serving large numbers of Medicaid beneficiaries. In the recent proposal, CMS explained it had identified arrangements where "with varying degrees of State awareness and involvement, providers appear to have pre-arranged agreements to redistribute Medicaid payments (or other provider funds that are replenished by Medicaid payments)." *Id.* at 28,130. CMS emphasized that such

agreements are hold harmless arrangements within the meaning of 42 U.S.C. § 1396b(w)(4)(C)(i) and 42 C.F.R. § 433.68(f)(3). *Id.* at 28,130–31. And the agency proposed to require that "each provider receiving payment under a State directed payment attest[] that it does not participate in any hold harmless arrangement with respect to any health care-related tax." *Id.* at 28,236.

## II.     CMS's Interactions with the State of Florida

In 2022, CMS reviewed Florida's proposed Medicaid Managed Care State Directed Payments (SDP) for Federal Fiscal Year (FY) 2022. The Local Provider Participation Fund ("LPPF") arrangement is part of the State's Directed Payment Program. Compl. ¶ 34. In reviewing Florida's SDP proposal, CMS became concerned about the possibility of hold harmless agreements between Florida hospitals. During the approval process, "CMS requested information from Florida to ensure that its hospitals do not have pre-arranged agreements to redirect or redistribute Medicaid state directed payments as part of a hold harmless arrangement." *See* Decl. of Rory Howe, Ex. A ("Companion Letter") at 2. In response, Florida offered a limited assurance that it "[was] unaware of any arrangement between the State or another unit of government and a taxpaying entity involving a payment, offset, or waiver imposing any offset within the ambit of § 433.68(f)." *Id.*

CMS approved the plan despite its concerns and issued a "companion letter" to the State of Florida, explaining that notwithstanding the approval, CMS was concerned about the state's use of revenues derived from the LPPF program. Companion Letter at 1. Specifically, CMS explained that, based on the LPPF tax structure and media reports, the agency was concerned about "tax arrangements in connection with which there appear to be pre-arranged agreements to redirect Medicaid payments away from Medicaid providers serving a high percentage of Medicaid beneficiaries to hospitals that do not participate in Medicaid or that serve a low percentage of Medicaid beneficiaries." *Id.* The letter explained that in other states, "[t]hese pre-arranged agreements . . . appear to occur with varying levels of state knowledge or direction." *Id.* CMS then explained that it intended to conduct a review of the LPPF program in fiscal year 2023. *Id.*

On February 22, 2023, CMS sent another letter notifying the State that CMS would perform an FMR "over the next several months" focused on the LPPF program. Wallace Decl. Ex B ("FMR

Letter") at 1, ECF No. 10-3.  The letter included a preliminary request for information regarding the LPPF program and hold harmless arrangements and indicated that additional questions might follow as necessary.  *Id.* at 4-6.  CMS also indicated that it anticipated requesting information directly from individual health care providers through the course of the review.  *Id.*  at 2.  The FMR is still ongoing.

## III.    This Litigation

On August 18, 2023, the State of Florida and AHCA filed this lawsuit.  *See generally* Complaint, ECF No. 1.  On August 29, 2023, Florida moved for a preliminary injunction, seeking to "enjoin the Defendants from enforcing, implementing, or otherwise relying on the Bulletin and the policy and interpretation it announces to conduct any audit or review, including the pending Financial Management Review of Florida, or to defer, reduce, or disallow any Medicaid funding for Florida."  *See* PI Mot. at 20.  The motion should be denied, for the reasons set forth below.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy that may only be awarded upon clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  The grant of a preliminary injunction is "the exception rather than the rule."  *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983).  "To justify a preliminary injunction, the plaintiff must plainly establish four preconditions: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a showing that plaintiff will suffer irreparable injury if an injunction does not issue, (3) proof that the threatened injury to plaintiff outweighs any harm that might result to the defendants, and (4) a showing that the public interest will not be disserved by grant of a preliminary injunction."  *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990).  "Where," as here, "the government is the party opposing the preliminary injunction, its interest and harm—the third and fourth elements—merge with the public interest."  *State of Fla. v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1293 (11th Cir. 2021).

"The burden of persuasion in all of the four requirements is at all times upon the plaintiff."  *United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Authority v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)).  Here, Florida has not met its burden with respect to any of these

four factors, and its motion should be denied.

**I.   Florida Has Not Shown a Substantial Threat of Irreparable Injury.**

"A showing of irreparable injury is the sine qua non of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quotation marks omitted).  "Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Id.*  Importantly, the mere possibility of irreparable injury is not enough to justify preliminary injunctive relief.  *See Winter*, 555 U.S. at 22.  Rather, "the asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Siegel*, 234 F.3d at 1163 (quotation marks omitted).

