**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

| | | |
|---|---|---|
| **STATE OF FLORIDA**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 23-cv-61595-WPD |
| | ) | |
| **CHIQUITA BROOKS-LASURE**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .........................................................................................................................2

I.      Statutory and Regulatory Background.................................................................................2

      A.      The Medicaid Program ..........................................................................................2

      B.      The Medicaid Voluntary Contribution & Provider-Specific Tax Amendments ..........3

      C.      Implementing Regulations.......................................................................................3

            i.      1992 Interim Final Rule and 1993 Final Rule ..............................................3

            ii.      2008 Rule....................................................................................................4

            iii.      2019 Proposed Rule....................................................................................5

      D.      February 2023 Informational Bulletin ....................................................................5

II.     CMS's Interactions with the State of Florida .....................................................................6

III.    This Litigation....................................................................................................................7

LEGAL STANDARD ..................................................................................................................7

ARGUMENT ...............................................................................................................................8

I.      Neither the informational bulletin nor the financial management review letter is a
final agency action............................................................................................................8

      A.      The informational bulletin merely reiterates the agency's pre-existing
interpretation of the relevant statute and regulations.........................................8

      B.      The FMR Letter marks the commencement of agency action, not the
consummation of it. ..........................................................................................12

II.     Judicial review is barred by the Thunder Basin doctrine and is not authorized by the
APA....................................................................................................................................15

III.    Florida's challenges to the informational bulletin and the financial management
review are not ripe............................................................................................................19

CONCLUSION............................................................................................................................20

## TABLE OF AUTHORITIES

**CASES**

*Alfa International Seafood v. Ross,*
  264 F. Supp. 3d 23 (D.D.C. Aug. 28, 2017) .......................................................................11

*Aluminum Company of America v. United States,*
  790 F.2d 938 (D.C. Cir. 1986) ........................................................................................14

*Ashley County Medical Center v. Thompson,*
  205 F. Supp. 2d 1026 (E.D. Ark. 2002).............................................................................3

*Atkins v. Rivera,*
  477 U.S. 154 (1986) ........................................................................................................2

*Board of Dental Examiners of Alabama. v. FTC,*
  519 F. Supp. 3d 1033 (N.D. Ala. 2021)..............................................................8, 14, 15

*Bennett v. Spear,*
  520 U.S. 154 (1997) ........................................................................................................8

*Canal A Media Holding, LLC v. United States Citizenship & Immigration Services,*
  964 F.3d 1250 (11th Cir. 2020)........................................................................................8

*City of San Diego v. Whitman,*
  242 F.3d 1097 (9th Cir. 2001)........................................................................................13

*Clayton County v. Federal Aviation Administration,*
  887 F.3d 1262 (11th Cir. 2018)................................................................................*passim*

*Doe v. Federal Aviation Administration,*
  432 F.3d 1259 (11th Cir. 2005)................................................................. 15, 16, 17, 18

*Elgin v. Department of Treasury,*
  567 U.S. 1 (2012) ..........................................................................................................15

*Federal Trade Commission v. Standard Oil Company of California,*
  449 U.S. 232 (1980) ................................................................................................ 13, 15

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ........................................................................................................8

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
  561 U.S. 477 (2010) ......................................................................................................19

*Frew ex rel. Frew v. Hawkins,*
  540 U.S. 431 (2004) ........................................................................................................2

*In re Hawaii Deparment of Human Services Board.*,
No. A-01-40, 2005 WL 1540188 (Dep't Appeals Bd., Appellate Div. June 24, 2005) ............... 4, 18

*Ipharmacy v. Mukasey*,
268 F. App'x 876 (11th Cir. 2008) ..................................................................................20

*Lawrence v. Dunbar*,
919 F.2d 1525 (11th Cir. 1990) ........................................................................................8

*McCormick v. Aderholt*,
293 F.3d 1254 (11th Cir. 2002) ........................................................................................8

*McElmurray v. Consolidated Government of Augusta-Richmond County*,
501 F.3d 1244 (11th Cir. 2007) ......................................................................................7, 8

*Mobil Exploration & Producing U.S., Inc. v. Department of Interior*,
180 F.3d 1192 (10th Cir. 1999) ......................................................................................13

*National Advertising Company v. City of Miami*,
402 F.3d 1335 (11th Cir. 2005) ......................................................................................20

*National Park Hospitality Association v. Department of Interior*,
538 U.S. 803 (2003) ................................................................................................ 19, 20

*Protestant Memorial Medical Center, Inc. v. Maram*,
471 F.3d 724 (7th Cir. 2006) ............................................................................................3

*Rhea Lana, Inc. v. Department of Labor*,
824 F.3d 1023 (D.C. Cir. 2016) ........................................................................................8

*Riverkeeper v. EPA*,
806 F.3d 1079 (11th Cir. 2015) ............................................................................8, 11, 13

*Securities & Exchange Commission v. Jerry T. O'Brien, Inc.*,
467 U.S. 735 (1984) ........................................................................................................20

*Texas v. Brooks-LaSure*,
---F. Supp. 3d---, 2023 WL 4304749 (E.D. Tex. June 30, 2023) ......................................10

*Texas v. United States*,
523 U.S. 296 (1998) ........................................................................................................20

*Thomas v. Union Carbide Agricultural Products Company*,
473 U.S. 568 (1985) ........................................................................................................20

*Thunder Basin Coal Company v. Reich*,
510 U.S. 200 (1994) ........................................................................................................15

*Veldhoen v. United States Coast Guard,*
   35 F.3d 222 (5th Cir. 1994) ................................................................................................ 13

**STATUTES**

5 U.S.C. § 704 ..................................................................................................................... 8

42 U.S.C. § 1316 ................................................................................................. 2, 16, 17, 18

42 U.S.C. §§ 1396 *et seq.* ................................................................................................... 2

42 U.S.C. § 1396b .............................................................................................. 1, 3, 15, 17

Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991,
   Pub. L. No. 102-234, 105 Stat. 1793 .............................................................................. 3

**RULES**

Fed. R. Civ. P. 12 ................................................................................................................. 7

**REGULATIONS**

42 C.F.R. § 430.42 ............................................................................................................. 15