Florida has made no such showing here. Florida claims that, absent a preliminary injunction, it will suffer irreparable harm "through significant compliance costs, lost Medicaid funding, or both." PI Mot. at 18.  But the State does not come close to meeting its burden to show a substantial likelihood of actual, imminent, and irreparable injury, for at least four reasons.

*First*, and most fundamentally, the injuries that Florida purportedly fears are not caused by the informational bulletin.  Informational bulletins "share information, address operational and technical issues, and highlight initiatives or related efforts."   Federal Policy Guidance, Medicaid.gov, https://www.medicaid.gov/federal-policy-guidance/index.html.  They are not intended to "establish new policy or issue new guidance." *Id.*  And the bulletin at issue in this case did not do so. For years, CMS has been quite clear that when taxpayers subject to a healthcare-related tax "enter into an agreement . . . to redistribute . . . Medicaid payments to ensure that taxpayers . . . receive all or any portion of their tax amount back," those agreements violate "existing statutory and regulatory requirements prohibiting hold harmless arrangements."  84 Fed. Reg. at 63,734.  The bulletin simply "reiterate[d]" this position.  Bulletin at 1.  Because the bulletin did not establish a new policy or new obligations, it cannot be the source of any irreparable harm to the State.

CMS's interactions with Florida make clear that the current FMR is not based on the bulletin, but on the agency's interpretation of the underlying statute and regulation. In September 2022— months before the bulletin was issued—CMS notified Florida about its concerns with the state's LPPF

arrangements and made clear that CMS intended to conduct an FMR into the LPPF arrangements. Companion Letter at 2.  The FMR did not stem from the bulletin, but instead from CMS's longstanding interpretation of the statute and regulations.

In *Texas v. Brooks-LaSure*, the court reached a different conclusion with respect to Texas based on its understanding that "CMS has maintained an equivocal stance on these agreements," No. 6:23-cv-00161-JDK, 2023 WL 4304749, at *7 (E.D. Tex. June 30, 2023); but it did so in part in reliance on a sworn statement in a declaration that in early 2019, "Texas contacted CMS to seek guidance" regarding the possibility of private redistribution arrangements and "CMS advised at that time that so long as neither the State nor unit of local government was providing the guarantee, there is not a prohibition on such private business arrangements."  Decl. of Victoria Grady ¶ 24, *Texas v. Brooks-LaSure*, No. 6:23-cv-00161-JDK (E.D. Tex. Apr. 14, 2023) (ECF No. 5-3); *see Texas*, 2023 WL 4304749, at *8 (citing the Grady declaration).[2]  The sole declarant in this case does not point to any similar conversations between CMS and the State of Florida, and the declaration conveniently skips over the September 2022 companion letter notifying the State of CMS's concerns regarding Florida's LPPF arrangements.  *See generally* Wallace Decl. ¶¶ 22-27.  The other statements relied on by Florida— a snippet of testimony from 2008, as cited in a 2012 appellate brief, and an ambiguous email exchange from 2019 between a CMS employee and counsel for certain private hospitals—do not overcome CMS's clear articulation, both in the Federal Register and in correspondence directly with the State, of its interpretation of the relevant statute and regulation.

*Second*, Florida has not shown that it will suffer actual or imminent irreparable harm because of the bulletin or the FMR; at most, it has shown the *possibility* of harm at some unknown point in the future.  Florida contends that it will suffer irreparable harm through compliance costs, but Florida has provided no testimony regarding when, if ever, the State would undertake any such compliance efforts. Notably, the specific requests for information that Florida cites in its brief were included in the FMR

---

[2] The government does not concede that this vague and ambiguous allegation of private assurances by an unidentified individual proves that CMS held this view, particularly in the face of the agency's public repudiation of that view in the 2019 proposed rule.  But Florida offers even less than that.

letter sent over six months ago.  *See* FMR Letter 4-6.  Florida claims that it "has already produced thousands of pages of documents to CMS" in response to those requests, Wallace Decl. ¶ 27, but— even assuming that producing those documents constituted harm attributable to the bulletin or the FMR—"past harm is not a basis for preliminary injunctive relief, which requires a showing of likely future injury if an injunction does not issue." *Hoop Culture, Inc. v. GAP, Inc.*, 648 F. App'x 981, 986 (11th Cir. 2016) (citing *Siegel*, 234 F.3d at 1176-77).  Florida submitted a declaration stating that "[t]he Bulletin saddles AHCA with *immediate* and substantial compliance requirements and costs," Wallace Decl. ¶ 29 (emphasis added).  But the bulletin was published over seven months ago, and nothing in the declaration suggests that AHCA has undertaken any of these purportedly "immediate" compliance efforts to date.  *Id.* ¶¶ 30-36 (discussing efforts and costs that AHCA supposedly "would" need to undertake with no discussion of when such efforts would take place).  The State has speculated about the cost of compliance, but it has not asserted any present intention to comply.