42 C.F.R. § 433.68 ..................................................................................................... 1, 3, 4, 7

45 C.F.R. § 16.14 ............................................................................................................... 18

Medicaid Program; Limitations on Provider-Related Donations & Health Care-Related Taxes;
   Limitations on Payments to Disproportionate Share Hospitals,
   57 Fed. Reg. 55,118 (Nov. 24, 1992) ............................................................................. 3

Medicaid Program; Limitations on Provider-Related Donations & Health Care-Related Taxes;
   Limitations on Payments to Disproportionate Share Hospitals,
   58 Fed. Reg. 43,156 (Aug. 13, 1993) ............................................................................. 4

Medicaid Program; Health Care-Related Taxes,
   73 Fed. Reg. 9685 (Feb. 22, 2008) .......................................................................... 4, 5, 9

Medicaid Program; Medicaid Fiscal Accountability Regulation,
   84 Fed. Reg. 63,722 (Nov. 18, 2019) ...................................................................... 1, 5, 9

Medicaid Program; Medicaid Fiscal Accountability Regulation, Medicaid Program; Medicaid
   Fiscal Accountability Regulation,
   86 Fed. Reg. 5105 (Jan. 19, 2021) ......................................................................... 5, 10

**OTHER AUTHORITIES**

Congressional Research Service, *Medicaid Provider Taxes* (Aug. 5, 2016),
    https://crsreports.congress.gov/product/pdf/RS/RS22843 ...............................................................3

Medicaid.gov, *Federal Policy Guidance*,
    https://www.medicaid.gov/federal-policy-guidance/index.html.........................................................9

## INTRODUCTION

Under the Medicaid program, the federal government matches certain state expenditures for medical assistance. These federal matching funds are subject to specific statutory and regulatory limitations. As relevant here, the statute and regulations require the disallowance of federal matching funds whenever states (or their subdivisions) collect health care-related taxes for which taxpayers are held harmless. *See* 42 U.S.C. § 1396b(w); 42 C.F.R. § 433.68(f). Such taxation schemes violate a fundamental premise of the Medicaid program by allowing states to collect federal funding without any meaningful expenditure of state funds.

For years, CMS has publicly advanced its view that the Medicaid statute and implementing regulations do not authorize federal matching funds when states or localities tax hospitals that have entered into collusive hold harmless arrangements amongst themselves. For example, the state may not collect federal matching funds where a county taxes its hospitals to fund additional Medicaid payments, and the hospitals that serve Medicaid beneficiaries use those payments to reimburse the hospitals that do not—which might seem attractive to Medicaid-reliant hospitals facing political opposition to the taxes. The agency said as much in the Federal Register in 2019. Medicaid Program; Medicaid Fiscal Accountability Regulation, 84 Fed. Reg. 63,722, 63,734 (Nov. 18, 2019) (explaining that these arrangements "are inconsistent with existing statutory and regulatory requirements"). And it specifically informed Florida in September 2022 of its concern that the State ran afoul of these requirements. In February 2023, in an informational bulletin published by CMS, the federal government "reiterate[d]" this view that state or local taxes featuring such arrangements are inconsistent with "the existing federal requirements." Compl., Ex. A at 1, ECF No. 1-7 ("Bulletin").

When, as here, the federal government identifies a health care-related tax arrangement that it suspects may run afoul of the statutory and regulatory prohibitions on hold harmless arrangements, the Centers for Medicare & Medicaid Services ("CMS") may conduct a financial management review ("FMR") to determine whether a violation has occurred. If that investigation reveals that the state share of Medicaid funding derives from a prohibited arrangement, the government then disallows federal matching funds on that basis, and any challenge to the disallowance is channeled through the

administrative process prior to judicial review. 42 U.S.C. § 1316(e). A reviewing court is then presented with detailed factual findings and legal conclusions about a particular taxation scheme, and the question for the court is whether that specific tax justifies a disallowance of matching funds.

Although CMS began a financial management review of Florida's health care-related tax program in February 2023, the agency has not yet determined whether Florida has violated the relevant statute and regulations, nor has it deferred or disallowed any Medicaid funds on that basis. In an effort to overcome the premature nature of its suit, Florida styles its Complaint as a challenge to "the policy announced in the Bulletin and Financial Review Letter,"  Compl. ¶¶ 12, 14, and its five claims arise under the Administrative Procedure Act ("APA"), *see generally id.* ¶¶ 87-115. But judicial review under the APA is subject to important jurisdictional hurdles that Plaintiffs cannot clear, including the absence of final agency action, the Medicaid statute's provision of a procedural scheme for administrative enforcement proceedings, and a lack of ripeness. Accordingly, the Complaint should be dismissed.

## BACKGROUND

I.   **Statutory and Regulatory Background**

      A.  **The Medicaid Program**

The Medicaid program, established under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, is a "cooperative federal-state program that provides federal funding for state medical services to the poor." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433 (2004). "The Federal Government shares the costs of Medicaid with States that elect to participate in the program." *Atkins v. Rivera*, 477 U.S. 154, 156-57 (1986). "In return, participating States are to comply with requirements imposed by the Act and by the Secretary of Health and Human Services." *Id.* at 157.

The Medicaid statute allows states to raise their own funds in many ways. In the early days of the program, that discretion was unfettered—and ultimately abused. States discovered that they could raise money selectively from hospitals serving a large share of Medicaid beneficiaries (through donations or taxes), receive federal matching funds, and then pay those same hospitals more than was

originally collected from them.[1]  This scheme allowed states to effectively claim federal Medicaid funds without contributing any state funds, because no entity within the state ultimately bore the funding burden, violating a fundamental premise of the Medicaid program: federal matching funds are only available when states are spending their own money too.

**B.  The Medicaid Voluntary Contribution & Provider-Specific Tax Amendments**

In the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991, Pub. L. No. 102-234, 105 Stat. 1793, Congress put an end to this scheme. As relevant here, proceeds from taxes imposed on providers would be deducted from a state's medical assistance expenditures and no longer matched with any federal funds unless they were broad-based and free of any hold harmless arrangements. 42 U.S.C. § 1396b(w)(1)(A)(ii)–(iii). The statute provided three definitions of a hold harmless arrangement. *Id.* § 1396b(w)(4). As relevant here, the statute provided that a hold harmless arrangement exists where: "The State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." *Id.* § 1396b(w)(4)(C).