Nor has Florida shown that an actual or imminent loss of Medicaid funding will occur absent a preliminary injunction.  Florida is currently the subject of an FMR, but that does not mean that a disallowance will necessarily follow.  A financial management review is just that: a review.  And the FMR letter sets out multiple steps that CMS anticipates taking prior to issuing any disallowance, including several that provide the State with opportunities to respond to the agency's findings.  At any point in this process, CMS might decide not to issue a disallowance, and thus Florida's fears of losing Medicaid dollars are merely speculative at this juncture.[3]  CMS has the authority to conduct a review to determine whether a state Medicaid program complies with statutory and regulatory requirements, and Florida is not entitled to enjoin that effort solely because it could possibly result in a loss of Medicaid funding at some point down the line.

*Third*, even if the bulletin or the FMR could eventually lead to harm, Florida has not explained why an injunction is needed *now*.  It is well established that "[a] district court should not issue a preliminary injunction unless it concludes that the movant will suffer immediate harm if relief is

---

[3] CMS emphasizes its commitment to supporting the Medicaid safety net and working with states to help them address programmatic issues in a lawful manner.  *See* Bulletin at 6.

delayed until the case is finally resolved on the merits." *De La Fuente v. Kemp*, 679 F. App'x 932, 934 (11th Cir. 2017) (citing *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1133–34 (11th Cir. 2005)). Even assuming *arguendo* that Florida will suffer irreparable harm at some point in the future, the State has offered no reason to believe that harm "will occur before the district court can rule on [its] requests for a permanent injunction and declaratory relief." *De La Fuente*, 679 F. App'x at 934.

*Fourth*, and in the same vein, Florida offers no explanation why it waited so long to seek a preliminary injunction, and Florida's long delay in seeking preliminary relief severely undermines its claim that irreparable injury is imminent.  "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).  Here, a full year has passed since CMS notified Florida that it intended to conduct an FMR during fiscal year 2023, *see* Companion Letter at 1, and seven months have passed since CMS issued the challenged bulletin and commenced the FMR, *see* Bulletin at 1; FMR Letter at 1.  That Florida "pursued its preliminary-injunction motion with the urgency of someone out on a meandering evening stroll rather than someone in a race against time" severely undermines any claim that the State will be imminently harmed in the absence of preliminary relief.  *Id.* at 1246.  Had the bulletin and the FMR imposed immediate, irreparable harm on the State of Florida, it presumably would not have waited so long to seek a preliminary injunction without any explanation for its delay.

## II.   Florida Has Not Shown a Substantial Likelihood of Success on the Merits.

Even if Florida had met its burden to show irreparable harm in the absence of preliminary relief—which it has not—its motion should nonetheless be denied because it has not established a substantial likelihood of success.  As discussed below, several threshold issues would prevent the Court from ever reaching the merits of Florida's claim.  Moreover, even if the Court could reach the merits of Florida's claims, none are likely to succeed.

### A.  The Court lacks jurisdiction to hear this case.

#### i.    Florida's challenge is not ripe.

Florida's claims are also likely to fail because its challenge to both the informational bulletin

and the FMR are not ripe.  The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" and "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003).  A party's claim "is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation omitted).

There are two ways that Florida could feel concrete effects from the legal interpretation articulated in the informational bulletin and the FMR.  First, at the conclusion of the FMR, CMS could determine that the State or one of its local governments has been collecting a health care related tax that includes a hold-harmless arrangement and disallow federal matching funds for the proceeds of that tax.  42 C.F.R. § 430.42(a)(5).  After issuing a disallowance, the State would have the option to seek reconsideration by the Administrator, *id.* § 430.42(b), and/or appeal that disallowance to the DAB, *id.* § 430.42(f), and then seek review in district court, 42 U.S.C. § 1316(e)(2).  Alternately, CMS could request documentation from Florida, which could refuse to comply on the grounds that the demand was unlawful, CMS could issue a disallowance, and Florida could raise its defenses in the administrative process and, ultimately, in federal court.

Because both of those events "may not occur as anticipated, or indeed may not occur at all," Florida's claims are not ripe for judicial review. *Texas*, 523 U.S. at 300.  Moreover, declining to exercise jurisdiction over Florida's claims would serve the purposes of the ripeness doctrine, by withholding judicial review until it could be grounded in detailed factual circumstances.  The ongoing FMR may provide information regarding the existence and nature of hold-harmless arrangements in Florida.  If CMS disallows federal matching funds after its FMR and the DAB upholds that disallowance, there would be a record that is likely to contain concrete information about hold-harmless arrangements in Florida, including evidence of the state's level of awareness and involvement.  Thus, rather than addressing the question of whose legal interpretation is correct in the abstract, a reviewing court would be able to decide whether the actual scheme at issue violated the statute and regulations.