**C.  Implementing Regulations**

**i.    1992 Interim Final Rule and 1993 Final Rule**

The statute authorized the Secretary to issue an interim rule, Pub. L. No. 102-234, § 5(a), 105 Stat. at 1804, which he did. Medicaid Program; Limitations on Provider-Related Donations & Health Care-Related Taxes; Limitations on Payments to Disproportionate Share Hospitals, 57 Fed. Reg. 55,118 (Nov. 24, 1992). The regulatory definition of a hold harmless arrangement was codified at 42 C.F.R. § 433.68(f). CMS emphasized that the "use of any [s]tate payment . . . in a way that is guaranteed to repay the taxpayer for all or part of the cost of health care-related taxes, is a hold harmless situation." 57 Fed. Reg. at 55, 129. CMS sought comment on the interim rule and published a final rule the

---

[1] The chief vehicle for these payments was the Medicaid disproportionate share hospital adjustment, which allows states to pay higher rates to hospitals serving a disproportionate number of low-income patients. When these schemes became common, there was no cap on such adjustments. For discussions of this history, *see Protestant Mem'l Med. Ctr., Inc. v. Maram*, 471 F.3d 724, 726 (7th Cir. 2006); *Ashley Cnty. Med. Ctr. v. Thompson*, 205 F. Supp. 2d 1026, 1029–32 (E.D. Ark. 2002); Cong. Rsch. Serv., *Medicaid Provider Taxes* at 2 (Aug. 5, 2016), https://crsreports.congress.gov/product/pdf/RS/RS22843.

following year with no changes relevant here. Medicaid Program; Limitations on Provider-Related Donations & Health Care-Related Taxes; Limitations on Payments to Disproportionate Share Hospitals, 58 Fed. Reg. 43,156 (Aug. 13, 1993).

In 2001, CMS concluded that five states had been collecting health care-related taxes that featured a hold harmless arrangement. Those states taxed nursing facilities, which passed the tax burden along to their private patients; then the states provided grants or tax credits to the private patients, to effectively indemnify the patients—and thus indirectly the nursing facilities—against the rate increases. CMS disallowed federal matching funds based on those taxes, and the states appealed to the Departmental Appeals Board ("DAB"). The DAB concluded that this taxing scheme did not guarantee to hold the taxpayers harmless. *In re Hawaii Dep't of Hum. Servs. Bd.*, No. A-01-40, 2005 WL 1540188 (Dep't Appeals Bd., Appellate Div. June 24, 2005).

### ii.    2008 Rule

CMS revised its hold harmless regulations in 2008, in part to make clear that the DAB's conclusion was in error. Medicaid Program; Health Care-Related Taxes, 73 Fed. Reg. 9685 (Feb. 22, 2008). As relevant here, the revised regulations provide that a hold harmless arrangement exists if "[t]he State (or other unit of government) imposing the tax provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount." 42 C.F.R. § 433.68(f)(3).

The preamble to the 2008 rule emphasized that the hold harmless prohibitions must be applied with awareness of both the tax and all "associated financial arrangements as a whole, including any non-Medicaid payments." 73 Fed. Reg. at 9691. As CMS explained, over the years, the agency had learned "that it is simply impossible to anticipate every hold harmless arrangement that may be implemented by States." *Id.* at 9690-91. CMS concluded that "to achieve the statutory purpose of ending hold harmless arrangements that result in shifting a disproportionate burden to the federal government, the test" set out at 42 C.F.R. § 433.68(f)(1), and the hold harmless prohibitions more broadly, "must be applied flexibly." *Id.* "Otherwise, financing arrangements will be structured to meet

the letter but not the underlying purpose of the statutory limitations." *Id.*

CMS explained that its revisions were intended as "clarifications," *id.* at 9687, and not "to expand the test for determining when an impermissible hold harmless arrangement exists," *id.* at 9690. CMS also clarified that the arrangements at issue in the 2005 DAB decision were indeed hold harmless arrangements. *Id.* at 9691 & 9694. CMS further explained that "[a] direct guarantee will be found when a State payment is made available to a taxpayer or a party related to the taxpayer with the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments)." *Id.* at 9694.

### iii.    2019 Proposed Rule

In 2019, CMS published a proposed rule further discussing hold harmless arrangements, among other Medicaid fiscal responsibility concerns. 84 Fed. Reg. at 63,722. In that proposed rule, CMS explained that it had "become aware of impermissible arrangements" in which "[t]he taxpayers enter into an agreement, which may or may not be written, to redistribute these Medicaid payments to ensure that taxpayers, when accounting for both the original Medicaid payment (from the state, unit of local government, or [managed care organization]) and any redistribution payment from another taxpayer or taxpayers, receive all or any portion of their tax amount back." *Id.* at 63,734. CMS emphasized that such arrangements are "inconsistent with existing statutory and regulatory requirements prohibiting hold harmless arrangements." *Id.* The agency was concerned that, "[d]espite the statutory and regulatory prohibitions, . . . states, local units of government, and/or providers continue to design and execute hold harmless practices that are antithetical to federal law and regulation," and so proposed "clarifying language to the hold harmless definition." *Id.* at 63,735.

The proposal was not finalized, but instead withdrawn on January 19, 2021. Medicaid Program; Medicaid Fiscal Accountability Regulation, 86 Fed. Reg. 5105 (Jan. 19, 2021). CMS made clear, however, that "[t]his withdrawal action does not affect CMS' ongoing application of existing statutory and regulatory requirements." *Id.*

### D.    February 2023 Informational Bulletin

On February 17, 2023, CMS published an informational bulletin reaffirming this interpretation

of the statute and regulations. Bulletin at 1. The bulletin, which was prompted by inquiries from states regarding potential hold harmless arrangements, "reiterate[d]" the agency's "longstanding position on the existing federal requirements." *Id.* It explained that CMS had "become aware of some health care-related tax programs that appear to contain a hold harmless arrangement that involves the taxpaying providers redistributing Medicaid payments after receipt to ensure that all taxpaying providers receive all or a portion of their tax costs back (typically ensuring that each taxpaying provider receives at least its total tax amount back)." *Id.* at 2.