13

The same is true for a dispute over an agency demand for information. Even if Florida denied any awareness of or involvement in a hold harmless arrangement, CMS would be within its rights to probe for such involvement. In resisting such a demand, Florida would need to show that it was not made pursuant to any lawful authority. The question before the court would be the lawfulness of the specific demand, rather than an abstract question of interpretation.

> ii.    **The informational bulletin and the financial management review are not final agency actions.**

Judicial review under the APA is generally limited to "final agency action," 5 U.S.C. § 704, and neither an informational bulletin, nor a letter commencing an FMR, constitute final agency action. Final agency action must (1) represent "the consummation of the agency's decisionmaking process," and (2) conclusively determine legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted). "The 'core question' about finality 'is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.'" *Canal A Media Holding, LLC v. United States Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1255 (11th Cir. 2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)). Courts should also consider "pragmatic" concerns, focusing "on whether judicial review at th[is] time will disrupt the administrative process." *Clayton Cnty., Ga. v. Fed. Aviation Admin.*, 887 F.3d 1262, 1266 (11th Cir. 2018) (quoting *Riverkeeper v. EPA*, 806 F.3d 1079, 1083 (11th Cir. 2015)); *see also Bd. of Dental Examiners of Ala. v. FTC*, 519 F. Supp. 3d 1033, 1039 (N.D. Ala. 2021) (discussing the "policy rationale" behind the final agency action requirement).

Florida cannot rely on the informational bulletin to establish the requisite final agency action. The bulletin "create[s] no new legal obligations beyond those the [statute and regulations] already imposed." *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1028 (D.C. Cir. 2016). Rather, it simply reminds the public of a legal view previously articulated by the agency. "An agency's restatement of an already-existing policy or interpretation does not, on its own, determine any rights or obligations and imposes no legal consequences." *Clayton Cnty.*, 887 F.3d at 1266-67. On a pragmatic level, "judicial review of the [bulletin] would interfere with agencies' ability to consult with and advise

14

regulated parties about how to comply with federal law and regulations." *Id.* at 1269.  To allow judicial intervention at this point "might mean that regulated parties could bring lawsuits whenever an agency advises a party of its already-existing obligations," which would in turn "discourage agencies from offering advisory guidance," harming regulated parties who benefit from such guidance.  *Id.*

Nor can Florida rely on the FMR letter, which marks the *start* of a financial management review, not the consummation of CMS's decisionmaking process. It is well-established that "an agency's observation that a party's practices may potentially violate the law does not necessarily mark the culmination of the agency's decisionmaking process so as to determine a party's legal rights or obligations." *Clayton Cnty.*, 887 F.3d at 1268.  Accordingly, the initiation of a review or investigation is not a final agency action.  *See, e.g.*, *Bd. of Dental Examiners*, 519 F.Supp.3d at 1039-40 (holding that neither the initiation of an FTC investigation nor the issuance of a Civil Investigative Demand requesting information constitute final agency action).

### iii.    Judicial review is barred by the Thunder Basin doctrine.

Finally, the Court lacks subject-matter jurisdiction over this action because Congress has already created an "exclusive remedy" in the Departmental Appeals Board.  Where it is "fairly discernible" that an elaborate statutory review scheme for administrative enforcement proceedings was intended to create an exclusive remedy, parallel jurisdiction outside that scheme is precluded.  *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994) (quotation omitted).  In such circumstances, claims may only proceed outside that scheme if they are not "of the type Congress intended to be reviewed within th[e] statutory structure." *Id.* at 212; *see also Doe v. FAA*, 432 F.3d 1259, 1261-63 (11th Cir. 2005).  Courts "presum[e] that Congress does not intend to limit . . . jurisdiction" if (1) "a finding of preclusion could foreclose all meaningful judicial review," (2) the suit is "wholly collateral to a statute's review provisions," and (3) the claims lie "outside the agency's expertise." *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 15 (2012) (citation omitted).

To begin with, the administrative enforcement proceedings that Congress established at 42 U.S.C. § 1316(e) are plainly meant to be exclusive.   And each *Thunder Basin* factor weighs in favor of the conclusion that Congress meant to limit jurisdiction over the claims at issue here. First,

precluding judicial review now would not foreclose meaningful judicial review later.   To the contrary, as described above, a court reviewing a DAB decision would be far better situated to resolve the legal issues at play here, because it would have a fully developed factual record. [4]  *See id.* § 1316(e)(2).   Second, Florida's claims are not "wholly collateral" to the administrative review scheme but go to the heart of the statute and regulations that CMS enforces.  *See Doe v. FAA*, 432 F.3d at 1263.  And third, the State's claims, which concern the proper interpretation of that statute and those regulations, are well within the agency's expertise.