Turning to the statute and regulations, the bulletin explained that "the state or other unit of government imposing the tax itself need not be involved in the actual redistribution of Medicaid payments for the purpose of making taxpayers whole for the arrangement to qualify as a hold harmless." *Id.* at 4. Instead, "[i]t is possible for a state to indirectly provide a payment within the meaning of section 1903(w)(4)(C)(i) of the Act that guarantees to hold taxpayers harmless for any portion of the costs of the tax, if some or all of the taxpayers receive those payments at issue through an intermediary (for example, a hospital association or similar provider affiliated organization) rather than directly from the state or its contracted managed care plan." *Id.* The bulletin further explained, "hold harmless arrangements . . . can be based [ ] on reasonable expectations that certain actions will take place among participating entities that will result in taxpayers being held harmless for all or a portion of their health care-related tax costs." *Id.*

Finally, the bulletin encouraged states to "make clear to their providers that these arrangements are not permissible under federal requirements, learn the details of how health care-related taxes are collected, and take steps to curtail these practices if they exist." *Id.* at 5. The bulletin also committed CMS "to work with states that may have existing questionable arrangements to ensure compliance with federal statutory and regulatory requirements." *Id.* at 2.

## II.    CMS's Interactions with the State of Florida

In 2022, before the issuance of the challenged bulletin, CMS reviewed Florida's proposed Medicaid Managed Care State Directed Payments (SDP) for Federal Fiscal Year (FY) 2022. The Local Provider Participation Fund ("LPPF") arrangement is part of the State's Directed Payment Program.

Compl. ¶ 34. In reviewing Florida's SDP proposal, CMS became concerned about the possibility of hold harmless agreements between Florida hospitals. *See* Compl., Ex. B at 1, ECF No. 1-8 ("FMR Letter"). In conjunction with approving that proposal, "CMS issued a companion letter to the state identifying concerns that the LPPF tax program may not comply with certain health care-related tax requirements in section 1903(w)(4) of the Social Security Act and implementing regulations in 42 C.F.R. [§] 433.68(f)(3)." *Id.* The companion letter also informed Florida that CMS intended to conduct a financial management review of Florida's LPPF tax program during fiscal year 2023. *Id.*

On February 22, 2023, CMS notified the State that CMS would perform an FMR "over the next several months" focused on the LPPF program. *Id.* The letter included a preliminary request for information regarding the LPPF program and hold harmless arrangements and indicated that additional questions might follow as necessary. *Id.* at 4-6. CMS also indicated that it anticipated requesting information directly from individual health care providers through the course of the review. *Id.* at 2. The financial management review is still ongoing.

## III.    This Litigation

On August 18, 2023, the State of Florida and AHCA filed this lawsuit. *See generally* Compl. Florida subsequently moved for a preliminary injunction to "enjoin the Defendants from enforcing, implementing, or otherwise relying on the Bulletin and the policy and interpretation it announces to conduct any audit or review, including the pending Financial Management Review of Florida, or to defer, reduce, or disallow any Medicaid funding for Florida." *See* Pls.' Mot. for Prelim. Inj. at 20, ECF No. 10 ("PI Mot."). A hearing on that motion is scheduled for December 20, 2023. Defendants now move to dismiss the Complaint.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows for dismissal of a claim when the court lacks subject-matter jurisdiction. A motion to dismiss for lack of subject matter jurisdiction brought pursuant to Rule 12(b)(1) may present either a facial or a factual challenge to the compliant. *See McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). "A 'facial attack' on the complaint 'require[s] the court merely to look and see if [the] plaintiff has sufficiently

alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'" *Id.* (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). The burden for establishing subject-matter jurisdiction rests with the parties bringing the claim, *i.e.* with Plaintiffs. *McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002).

## ARGUMENT

I.  **Neither the informational bulletin nor the financial management review letter is a final agency action.**

Judicial review under the APA is generally limited to "final agency action," 5 U.S.C. § 704, and neither an informational bulletin, nor a letter commencing an FMR, constitute final agency action. Final agency action must (1) represent "the consummation of the agency's decisionmaking process," and (2) conclusively determine legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). "The 'core question' about finality 'is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.'" *Canal A Media Holding, LLC v. U.S. Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1255 (11th Cir. 2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)).

Courts should also consider "pragmatic" concerns, focusing "on whether judicial review at th[is] time will disrupt the administrative process." *Clayton Cnty. v. Fed. Aviation Admin.*, 887 F.3d 1262, 1266 (11th Cir. 2018) (quoting *Riverkeeper v. EPA*, 806 F.3d 1079, 1083 (11th Cir. 2015)); *see also Bd. of Dental Exam'rs of Ala. v. FTC*, 519 F. Supp. 3d 1033, 1039 (N.D. Ala. 2021) (discussing the "policy rationale" behind the final agency action requirement).

Florida seeks to challenge "the policy announced in the Bulletin and Financial Review Letter," Compl. ¶¶ 12, 14, neither of which constitute final agency action under the APA.

A.  **The informational bulletin merely reiterates the agency's pre-existing interpretation of the relevant statute and regulations.**

Florida cannot rely on the informational bulletin to establish the requisite final agency action. The bulletin "create[s] no new legal obligations beyond those the [statute and regulations] already imposed." *Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016). Rather, it simply reminds the public of a legal view previously articulated by the agency. "An agency's restatement of

an already-existing policy or interpretation does not, on its own, determine any rights or obligations and imposes no legal consequences." *Clayton Cnty.*, 887 F.3d at 1266-67.

Informational bulletins "share information, address operational and technical issues, and highlight initiatives or related efforts." Medicaid.gov, *Federal Policy Guidance* (last visited Dec. 10, 2023), https://www.medicaid.gov/federal-policy-guidance/index.html. They are not intended to "establish new policy or issue new guidance." *Id.* And the bulletin at issue in this case did not do so.