That CMS has not yet issued a disallowance does not mean that Florida can skip over administrative proceedings and go directly to federal court.  In *Doe v. FAA*, plaintiffs tried a similar tactic and claimed that "the statutorily prescribed administrative-review process [was] inapplicable because their lawsuit was filed before" any administrative proceedings.  432 F.3d at 1262.  The Eleventh Circuit found that argument was "meritless" and explained that the plaintiffs "simply cannot avoid the statutorily established administrative-review process by rushing to the federal courthouse for an injunction preventing the very action that would set the administrative-review process in motion."  *Id.* at 1263.  To hold otherwise would undermine the entire statutory review scheme, as any state could avoid an FMR by simply rushing to Court as soon as the agency began its review.

### B.  The challenged bulletin and the financial management review do not violate the Administrative Procedure Act.

#### i.   CMS's interpretation of the statute and regulations is lawful.

The statutory provision at issue here, 42 U.S.C. § 1396b(w)(4), was enacted to end a scheme in which states would claim federal Medicaid funds without meaningfully contributing any state funds, because no entity within the state ever truly bore the burden of the levied tax.

Since at least 2019, the agency has been "aware of some health care-related tax programs that appear to contain a hold harmless arrangement that involves the taxpaying providers redistributing Medicaid payments after receipt to ensure that all taxpaying providers receive all or a portion of their

---

[4] Because an adequate alternative remedy exists for the State of Florida, the APA does not provide for judicial review.  *See* 5 U.S.C. § 704 (providing for judicial review of "final agency action for which there is no other adequate remedy in a court").

tax costs back." Bulletin at 2; *see* 88 Fed. Reg. at 28,130-31; 84 Fed. Reg. at 63,734. Such arrangements achieve precisely the end that Congress sought to avoid: allowing states to collect federal Medicaid funds without bearing the burden of raising their own state funds, because all state taxpayers are indemnified. Under Florida's reading of the statute, private parties could agree to indemnify each other, inform (or hint to) the government about that agreement, and the government could then create tax policy that would ensure no taxpayer would truly be burdened by the tax, all while collecting federal "matching" funds with no meaningful contribution from the State—just so long as the State did not directly make the redistribution agreement itself.[5]

Florida is incorrect. The statute and regulations contemplate that both a hold harmless guarantee and the associated payment can provided directly or indirectly. *See* 42 U.S.C. § 1396b(w)(4)(C); 42 C.F.R. § 433.68(f)(3). When taxpayers enter an agreement to indemnify each other against the burdens of a health care related tax, each taxpayer receives a direct guarantee. When Medicaid funds are redistributed to honor that guarantee, the state provided for that payment indirectly. While the statute contains a "tight grammatical link between *the government*, as the actor providing for something," and "the thing provided for," PI Mot. at 11 (quoting *Texas*, 2023 WL 4304749, at *10), under the statute, the thing provided for is the payment, offset, or waiver. Here, that payment undeniably comes from the State, even if indirectly. *See* Bulletin at 4; *see also* 73 Fed. Reg. at 9,686 (discussing instances of "a direct guarantee of an indirect payment to taxpayers"). Notably, Congress chose broad language when describing what the State must do. It required only that the State "provide for" the payment, a phrasal verb that can mean either "to cause (something) to be available or to happen in the future" or "to supply what is needed for (something or someone)." *Provide for*, Merriam Webster Online, https://www.merriam-webster.com/dictionary/provide%20for. Thus, a State may "provide for" a hold-harmless payment by supplying (directly or indirectly) the

---

[5] Florida insists that CMS's reading of the statute would lead to "absurd results," where private entities could endanger the State's Medicaid funding through retroactive, private redistribution agreements even after matching funds were already obtained. *See* PI Mot. at 12. But that does not necessarily follow from CMS's more modest interpretation: that a State payment may guarantee that a taxpayer is held harmless even if the State is not itself redistributing the funds. Bulletin at 5.

SDPs that are later redistributed to offset the burden of the health care-related taxes.

CMS has long recognized that a guarantee under the Medicaid statute may not involve an express legal agreement between the State and the taxpayer. Indeed, the 2008 rule adopting the current regulations defines a "direct guarantee" as that which produces a "reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments)." 73 Fed. Reg. at 9,694. The guarantee was defined in that way "because 'state laws were rarely overt in requiring that state payments be used to hold taxpayers harmless.'" Bulletin at 4 (quoting 73 Fed. Reg. at 9,694). The rule emphasized that, to be effective, the hold harmless prohibitions must be applied "flexibly" and with awareness of both the health care related tax and all "associated financial arrangements." 73 Fed. Reg. at 9,691; *see id.* at 9,690. The bulletin is simply a valid continuation of that longstanding interpretation.[6]