For years, CMS has been quite clear that when taxpayers subject to a health care-related tax "enter into an agreement . . . to redistribute [ ] Medicaid payments to ensure that taxpayers . . . receive all or any portion of their tax amount back," those agreements violate "existing statutory and regulatory requirements prohibiting hold harmless arrangements." 84 Fed. Reg. at 63,734. In 2008, CMS published a preamble to a final rule on hold harmless arrangements explaining "that it is simply impossible to anticipate every hold harmless arrangement that may be implemented by States," and that regulations "cannot address every specific circumstance and nuance," and thus that CMS must consider "the tax and associated financial arrangements as a whole, including any non-Medicaid payments." 73 Fed. Reg. at 9690-91. The 2008 preamble made clear that the test "must be applied flexibly," *id.* at 9691, because "[o]therwise, financing arrangements will be structured to meet the letter but not the underlying purpose of the statutory limitations." *Id.* CMS also explained that "[a] direct guarantee will be found when a State payment is made available to a taxpayer or a party related to the taxpayer with the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments)." *Id.* at 9694.

In 2019, CMS published a proposed rule directly acknowledging the type of arrangement addressed in the bulletin, noting that it had "become aware of impermissible arrangements" in which "[t]he taxpayers enter into an agreement, which may or may not be written, to redistribute these Medicaid payments to ensure that taxpayers, when accounting for both the original Medicaid payment (from the state, unit of local government, or [managed care organization]) and any redistribution payment from another taxpayer or taxpayers, receive all or any portion of their tax amount back." 84 Fed. Reg. at 63,734. In the proposed rule, CMS made clear that it viewed such arrangements as

"inconsistent with existing statutory or regulatory requirements prohibiting hold harmless arrangements." *Id.* Although the proposed rule was eventually withdrawn, CMS expressly stated that the withdrawal "does not affect CMS' ongoing application of existing statutory and regulatory requirements." 86 Fed. Reg. at 5105.

And in September 2022—months *before* the informational bulletin issued—CMS conveyed to Florida its concerns that the State's LPPF tax program "may not comply" with the statutory and regulatory prohibition on hold harmless arrangements, and notified the State that it intended to conduct a financial management review to investigate whether there is an arrangement in the State to redistribute Medicaid state directed payments. FMR Letter at 1-2.

When CMS issued the informational bulletin in February 2023, then, it was not advancing a new interpretation of the statute or regulations. Rather, it simply "reiterate[d]" the agency's existing position. Bulletin at 1. And CMS had already made clear its intent to investigate Florida's LPPF tax program before the bulletin even issued. Because the bulletin did not establish a new policy or new obligations, it does not determine any rights or obligations, and it imposes no legal consequences.

In *Texas v. Brooks-LaSure*, the court reached a different conclusion on a motion for preliminary injunction based on its understanding that "CMS has maintained an equivocal stance on these agreements," ---F. Supp. 3d---, 2023 WL 4304749, at *7 (E.D. Tex. June 30, 2023); but it did so in part in reliance on a sworn statement in a declaration that in early 2019, "Texas contacted CMS to seek guidance" on private redistribution arrangements and "CMS advised at that time that so long as neither the State nor unit of local government was providing the guarantee, there is not a prohibition on such private business arrangements." Decl. of Victoria Grady ¶ 24, *Texas v. Brooks- LaSure*, No. 6:23-cv-00161-JDK (E.D. Tex. Apr. 14, 2023) (ECF No. 5-3); *see Texas*, 2023 WL 4304749, at *8 (citing the Grady declaration).[2] The Complaint does not point to any similar conversations between CMS and Florida, and it conveniently skips over the September 2022 companion letter notifying the

---

[2] The government does not concede that this vague and ambiguous allegation or private assurances by an unidentified individual proves that CMS held this view, particularly in the face of the agency's public repudiation of that view in the 2019 proposed rule. But Florida offers even less than that.

state of CMS's concerns regarding Florida's LPPF arrangements *before* the bulletin issued. *See* Compl. ¶¶ 45-50. The other statement relied on by Florida—an ambiguous email exchange from 2019 between a CMS employee and counsel for certain private hospitals—does not overcome CMS's clear articulation, both in the Federal Register and in correspondence directly with the State, of its interpretation of the relevant statute and regulation. *Cf. Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 53 (D.D.C. Aug. 28, 2017) (holding that a single, isolated email from an agency employee about the scope of the agency's authority does not displace a subsequent, more formal statement of the agency's position).

On a pragmatic level, judicial review based solely on the informational bulletin would "disrupt the administrative process" in at least two ways. *Clayton Cnty.*, 887 F.3d at 1269 (quoting *Riverkeeper*, 806 F.3d at 1083). First, allowing court intervention in this scenario would "interfere with the agencies' ability to consult with and advise regulated parties about how to comply with federal law and regulations." *Id.* CMS published the bulletin at issue in this case because it "ha[d] been approached by several states with questions regarding the statutory and regulatory requirements applicable to health care-related taxes[.]" Bulletin at 1. CMS had received questions "focused on whether health care-related tax arrangements involving the redistribution of Medicaid payments among providers subject to the tax would comply with the statutory and regulatory prohibition on 'hold harmless' arrangements." *Id.* Faced with these questions, CMS had a choice. It could have responded only to those states that asked direct questions about the issue, thus leaving other states without valuable additional guidance regarding CMS's interpretation of the statute. Or it could have initiated financial management reviews—or even disallowances—based on that interpretation, without issuing a guidance document. But CMS chose to issue the bulletin to ensure that every state had a clear understanding of its interpretation of the federal requirements for health care-related taxes, expressing its intention "to work with states that may have existing questionable arrangements to ensure compliance[.]" *Id.* at 2. To allow judicial intervention at this point "might mean that regulated parties could bring lawsuits whenever an agency advises a party of its already-existing obligations," which would in turn "discourage agencies from offering advisory guidance," harming regulated parties who

benefit from such guidance. *Clayton Cnty.*, 887 F.3d at 1266.

Second, if the Court were to intervene at this stage, "it would force the agency to litigate over what may be a preliminary conclusion made without a full grasp of the relevant facts." *Id.* at 1269. In its Complaint, Florida has raised arguments for why its LPPF tax program does not violate the relevant statute and regulations, *see, e.g.*, Compl. ¶ 96. CMS should be permitted to investigate the facts underlying Florida's LPPF arrangements and consider the State's arguments before making a final determination about Florida's compliance with the relevant law, rather than being forced to litigate these issues for the first time in federal court without full command of the relevant facts and before it has even made a decision to disallow funds. Moreover, CMS's review might reveal that many of the arguments raised in the Complaint are merely academic—for example, if CMS were to find that Florida was aware of or coordinated hold harmless arrangements between private hospitals, then it would be entirely beside the point whether the statute prohibits hold harmless arrangements without any State involvement or awareness.