Florida argues that if CMS's interpretation is correct, then the statute violates the Spending Clause because it is too ambiguous. PI Mot. at 12. Once again, Florida's argument is unlikely to succeed. "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds," such that "we can fairly say that the State could make an informed choice." *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 24-25 (1981). Here, "a state official who is engaged in the process of deciding whether the State should accept [Medicaid] funds and the obligations that go with those funds" would "clearly understand that one of the obligations of the Act is the obligation" not to use funding derived from a health care-related tax arrangement that in effect holds the taxpayer harmless. *Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). The statute both "'unambiguously' link[s] 'its conditions to the receipt of federal funds and define[s] those conditions clearly enough for the states to make an informed choice.'" *W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th

---

[6] In a single-sentence footnote, Florida appears to challenge the lawfulness of the 2008 Rule. *See* PI Mot. at 14 n.4. Setting aside that Florida cannot establish a likelihood of success on the merits by simply stating without support that a regulation is unlawful, its challenge also comes nearly a decade too late. 28 U.S.C. § 2401 (setting a six-year statute of limitations for civil actions against the United States); *see U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1280 (11th Cir. 2007) (applying the six-year statute of limitations to claim brought under the APA).

1124, 1143 (11th Cir. 2023) (quoting *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004)).  The statute is explicit that federal financial participation "shall be reduced by the sum of any revenues received by the State (or by a unit of local government in the State" "from a broad-based health care related tax, if there is in effect a hold harmless provision . . . with respect to the tax." 42 U.S.C. § 1396b(w)(1)(A).  And the statute further explains that a hold harmless provision exists "if the Secretary determines that," among other things, "[t]he State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." *Id.* § 1396b(w)(4).  As explained above, this statutory language encompasses a scenario where a State provides for a payment that is redistributed to hold taxpayers harmless.  Florida seems to suggest that to be constitutional, the statute must describe every possible arrangement that it prohibits, but that is neither practicable nor constitutionally required. *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985) ("[T]he Federal Government simply could not prospectively resolve every possible ambiguity concerning particular applications of [a grant program's] requirements . . . ."); *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) ("Congress is not required to list every factual instance in which a state will fail to comply with a condition."). The statute as written provides the State with the information necessary to make an informed choice to accept Medicaid funding, with the knowledge that the state share cannot be funded by a tax where there is in effect an arrangement to hold the taxpayer harmless.

Florida separately contends that even if the interpretation described in the bulletin is correct, CMS cannot conduct a financial management review into Florida's taxing arrangements because the taxes at issue in Florida are imposed by cities or counties, while the payments at issue originate from the State.  PI Mot. at 10.  In other words, Florida believes that it can escape scrutiny of potential hold harmless arrangements simply by structuring its tax program so that the entity imposing the tax is not the entity providing the payment.

However, Florida's argument hinges on a misreading of the phrase "[t]he State or other unit of government imposing the tax" in the statute, and it also contradicts the statute's intended purpose. 42 U.S.C. § 1396b(w)(4)(C). Contrary to Florida's suggestion, nothing in that statutory provision

"expressly requires" that the same unit of government that imposes the tax provides for the payment, offset, or waiver at issue. PI Mot. at 10. Rather, the use of "[t]he State or other unit of government imposing the tax" reflect Congress's aim of prohibiting hold-harmless arrangements regardless of whether the State granted taxing authority to a local unit of government. Indeed, Florida's proposed interpretation ignores the fact that the local unit of government is the creation of the State and its taxing powers derive from the State. Fla. Stat. § 125.01(1) (Florida law providing "[t]he legislative and governing body of a county" with "power to carry on county government," including the power to "[l]evy and collect taxes . . . and special assessments"). Florida's proposed interpretation also violates the "rule of the last antecedent," which is an interpretation canon "according to which a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows. . . ." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). Under the "rule of the last antecedent," the clause "imposing the tax" should be read as modifying only the "other unit of government." At best, then, Florida has advanced *a* possible reading of the statute, and one that is inconsistent with the statute's purpose and meaning.

In any event, the Court need not decide whether Florida's statutory interpretation is correct because Florida has offered no support for its apparent claim that a federal district court can prohibit a federal agency from even *reviewing* a state's Medicaid program for statutory compliance solely because the State disagrees with a possible statutory interpretation. Florida is free to argue its interpretation of the statute to CMS during the FMR process, and in response to a draft report, and in response to a disallowance, and before the DAB, and ultimately before a federal district court, should it become necessary. But it cannot avoid the FMR process authorized by law simply because it believes it has designed its Medicaid program to fall outside of the reach the statute.

### ii. The informational bulletin did not reverse prior agency interpretations.

Florida claims that the informational bulletin "departed from prior policy" without explanation and is therefore arbitrary and capricious. PI Mot. at 14. As explained above, that is simply not so. Rather, the informational bulletin simply repeats the agency's longstanding view, as described in the Federal Register in 2019 and in CMS's interactions with the State in 2022.