### B. The FMR Letter marks the commencement of agency action, not the consummation of it.

The FMR Letter is also not final agency action, as it marks the *start* of a financial management review, not the consummation of CMS's decisionmaking process. Florida argues that the FMR letter constitutes final agency action because the letter "immediately obligated Florida to comply with CMS's informational demands," *see* Pls.' Reply in Supp. of their Mot. for Prelim. Inj. at 4-5, ECF No. 23 ("PI Reply"), but that argument holds no water.

The Eleventh Circuit rejected a similar argument in *Clayton County*, where several Georgia counties sought to challenge a letter from the FAA setting forth its interpretation of a particular statute and "expressing concern that [the counties] might not be in compliance" and asking them "to contact the FAA to discuss . . . methods . . . to achieve compliance." 887 F.3d at 1264-66. The counties challenged the letter in court, arguing that it constituted final agency action because it "set[] forth a new, binding interpretation of" the relevant statute, and because it "reflects that the FAA has decided that [the counties' conduct] violate[d] [the relevant statute] and that the FAA will enforce its

interpretation of [the statute] against [the counties]." *Id.* at 1266. With respect to the former argument, the court held that the letter "merely restate[d]" the agency's prior interpretation of the statute. *Id.* With respect to the latter argument, the counties claimed that "they risk[ed] significant civil penalties if they fail[ed] to follow the Letter." *Id.* at 1268. But the Eleventh Circuit soundly rejected that argument, noting that "an agency's observation that a party's practices may potentially violate the law does not necessarily mark the culmination of the agency's decisionmaking process so as to determine a party's legal rights or obligations." *Id.*; *see also Riverkeeper*, 806 F.3d at 1080-83 (holding that an "interim response" from EPA expressing "significant concerns about the adequacy" of a state's permitting program did not constitute final agency action (citation omitted)). The court then held that the letter "is not final agency action in the sense that it determines that [the counties] have violated the law or threatens enforcement," and thus "the Letter by itself does not determine [the counties'] rights or obligations." *Clayton Cnty.*, 887 F.3d at 1269.

Other courts have reached similar conclusions. In *Federal Trade Commission v. Standard Oil Company of California*, the Supreme Court held that FTC's issuance of a complaint averring that it had reason to believe that eight major oil companies were violating the law was not final agency action because it was "not a definitive statement of position [but instead] represent[ed] a threshold determination that further inquiry [was] warranted and that a complaint should initiate proceedings." 449 U.S. 232, 241 (1980). On the same logic, the Tenth Circuit held that a letter "ask[ing] [a company] to keep its records for the audit period, request[ing] access to all documents and information in [the company's] possession relating to crude oil production and disposition for the audit period, and notif[ying] [the company] that [the agency] intended to initiate an audit" did not constitute final agency action. *Mobil Expl. & Producing U.S., Inc. v. Dep't of Interior*, 180 F.3d 1192, 1198-99 (10th Cir. 1999); *see also, e.g.*, *City of San Diego v. Whitman*, 242 F.3d 1097, 1101-02 (9th Cir. 2001) (holding that a letter from an agency did not constitute final agency action where the "consummation of the decision-making process on the issue" would be a decision by the Environmental Appeals Board); *Veldhoen v. U.S. Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994) ("An agency's initiation of an investigation does not constitute final agency action. . . . Normally, the plaintiff must await resolution of the agency's inquiry and

challenge the final agency decision." (citation omitted)).

The same reasoning applies here. Even Florida does not argue that the FMR Letter itself set forth a new, binding interpretation of the relevant statute (which makes sense, given that Florida claims that interpretation was first set out in the informational bulletin that predated the FMR Letter). And the FMR Letter does not determine that Florida has violated the statutory prohibition on hold harmless arrangements; instead, it expresses the agency's concern that "the Florida LPPF arrangement may be similar to other states' arrangements that appear to violate federal requirements." FMR Letter at 1. The letter marks the beginning of an investigation, not the end of one, and it does not threaten enforcement. It explains that CMS will begin a financial management review "to examine whether the state's source of non-federal share, including the LPPF tax program, complies with Federal statute and regulations," and sets out a number of steps that the agency intends to take as part of its review, including providing several opportunities for Florida to respond to any findings, observations, or recommendations. *Id.* at 2. The FMR Letter ends by notifying Florida that after each of these steps has been taken, "a final report will be issued that will incorporate the state's response to any findings, observations, and recommendations including CMS comments to the state's response." *Id.* Thus, like the letter at issue in *Clayton County*, the FMR Letter "by itself does not determine [Florida's] rights or obligations," and therefore does not constitute reviewable final agency action. 887 F.3d at 1269.

The FMR Letter's "informational demands" do not change this analysis. Agency investigations or adjudications frequently require participation from the targets of those investigations. But "[i]t is firmly established that agency action is not final merely because it has the effect of requiring a party to participate in an agency proceeding." *Aluminum Co. of Am. v. United States*, 790 F.2d 938, 941 (D.C. Cir. 1986). The same is true of participation in an investigation or a financial management review. *See Bd. of Dental Ex'rs*, 519 F. Supp. 3d at 1039-40 (holding that neither the initiation of an FTC investigation nor the issuance of a Civil Investigative Demand requesting information constitute final agency action). To hold otherwise would allow the subjects of administrative investigations and adjudicatory proceedings to litigate any non-final administrative actions, leading to "more protracted" investigations "full of stops and starts" as courts are called on to second-guess every step taken by an

agency. *Id.* at 1039. This approach would "burden courts and administrative agencies, delay resolution of administrative proceedings, and prevent administrative agencies from correcting their mistakes." *Id.*; *see also Standard Oil*, 449 U.S. at 243 ("Judicial intervention into the agency process denies the agency an opportunity to correct its own mistakes and to apply its expertise. . . . Intervention also leads to piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary." (citation omitted)).