20

Florida points to three pieces of evidence for its belief to the contrary, but none is persuasive. First, Florida points to a 2005 DAB decision, *In re: Hawaii*, 2005 WL 1540188. But when CMS amended its regulations in 2008, it made clear that the DAB decision was in error. 73 Fed. Reg. at 9,691 & 9,694. Given that CMS disclaimed the interpretation set forth in the 2005 DAB decision fourteen years prior to issuing the informational bulletin, that decision is not evidence that the informational bulletin represents a change in position.

Next, Florida tries to identify inconsistencies between the 2008 rule and the informational bulletin that do not exist. The preamble to the 2008 rule reflects CMS's view that "[a] direct guarantee will be found when a State payment is made available to a taxpayer or a party related to the taxpayer with the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments)." 73 Fed. Reg. 9694-95. Florida argues that this language is consistent with a scenario where the *State* has a reasonable expectation that the payment would result in the taxpayer being held harmless—but it is also consistent with a scenario where the taxpayer is the one with the reasonable expectation. In any case, a State may well have a "reasonable expectation" that a payment would result in a taxpayer being held harmless even if the State is not involved in the redistribution agreement itself. *See* 73 Fed. Reg. 9,694 (explaining that a direct guarantee "does not need to be an explicit promise or assurance of payment" but simply "the provision for payment by State statute, regulation, or policy"). A State could, for example, be aware (or suspect) that taxpayers appear to have entered into some sort of agreement to redistribute Medicaid payments, and it could provide a payment to a taxpayer with a "reasonable expectation" that it would be redistributed even without "promis[ing] or direct[ing] indemnification." PI Mot. at 15. Given that CMS reports "increasingly encountering" such programs during its review, it is reasonable to assume that states might also be aware of these arrangements within their own jurisdictions. Bulletin at 2-3. In Florida, for example, CMS suspected the possibility of an impermissible hold-harmless arrangement due to "Florida's LPPF tax structure and media reports," information that is presumably equally available to the State, which has its own obligations to ensure that no impermissible hold-harmless arrangements exist. FMR Letter at 1; *see also* Bulletin at 6.

Florida's other attempts to introduce inconsistencies between the 2008 rule and the informational bulletin are misleading.  For example, Florida quotes a portion of the 2008 rule saying that use of the term "influenced by the state" was too broad, *see* PI Mot. at 15—but that language was referencing the definition of which *payments* could be attributed to the State, *see* 73 Fed. Reg. at 9,694. Specifically, CMS was responding to commenters concerns regarding CMS's language in the preamble to the proposed rule that "monies 'controlled or influenced by the state' will be considered in applying the guarantee test." *Id.*  CMS agreed with commenters that the word influenced was too broad and explained that "'controlled or directed by the state' is a more accurate description *of the types of payments that will be considered in evaluating whether an impermissible hold harmless arrangement exists*." *Id.* (emphasis added).  Thus, CMS was concerned with the question of what *payments* could be attributed to the State, not the question of who was involved in any underlying redistribution agreements.  In other words, the language quoted by Florida addresses a separate issue, and does not conflict with the interpretation advanced in the bulletin.  Indeed, contrary to Florida's suggestion, the 2008 regulation specified that the state need not "require[]" redistribution of funds, so long as the structure in place made it "reasonable to expect" that the payments would be redistributed.  *See id.*[7]

Finally, Florida wrongly insists that CMS could not possibly have understood the hold-harmless rule to reach this type of conduct because it proposed (and then withdrew) a 2019 proposed rule that explained that a direct guarantee exists if "the net effect of an arrangement between the State (or other unit of government) and the taxpayer results in a reasonable expectation that the taxpayer will receive a return of all or any portion of the tax amount."  84 Fed. Reg. at 63,778.  As Florida itself acknowledges, that interpretation of the relevant statute and regulations is consistent with the interpretation advanced in the bulletin.  PI Mot. at 15; *see also* 84 Fed. Reg. at 63,734.  But contrary to Florida's suggestion, the 2019 proposed rule was not setting out a *new* interpretation of the statute and

---

[7] Florida points to factual distinctions between the nursing home example discussed in the 2008 regulation and the arrangements described in the informational bulletin.  PI Mot. at 16.  But CMS has never claimed that these scenarios are identical, only that "[i]t remains true that hold harmless arrangements typically are not overtly established through state law but can be based instead on reasonable expectations."  Bulletin at 4.

regulations; instead, it explained that "[s]uch arrangements . . . are inconsistent with existing statutory and regulatory requirements prohibiting hold harmless arrangements." *Id.* at 63,734. That the agency proposed, but did not finalize, "clarifying language" does not change the fact that CMS understood such arrangements to be impermissible under the existing statute and regulations. *Id.* at 63,735.