The FMR Letter marks the beginning of the financial management review process. In connection with that process, CMS has begun to review documentation to determine whether Florida has violated the relevant portion of the Medicaid Act and related regulations. CMS has not yet determined whether Florida has violated the law, and the review process will offer Florida several opportunities to make its case—including by raising arguments that it has advanced before this Court. If the FMR does culminate in a disallowance, there is already a mechanism in place for Florida to challenge that decision—first, in agency proceedings, and eventually, before this Court.[3] Florida should not be allowed to circumvent that orderly process.

## II.   Judicial review is barred by the *Thunder Basin* doctrine and is not authorized by the APA.

The Court also lacks subject-matter jurisdiction over this action because Congress has already created an "exclusive remedy" in the Departmental Appeals Board. Where it is "fairly discernible" that an elaborate statutory review scheme for administrative enforcement proceedings was intended to create an exclusive remedy, parallel jurisdiction outside that scheme is precluded. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994) (citation omitted). In such circumstances, claims may only proceed outside that scheme if they are not "of the type Congress intended to be reviewed within th[e] statutory structure." *Id.* at 212; *see also Doe v. Fed. Aviation Admin.*, 432 F.3d 1259, 1261-63 (11th Cir. 2005). Courts "presum[e] that Congress does not intend to limit . . . jurisdiction" if (1) "a finding of preclusion could foreclose all meaningful judicial review," (2) the suit is "wholly collateral to a statute's review provisions," and (3) the claims lie "outside the agency's expertise." *Elgin v. Dep't of Treasury*, 567

---

[3] A state that appeals to the DAB may retain any disputed funding unless and until the DAB upholds the disallowance. *See* 42 U.S.C. § 1396b(d)(5); 42 C.F.R. § 430.42(b).

U.S. 1, 15 (2012) (citation omitted).

That CMS has not yet issued a disallowance does not mean that Florida can skip over administrative proceedings and go directly to federal court. In *Doe v. FAA*, plaintiffs tried a similar tactic and claimed that "the statutorily prescribed administrative-review process [was] inapplicable because their lawsuit was filed before" any administrative proceedings. 432 F.3d at 1262. The Eleventh Circuit found that argument was "meritless," and that the district court lacked subject-matter jurisdiction over the suit. *Id.* at 1262-63. Florida has tried to distinguish *Doe* on the basis that Florida is not challenging a specific disallowance, *see* PI Reply at 6, but that argument has no merit. In *Doe*, the plaintiffs were not challenging a specific certificate action. As the Eleventh Circuit explained, "the [plaintiffs] contend[ed] that they need not submit to the administrative-review process because the FAA has not yet taken any certification action[.]" 432 F.3d at 1262. The Eleventh Circuit soundly rejected that argument, noting:

> [i]f, instead of filing their lawsuit in district court, the [plaintiffs] had either: (1) refused to submit to reexamination, or (2) submitted to and failed reexamination, the FAA could have: (1) determined that a safety emergency existed and issued an order suspending or revoking the mechanics' certificates immediately, or (2) issued an order notifying the mechanics of the reasons for its concern and provided them with opportunities to be heard by the NTSB as to why their certificates should not be suspended or revoked. . . . Once one of these FAA orders was issued, the mechanics' rights to appeal to the NTSB would have vested; and the mechanics could obtain judicial review of any NTSB order in the appropriate federal court of appeals.

*Id.* at 1262-63 (citation omitted). The same is true here: if, instead of filing its lawsuit in district court, Florida had either (1) refused to comply with CMS's financial management review, or (2) participated in a financial management review that revealed a prohibited hold harmless arrangement, then CMS could have issued a disallowance that would then be appealable to the DAB under 42 U.S.C. § 1316(e). Florida's entire theory of harm in this case turns on CMS's ability to issue a disallowance, whether for failure to comply with a reasonable demand for information or for failure to comply with the statutory and regulatory prohibition on hold harmless arrangements. *See, e.g.*, Compl. ¶¶ 68-69 (alleging that "a disallowance would likely deprive the State of all the funding—federal and non-federal—generated through the LPPF" and that "[w]ithout the LPPF-associated funding, hospitals will be deprived of crucial funding"); *see also id.* ¶ 80 (noting that failure to comply with informational requests "may result

16

in a deferral or disallowance of federal financial participation" (quoting FMR Letter at 1)). Indeed, Florida explicitly asks this Court to, among other things, "enjoin[] defendants from relying on" CMS's interpretation of 42 U.S.C. § 1396b(w)(4)(C)(i) "as a basis to recoup, defer, or disallow any Medicaid reimbursement payments." Compl., Prayer for Relief. In other words, Florida's goal in pursuing this litigation is to prevent CMS from issuing a disallowance, thus avoiding the administrative review process mandated by statute.

But Florida, like the plaintiffs in *Doe*, "simply cannot avoid the statutorily established administrative-review process by rushing to the federal courthouse for an injunction preventing the very action that would set the administrative-review process in motion." 432 F.3d at 1263. To hold otherwise would undermine the entire statutory review scheme, as any state could avoid a financial management review by simply rushing to court as soon as the agency began its review. *See id.*

To begin with, the administrative enforcement proceedings that Congress established at 42 U.S.C. § 1316(e) are plainly meant to be exclusive. Section 1316(e)(1) provides that when the agency issues a disallowance, a State "shall be entitled to and upon request shall receive a reconsideration of the disallowance" within sixty days of notice of the disallowance. 42 U.S.C. § 1316(e)(1). Section 1316(e)(2) provides that a State may appeal either a disallowance or an unfavorable reconsideration of a disallowance to the Departmental Appeals Board within sixty days of notice of the disallowance or unfavorable reconsideration, and "[t]he Board shall consider a State's appeal . . . on the basis of such documentation as the State may submit and as the Board may require to support the final decision of the Board." *Id.* § 1316(e)(2)(B). "The Board's decision of an appeal . . . shall be the final decision of the Secretary and shall be subject to reconsideration by the Board only upon motion of either party filed during the 60-day period that begins on the date of the Board's decision or to judicial review in accordance with subparagraph (C)." *Id.* Finally, "[a] State may obtain judicial review of a decision of the Board by filing an action in any United States District Court located within the appealing State . . . or the United States District Court for the District of Columbia." *Id.* § 1316(e)(2)(C). Of note, the statute provides that "[s]uch an action may only be filed" within sixty days following the Board's decision, or within sixty days of the Board's decision on a timely motion for reconsideration. *Id.* In

other words, the statute provides that to obtain judicial review of a disallowance decision, the State must first submit to the administrative enforcement scheme set forth in section 1316(e).