Separately, Florida emphasizes "States' and providers' considerable reliance interests in" what it believes to have been CMS's prior policy. *See* PI Mot. at 16-17. In doing so, Florida paints a picture of CMS blindsiding the State by approving funding only to turn around and claw it back. *Id.* As explained above, the informational bulletin does not represent a change in position, and thus no reliance interests were at issue. Moreover, Florida's discussion of reliance interests omits one important factor: CMS already warned Florida of the risk of disallowance *at the same time* that it approved the SDP program. CMS explained that it "[was] concerned that the state's use of revenues derived from its Local Provider Participation Program (LPPF) tax program as a source of Florida's non-federal share for payments under this preprint may not comply with certain health care-related tax requirements . . . ." Companion Letter at 1. Contrary to Florida's claim, this is not a scenario where the State took a variety of steps "based on the understanding that such arrangements were not impermissible hold-harmless provisions," and is only now threatened with the prospect of disallowance. PI Mot. at 16. Rather, CMS notified Florida of its concerns and its intent to initiate a FMR and Florida chose to take the risk of continuing with these funding arrangements, knowing that an FMR was coming. Accordingly, Florida cannot credibly claim that it was unaware of the risk of disallowance when it expended the funds in question.

### iii.   The informational bulletin is an interpretive rule, for which notice and comment are not required.

Finally, the informational bulletin is not a legislative rule subject to APA notice-and-comment requirements. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); 5 U.S.C. § 553(b). Rather, it is an interpretive rule, "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez*, 575 U.S. at 97 (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)). "In contrast to legislative rules, which 'effect[] a substantive change in existing law or

policy,' interpretive rules 'clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or 'merely track[]' preexisting requirements and explain something the statute or regulation already required." *POET Biorefining LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020) (quoting *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014)); *see also Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979).  The APA's notice-and-comment requirement "does not apply" to interpretive rules, 5 U.S.C. § 553(b)(3)(A), and so the informational bulletin was not required to undergo notice and comment before it was issued.

Florida construes the bulletin as defining legally binding requirements for States, localities, and providers because it informs states that they should "learn the details of how health care-related taxes are collected," "take steps to curtail these practices if they exist," and "have detailed information available regarding their health care-related taxes," but those obligations stem from the Medicaid statute and regulations, not the bulletin.  *See* Bulletin at 5 (citing statutory and regulatory provisions regarding CMS's authority to request records and documentation related to the Medicaid program); *see also, e.g.*, 42 C.F.R. § 433.74(a).  Thus, any "adverse consequences" stem not from the bulletin, but from statutory and regulatory requirements that long predate the bulletin.  Florida's argument to the contrary relies entirely on its claim that the bulletin represents an abrupt departure from the agency's earlier view, which—as discussed above—is simply incorrect.

That CMS has separately proposed two rulemakings that affirm the agency's interpretation of the statute and regulations does not, as Florida argues, mean that the agency has "effectively acknowledged" that the bulletin should have gone through notice-and-comment rulemaking.  PI Mot. at 18.  To the contrary, the 2019 proposed rule proposed a variety of regulatory changes that were not adopted, but also clarified and confirmed the agency's interpretation of the statute and regulations, 84 Fed. Reg. at 63,734-35, which is reiterated in the informational bulletin.  The current rulemaking again reaffirms that interpretation in the context of proposing a new attestation requirement, 88 Fed. Reg. at 28,130-31.  Neither rulemaking supports Florida's argument that the bulletin should have gone through notice and comment.

**III.  Florida has not shown that the balance of equities and the public interest favor preliminary injunctive relief.**

Finally, Florida has not shown that the balance of equities and the public interest support a preliminary injunction.  Florida's sole argument regarding the balance of equities is that the bulletin and the FMR are "unlawful agency action," which they are not.  And with respect to the public interest, Florida invokes the risk to its Medicaid funding that served as its basis for claiming irreparable harm. But, as explained above, Florida has not offered any evidence that such harms will occur in the time before this case can be resolved on the merits.

**CONCLUSION**

For the reasons set forth above, the motion for preliminary injunction should be denied.

Date: September 28, 2023                                 Respectfully submitted,


                                                        BRIAN M. BOYNTON
                                                        Principal Deputy Assistant Attorney General

                                                        MICHELLE BENNETT
                                                        Assistant Director, Federal Programs Branch

                                                        */s/  Alexandra R. Saslaw*
                                                        ALEXANDRA R. SASLAW
                                                        Trial Attorney
                                                        United States Department of Justice
                                                        Civil Division, Federal Programs Branch
                                                        1100 L Street, NW
                                                        Washington, DC 20530
                                                        Alexandra.R.Saslaw@usdoj.gov
                                                        Telephone: (202) 514-4520

                                                        *Counsel for Defendants*

25