Each *Thunder Basin* factor weighs in favor of the conclusion that Congress meant to limit jurisdiction over the claims at issue here. First, precluding judicial review now would not foreclose meaningful judicial review later. To the contrary, a court reviewing a DAB decision would be far better situated to resolve the legal issues at play here, because it would have a fully developed factual record. *See id.* § 1316(e)(2). For example, the financial management review could reveal not only whether a hold harmless arrangement exists within the State of Florida in connection with the LPPF tax program, but also whether and to what extent Florida knew about such an arrangement. That information is critical because it would move the legal issues in this case from hypothetical to actual. And while the DAB is "bound by all applicable laws and regulations," 45 C.F.R. § 16.14, it is empowered to consider whether the agency has correctly interpreted and applied those laws and regulations. Florida itself notes that in 2005, the DAB disagreed with CMS's interpretation of the hold harmless provision and sided with a state over the agency. Compl. ¶ 46 (citing *In re Hawaii*, 2005 WL 1540188, at *3). If Florida is correct that the agency has misinterpreted the relevant statute and regulations, the DAB is empowered to overturn a disallowance based on that misinterpretation. *See In re Hawaii*, 2005 WL 1540188 (rejecting CMS's interpretation of the hold harmless provision and overturning disallowances in their entirety). Granted, this process would provide for "delayed judicial review," insofar as Florida would need to appeal any disallowance to the DAB before challenging that decision in federal court. *Doe v. FAA*, 432 F.3d at 1263. But that delay is inherent in any administrative review scheme, and it does not deprive Florida of all federal court review of its allegations. *Id.*

Second, Florida's claims are not "wholly collateral" to the administrative review scheme but go to the heart of the statute and regulations that CMS enforces. *See id.* Florida has argued that this factor is not met because "this case concerns CMS's policy, not a particular disallowance determination," PI Reply at 7. But, as explained above, each of the negative consequences that Florida fears stems from the threat of disallowance. *See* pages 16-17, *supra*. And if CMS were to issue a disallowance, Florida would presumably reiterate all its arguments regarding CMS's "policy" in its

18

appeal to the DAB. Thus, this action effectively raises the same claims that would be raised if this matter went before the DAB after a disallowance. The fact that Florida filed this action before CMS issued a disallowance does not change the fact that the claims in this litigation go to the heart of the statute and regulations that would be at issue in a proceeding challenging a disallowance.

Finally, the State's claims, which concern the proper interpretation of that statute and those regulations, are well within the agency's expertise. Florida has argued that "standard questions of administrative and constitutional law" do not require an agency's expertise, *see* PI Reply at 7 (citation omitted), but that argument ignores that the DAB would be called on to address not only the questions of administrative and constitutional law raised by Florida in this litigation, but also "fact-bound inquiries that, even if 'formulated in constitutional terms,' rest[] ultimately on 'factors that call for [an] understanding'" of Medicaid funding and health care-related tax arrangements—*i.e.*, matters within the agency's expertise, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 (2010) (contrasting statutory questions requiring "technical considerations of [agency] policy" with "standard questions of administrative law" (citations omitted)). For example, the DAB would be called on to determine not just whether a redistribution agreement between hospitals could constitute a hold harmless arrangement under the relevant statute and regulations, but whether a *specific* redistribution agreement had the effect of holding the taxpayer harmless, among other fact-bound inquiries.

Through section 1316(e), Congress provided an elaborate statutory review scheme for challenges to disallowances, including those disallowances related to impermissible hold harmless arrangements. Florida is not permitted to circumvent that system by rushing to court as soon as it fears that a disallowance may be coming down the pike.

## III.   Florida's challenges to the informational bulletin and the financial management review are not ripe.

"The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citation omitted). The doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative

policies" and "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 807-08; *see also Ipharmacy v. Mukasey*, 268 F. App'x 876, 878 (11th Cir. 2008). "When a court is asked to review decisions of administrative agencies, it is hornbook law that courts must exercise patience and permit the administrative agency the proper time and deference for those agencies to consider the case fully." *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005). Accordingly, a party's claim "is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)).

Here, Florida's challenge to the informational bulletin and the financial management review are not fit for decision. CMS has not yet made any determination regarding whether the tax arrangements in Florida violate the relevant statute and regulations, and therefore no administrative decision has been formalized, nor have its effects been felt in a concrete way by the State. *Nat'l Park*, 538 U.S. at 807. The Eleventh Circuit has recognized that where a guidance document merely clarifies the agency's understanding of the relevant law, it does not constitute final agency action and therefore does not concern a ripe controversy. *See Ipharmacy*, 268 F. App'x at 878 (addressing DEA guidance document). And it matters not that CMS has instituted a financial management review of the State's LPPF tax program, as "the decision of an agency to investigate someone does not affect that person's legal rights." *Id.* (citing *Sec. & Exch. Comm'n v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 742 (1984)). The same is true here.

## CONCLUSION

For the reasons set forth above, the Complaint should be dismissed in its entirety.

Date: December 12, 2023                    Respectfully submitted,


                                           BRIAN M. BOYNTON
                                           Principal Deputy Assistant Attorney General

                                           MICHELLE BENNETT
                                           Assistant Director, Federal Programs Branch

                                           */s/  Alexandra R. Saslaw*
                                           ALEXANDRA R. SASLAW
                                           Trial Attorney
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L Street, NW
                                           Washington, DC 20530
                                           Alexandra.R.Saslaw@usdoj.gov
                                           Telephone: (202) 514-4520

                                           *Counsel for Defendants*

**CERTIFICATE OF GOOD FAITH CONFERENCE**

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues raised in this motion and has been unable to do so.  Plaintiffs oppose the motion.

_/s/  Alexandra R. Saslaw_
ALEXANDRA R. SASLAW