UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CV-61595-DIMITROULEAS/AUGUSTIN-BIRCH

STATE OF FLORIDA, et al.,

 Plaintiffs,

v.

CHIQUITA BROOKS-LASURE, et al.,

 Defendants.
_____/

**REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [DE 10] AND DEFENDANTS' MOTION TO DISMISS [DE 40]**

 This cause comes before the Court on Plaintiff State of Florida's Motion for Preliminary Injunction, DE 10, and Defendants' Motion to Dismiss. DE 40. The Honorable William P. Dimitrouleas, United States District Judge, has referred both Motions to the undersigned United States Magistrate Judge for a report and recommendation. DE 24; DE 41. The Court held a hearing on Florida's Motion for Preliminary Injunction on December 20, 2023, and the Court has carefully considered the Motions, the briefing, the record, and is otherwise fully advised. For the same underlying reason—the lack of final agency action—the Court **RECOMMENDS** that Florida's Motion for Preliminary Injunction [DE 10] be **DENIED WITHOUT PREJUDICE**, that Defendants' Motion to Dismiss [DE 40] be **GRANTED**, and that Florida's complaint be **DISMISSED WITHOUT PREJUDICE.**

### I. Background

 This case involves how Florida raises funds for its Medicaid program, and, as Florida alleges, Defendants' new rule regarding what constitutes an impermissible method of raising funds. The following is provided by way of background.

### A. The Medicaid System and Prohibition on Hold Harmless Provisions

Medicaid, established at 42 U.S.C. § 1396 *et seq.*, is "a jointly financed federal-state program, designed to help states furnish medical treatment to their needy citizens." *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011). As part of the federal-state cooperation under the Medicaid system, "[s]tates devise and fund their own medical assistance programs, subject to the requirements of the Medicaid Act, and the federal government provides partial reimbursement." *Id.* (citing 42 U.S.C. §§ 1396b(a), 13986d(b)). States are permitted to raise funds for their non-federal share of Medicaid payments in a variety of manners, but Congress has closed a loophole that states previously utilized to gain extra federal matching funds.

During the late 1980s and early 1990s, states imposed health care-related taxes on providers and received provider-related donations to finance their non-federal share of Medicaid payments. Medicaid Program; Medicaid Fiscal Accountability Regulation, 84 Fed. Reg. 63,722, 63,730 (Nov. 18, 2019). Based on the increased funds resulting from the taxes and donations, states would then receive extra federal matching funds without having contributed any additional state money towards their Medicaid contribution, and the providers would recoup the imposed tax or donation through state payments bolstered by the increased Medicaid matching funds, thereby holding the providers "harmless" for the cost of their tax or donation payment. *Id.* To curb this practice, Congress passed the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments, Pub. L. 102-234, 105 Stat. 1, 793 (codified as amended at 42 U.S.C. § 1396b(w)), which required "the total amount of the state's Medicaid expenditures [to] be reduced by the amount of revenue the state collects from impermissible health care-related taxes." *Id.*

One type of impermissible health care-related tax occurs when the health care-related tax contains, in effect, a "hold harmless provision," 42 U.S.C. § 1396b(1)(A)(iii), and a "hold harmless provision" is defined by statute as: "The State or other unit of government imposing the tax

provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." *Id.* § 1396b(4)(C)(i). Defendant Centers for Medicare and Medicaid Services ("CMS") later implemented this statutory definition into regulation for determining whether a hold harmless provision exists. Medicaid Program; Health Care-Related Taxes, 73 Fed. Reg. 9,685, 9,699 (Feb. 22, 2008) (codified at 42 C.F.R. § 433.68(f)(3)).

### B. Florida's Directed Payment Program

According to Florida, because a hospital's costs for providing services to Medicaid recipients are often greater than the Medicaid payments received by the hospital, hospitals in Florida generally suffer a "shortfall." DE 10-1 ¶ 8. To remedy this shortfall, Florida established a "Directed Payment Program" ("DPP") to generate additional Medicaid funding. *Id.* ¶ 9; Ch. 2021-36, § 3, Ln. 210, Laws of Fla. Under Florida's DPP, municipalities and counties can levy a special assessment on private hospitals within their jurisdiction, and the assessments are then pooled into a dedicated fund called a Local Provider Participation Fund ("LPPF"). DE 10-1 ¶¶ 10–11. Pooled funds in the LPPF are then transferred to Florida's Agency for Health Care Administration ("AHCA"), which in turn obtains matching federal funds from CMS. *Id.* ¶ 11. Once Florida's AHCA receives matching federal funds from CMS, it transfers all of the funds obtained, both the LPPF funds and the matching federal funds, to Florida's Medicaid Managed Care Organizations ("MCO"), which then distributes the funds to Florida hospitals. *Id.* ¶ 12. Therefore, as Florida contends, the entity imposing the assessment on private hospitals—counties and municipalities in Florida—is different from the entity providing payments to the hospitals—Florida's MCO. *Id.* ¶ 20. And as of August 2023, twenty-one Florida counties and municipalities have passed ordinances establishing the LPPFs that fund the DPP, and each ordinance provides that the assessments may not hold harmless the private hospitals subject to the assessments. *Id.* ¶¶ 16–17.

## C. CMS's Informational Bulletin

On February 17, 2023, CMS issued an "Informational Bulletin" entitled "Health Care-Related Taxes and Hold Harmless Arrangements Involving the Redistribution of Medicaid Payments." DE 1–7 at 2. In the Bulletin, CMS stated it was reiterating the federal requirements concerning hold harmless arrangements, recommended that states with questions or concerns about the permissibility of a health care-related tax raise these concerns to CMS early in the process of the state's development of a tax program, and announced its intention to work with states that have questionable arrangements to ensure compliance with federal statutory and regulatory requirements. *Id.* at 3.

In particular, CMS announced in the Informational Bulletin that it was increasingly encountering health care-related tax programs that appeared to contain hold harmless arrangements. *Id.* CMS described the arrangements it was finding as follows:

> [A] state or other unit of government imposes a health-care related tax, then uses the tax revenue to support the non-federal share of Medicaid payments back to the class of providers subject to the tax. The taxpayers appear to have entered into oral or written agreements (meaning explicit or implicit meeting of the minds, regardless of the formality or informality of any such agreement) to redirect or redistribute the Medicaid payments to ensure that all taxpayers receive all or a portion of their tax back, when considering each provider's retained portion of any original Medicaid payment (either directly from the state or from the state through a managed care plan ) and any redistribution payment received by the provider from another taxpayer or taxpayers. These redistribution payments may be made directly from one taxpaying provider to another, or the funds may be contributed first to an intermediary redistribution pool.

*Id.* at 3–4 (footnotes omitted). CMS further noted "there appear to be agreements among providers (explicit or implicit in nature) such that providers that furnish a relatively high percentage of Medicaid-covered services redistribute a portion of their Medicaid payments to providers with relatively low (or no) Medicaid service percentage," which results in taxpaying providers being held harmless for all or a portion of their health care-related taxes. *Id.* at 4.

4

Moreover, CMS discussed in the Informational Bulletin its definition of a hold harmless arrangement, as implemented in 42 C.F.R. § 433.68(f)(3). *Id.* at 5 ("[A] hold harmless arrangement exists where '[t]he State (or other unit of government) imposing the tax provides for any direct or <u>indirect</u> payment, offset, or waiver such that the provision of the payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount." (emphasis in original)). And CMS explained that "indirect," as used in the regulation, "makes clear that the state or other unit of government imposing the tax itself need not be involved in the actual redistribution of Medicaid payments for the purpose of making taxpayers whole for the arrangement to qualify as a hold harmless." *Id.* Therefore, CMS maintained that a state could indirectly provide for a payment that guarantees to hold taxpayers harmless for any portion of a cost if the taxpayers receive the payments through an intermediary. *Id.* CMS further articulated that these hold harmless arrangements "typically are not overtly established through state law" but can instead be based on "reasonable expectations that certain actions will take place among participating entities that will result in taxpayers being held harmless for all or a portion of their health care-related tax costs." *Id.*

Accordingly, CMS advised states to "make clear to their providers that these arrangements are not permissible under federal requirements, learn the details of how health care-related taxes are collected, and take steps to curtail these practices if they exist." *Id.* at 6. CMS also announced that "as part of the agency's normal oversight activities and review of state payment proposals" it "intends to inquire about potential redistribution arrangements and may conduct detailed financial management review of health care-related tax programs that appear to include redistribution arrangements or that CMS has information may include redistribution arrangements." *Id.* To aid in this regular oversight, CMS expected "states to have detailed information available regarding their health care-related taxes" and for "states to make available all requested documentation

5

regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments." *Id.* Additionally, CMS encouraged states to examine their provider agreements to ensure that "providers, as a condition of participation in Medicaid and/or of network participation for a Medicaid managed care plan, agree to provide necessary information to the state" and cautioned that CMS would take enforcement action if it discovered the existence of impermissible financing practices. *Id.*

### D. CMS's Notification of Financial Management Review

Five days after issuing the Informational Bulletin, CMS sent Florida's Deputy Secretary for Medicaid a "Notification of Financial Management Review," explaining that CMS would perform a Financial Management Review ("FMR") over the next several months that would "focus on Florida's use of revenues derived from its Local Provider Participation Program (LPPF) tax program as a source of the non-federal share of Medicaid payments." DE 1-8 at 2. The FMR Letter reminded Florida's Deputy Secretary for Medicaid that CMS had previously issued a letter to Florida in 2022, which expressed concerns that Florida's LPPF program "may not comply with certain health care-related tax requirements" and informed Florida of CMS's intent to conduct a FMR in fiscal year 2023. *Id.* Attached to the FMR Letter was an initial document and information request, pursuant to CMS's statutory and regulatory authority to request records and documentation related to a state's Medicaid program. *Id.* at 4.

### E. The Pending Litigation

In response to CMS's Informational Bulletin and FMR Letter, Florida filed a complaint for declaratory and injunctive relief, seeking to have the Bulletin and FMR Letter declared unlawful and to further enjoin all Defendants from enforcing or relying on the Bulletin and FMR Letter. DE 1. Specifically, Florida argued that, under CMS's previous policy, matching funds were disallowed only when the same governmental unit that imposed the tax also indemnified the taxpayer, but

6

now, as Florida alleged, CMS improperly changed its policy, without engaging in rulemaking, to categorize purely private redistribution arrangements as constituting a prohibited hold-harmless agreement. *Id.* ¶¶ 6–9. Therefore, Florida alleged, inter alia, that CMS's purported new policy announced in the Bulletin, and implemented through the FMR Letter, was not in accordance with the plain text of 42 U.S.C. § 1396b(w)(4)(C)(i), *id.* ¶ 90, and that the apparently new policy announced by CMS in the Bulletin, and implemented through the FMR Letter, was adopted without the required notice-and-comment rulemaking procedure. *Id.* ¶ 110.

After filing its complaint, Florida filed the present Motion for Preliminary Injunction. DE 10. Subsequently, CMS responded to Florida's complaint by filing the present Motion to Dismiss. DE 40.

## II. Final Agency Action

Florida brings its suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* DE 1 ¶ 22. "In order to bring suit under the APA, plaintiffs must demonstrate that the decision at issue was 'final agency action.'" *Canal A Media Holding, LLC v. U.S. Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1255 (11th Cir. 2020) (quoting 5 U.S.C. § 704); *see also Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003) ("[F]ederal jurisdiction is . . . lacking when the administrative action in question is not 'final' within the meaning of 5 U.S.C. § 704."). Generally, to constitute final agency action, two conditions must be met. *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the 'consummation' of the agency's decisionmaking process" and "must not be of a merely tentative or interlocutory nature." *Id.* (citing *Chi. & S. Air Lines Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948)). "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62 (1970)). If both conditions are not met, the agency action is non-final,

7

which prevents a court from reaching the merits of the dispute. *See Nat'l Parks Conservation Ass'n*, 324 F.3d at 1237.

Here, for the reasons set forth below, neither the FMR nor the Informational Bulletin constitute final agency action.

### A. The FMR is not Final Agency Action

In the FMR Letter sent to Florida, CMS notified Florida that it would conduct a FMR "over the next several months" of Florida's LPPF tax program to determine whether it contained impermissible hold-harmless agreements. *See* DE 10-3 at 2–3. CMS laid out the timeline for the FMR as follows: (1) CMS would start its review on March 6, 2023; (2) CMS anticipated issuing a draft report to Florida "by the end of calendar year 2023"; (3) after issuance of the draft report, Florida would have 30 days to formally respond; and (4) after those 30 days, CMS would issue its final report. *Id.* at 3. Therefore, if this timeline is adhered to, CMS will issue a final report containing its findings and determination by February 1, 2024, at the earliest.

However, at the December 20, 2023 hearing on Florida's Motion for Preliminary Injunction, the parties could not provide the Court with a status update on the FMR regarding what stage the FMR was in or whether the FMR would be completed on schedule; therefore, it appears that the FMR is not on schedule. As such, the Court instructed the parties to file a status report with the Court to inform the Court of any developments with the FMR, but the Court has not seen or been apprised of any status report as of the date of this Report and Recommendation, which further indicates that the FMR is not on schedule. Consequently, the Court finds that the FMR has not been completed. But, unless the timeline set forth in the FMR Letter was significantly overoptimistic, it appears that the FMR should be done in the near future.

In any event, the FMR, which merely serves to investigate Florida's LPPF tax program, does not constitute final agency action. *See F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239–

45 (1949) (holding issuance of agency complaint against company, which alleged Federal Trade Commission had "reason to believe" company violated Federal Trade Commission Act, was not "final agency action" because the complaint served "only to initiate the proceedings" and had "no legal force comparable to that at issue in *Abbott Laboratories*"); *see also Veldhoen v. U.S. Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994) ("An agency's initiation of an investigation does not constitute final agency action. Normally, the plaintiff must await resolution of the agency's inquiry and challenge the final agency decision." (internal citations omitted)); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003) ("The leading Supreme Court case on final agency action, *Standard Oil*, held that even the filing of an administrative complaint does not constitute final agency action. It follows that the Commission's actions here, which are merely investigatory and clearly fall short of filing an administrative complaint, are not final agency action." (internal citation omitted)); *Mobil Expl. & Producing U.S., Inc. v. Dep't of Interior*, 180 F. 3d 1192, 1198 (10th Cir. 1999) (concluding United States Minerals Management Service Letter was not "final agency action" seeing as it "served only to initiate further proceedings by which the MMS could determine whether [p]laintiffs owed royalties").

Naturally, Florida disagrees, and it maintains that the FMR is final agency action. First, in its reply to CMS's response to the Motion for Preliminary Injunction, Florida appears to argue that the FMR constitutes final agency action because it "immediately obligated Florida to comply with CMS's informational demands." DE 23 at 11. Although undoubtedly burdensome, these informational demands as part of an investigation do not create final agency action. *See Standard Oil Co. of Cal.*, 449 U.S. at 242 ("Socal does not contend the issuance of the complaint had any such legal or practical effect, except to impose upon Socal the burden of responding to the charges made against it. Although this burden certainly is substantial, it is different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action."); *see*

9

*also Aluminum Co. of Am. v. United States*, 790 F.2d 938, 941 (D.C. Cir. 1986) ("It is firmly established that agency action is not final merely because it has the effect of requiring a party to participate in an agency proceeding."); *CEC Energy Co. v. Pub. Serv. Comm'n of V.I.*, 891 F.2d 1107, 1110 (3rd Cir. 1989) ("In this case, the only affirmative obligation imposed . . . is the obligation to respond to the Commission's further inquiries. Although arguably substantial, 'it is different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action.'" (quoting *Standard Oil Co. of Cal.*, 449 U.S. at 242)).

Next, in its response to CMS's motion to dismiss, Florida again asserts that the FMR is final agency action, but it fails to provide any authorities that distinguish or carve out an exception to the preceding case law. Instead, Florida writes: "Florida is challenging the policy announced in the Bulletin and implemented by the FMR. It seeks an injunction barring reliance on or implementation of that policy, not an injunction barring an FMR in general." DE 46 at 15. Thus, Florida apparently has no issue with being investigated; it only has an objection to the potential subject matter of the investigation. This topic will be addressed in greater detail below, but, for purposes of determining whether the FMR constitutes final agency action, the Court concludes that the FMR is not final agency action based on the foregoing.

### B. The Informational Bulletin is not Final Agency Action

Normally, an agency action is non-final when it "does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." *Nat'l Parks Conservation Ass'n*, 324 F.3d at 1237 (quoting *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 288 (5th Cir. 1999); *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)); *see, e.g.*, *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) ("[C]ourts have defined a nonfinal agency order as one, for instance, that 'does not itself adversely affect complainant but only affects his rights adversely on the contingency of future

administrative action.'" (quoting *Rochester Tel. Corp.*, 307 U.S. at 130)). The Informational Bulletin at issue here satisfies this formulaic definition of non-final agency action because it does not itself affect Florida's rights without CMS taking future administrative action.

Specifically, CMS states in the Bulletin that, "[a]s part of the agency's normal oversight activities and review of state payment proposals," it "intends to inquire about potential redistribution arrangements and may conduct detailed financial management reviews of health care-related tax programs."[1] DE 1-7 at 6. To aid in its inquiries, CMS expected "states to have detailed information regarding their health care-related taxes" and for states to "make available all requested documentation regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments." *Id.* Additionally, CMS said states should "work with their providers to ensure necessary information is available" and "should examine their provider participation agreements and managed care plan contracts to ensure that providers . . . agree to provide necessary information to the state." *Id.* None of these recommendations or expectations for a potential inquiry or request for documents by CMS exceed what has previously been established to not constitute final agency action. *See, e.g.*, *Standard Oil Co. of Cal.*, 449 U.S. at 242; *Aluminum Co. of Am.*, 790 F.2d at 941 (noting agency demand to cooperate with investigation does not make an agency action "final" for purposes of judicial review). Furthermore, to the extent CMS will disallow matching federal funds upon the finding of impermissible hold-harmless arrangements, as defined in the Bulletin, that will only occur contingent upon future

---

[1] As explained in the FMR Letter, DE 1-7 at 6, CMS has the statutory and regulatory authority to request documents from states regarding their Medicaid funding programs. *See* 42 U.S.C. § 1396a(a)(6) ("A state plan for medical assistance must provide that the State agency will make such reports, in such form and containing such information, as the Secretary may from time to time require, and comply with such provisions as the Secretary may from time to time find necessary to assure the correctness and verification of such reports [.]"); 45 C.F.R. § 75.364 (requiring right of access to "documents, papers, or other records of the non-Federal entity which are pertinent to the Federal award, in order to make audits, examinations, excerpts, and transcripts"); 42 C.F.R. § 433.74 ("[E]ach State must submit to CMS quarterly summary information on the source and use of all provider-related donations . . . received by the State or unit of local government, and health care-related taxes collected. Each State must also provide any additional information requested by the Secretary related to any other donations made by, or taxes imposed on, health care providers.").

11

agency action by CMS. *See* DE 1-7 at 6 ("If CMS . . . discovers the existence of impermissible financing practices related to health care-related taxes CMS will take enforcement action as necessary."). Therefore, under this formulaic definition of finality, the Informational Bulletin does not constitute final agency action.

Nevertheless, under the "flexible" and "pragmatic" approach to finality long advocated for by the Supreme Court, the Supreme Court has permitted pre-enforcement challenges to agency action where the complainant faced the risk of serious penalties for non-compliance with the agency's decision. *See, e.g.*, *Frozen Food Express v. United States*, 351 U.S. 40, 43–45 (1956) (allowing pre-enforcement review of agency order where the order "has an immediate and practical impact on carriers who are transporting the commodities"; the order "warns every carrier, who does not have authority from the Commission to transport those commodities, that it does so at the risk of incurring criminal penalties"); *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 152–53 (1967) (permitting pre-enforcement challenge to agency regulation due to dilemma caused by regulation: "If petitioners wish to comply they must change all their labels, advertisements, and promotional materials; they must destroy stocks of printed matter; and they must invest heavily in new printing type and new supplies. The alternative to compliance . . . may be even more costly. That course would risk serious criminal and civil penalties for the unlawful distribution of 'misbranded' drugs."); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) (letting pre-enforcement review of agency determination proceed because complainant faced serious risk of criminal and civil penalties if found in violation of agency action, so the complainant "need not assume such risk while waiting for EPA to 'drop the hammer' in order to have their day in court").

In apparent recognition of this precedent, Florida echoes this pragmatic consideration. *See* DE 23 at 8 ("CMS's policy forces Florida into a Hobson's choice" since it forces Florida "to take significant and costly compliance measures" or risk "detrimental enforcement action by CMS"

12

(quotation omitted)). However, the Court does not find that the Informational Bulletin is final agency action under the pragmatic considerations at play here.

First, as previously mentioned, there is a non-final, ongoing, and ostensibly soon-to-be-completed FMR into Florida's LPPF tax program to determine whether it contains impermissible hold-harmless arrangements. Due to its non-final nature, the FMR cannot be enjoined or subjected to judicial review at this time, and the conclusion of the FMR could moot Florida's concerns. For instance, at the end of the FMR, CMS could conclude that Florida's LPPF tax program does not contain impermissible hold-harmless arrangements, or CMS could determine that Florida's LPPF tax program contains impermissible hold-harmless arrangements under what Florida considers CMS's old position on hold-harmless arrangements, as opposed to what Florida claims is CMS's new position on hold-harmless arrangements as set forth in the Informational Bulletin. Consequently, judicial intervention at this time could "prove to have been unnecessary." *See Standard Oil Co. of Cal.*, 449 U.S. at 243 (cautioning against judicial intervention as interfering with "the proper functioning of the agency" when, "upon completion of the agency process," interference "might prove to have been unnecessary"); *CEC Energy Co.*, 891 F.2d at 1112 ("Moreover, judicial interference in the investigatory process at this time serves to disrupt and postpone a final agency determination that in the end could obviate the need for judicial review.").

Secondly, unlike *Frozen Food* and its progeny, Florida does not face or allege a serious risk of penalties while awaiting the conclusion of CMS's FMR. For example, in *Hawkes Co.*, the complainant faced the risk of "civil penalties of up to $37,500 for each day" they were in non-compliance, along with potential criminal liability, and the Supreme Court found that the complainant "need not assume such risks" while waiting for the agency to make a determination. 578 U.S. at 600. Florida does not face a similar predicament.

In its complaint, Florida alleges two adverse consequences resulting from the Informational Bulletin: disallowance of matching federal funds and increased compliance costs. DE 1 ¶¶ 66–73. However, the risk of penalties here—that is, the disallowance of matching federal funds—relates to a discrete period of time. As noted in its complaint, Florida's DPP was first authorized by the Florida Legislature in 2021, and CMS approved it for use starting in the 2021-2022 fiscal year. *Id.* ¶ 33. Florida then goes on to list the funds generated by its DPP for the past two fiscal years and its expectations for the current fiscal year, *id.* ¶¶ 37–39, and Florida alleges that a disallowance could cause hospitals in Florida to "abruptly lose access to nearly $2 billion in federal funds." *Id.* ¶ 68. Yet, Florida does not allege that CMS has refused to renew or approve its DPP for a future fiscal year, which CMS would need to do. 42 C.F.R. § 438.6(c); DE 1 ¶ 3 ("CMS must approve Florida's DPP on an annual basis."); DE 1-7 at 2 (noting CMS reviews "proposals to implement or renew Medicaid managed care state directed payments (SDPs) under 42 C.F.R. § 438.6(c)"). Therefore, the risk or threat of disallowance that Florida faces as a potential consequence of the Informational Bulletin relates to a set period of time (the past two fiscal years and potentially the current fiscal year); consequently, Florida's potential risk exposure is the same today as it will be by the end of the FMR. As such, the Informational Bulletin's threat of disallowance is not a pragmatic consideration that favors permitting Florida to bypass any investigatory or enforcement action by CMS.

Likewise, the "significant compliance costs" Florida alleges it will incur as a result of the Informational Bulletin does not favor allowing Florida to bypass any investigatory or enforcement action by CMS. Florida asserts in its complaint that the Informational Bulletin essentially requires it to create a new and "very expensive" regulatory and oversight regime in order to comply with CMS's informational demands. *See* DE 1 ¶¶ 70–73. But, as previously explained, CMS expected for states to have the information listed in the Informational Bulletin in order to assist with "the

14

agency's normal oversight activities and review of state payment proposals." DE 1-7 at 6. Thus, these alleged compliance costs cannot create final agency action. *See Standard Oil Co. of Cal.*, 449 U.S. at 242 ("Although this burden [of responding to administrative charges] certainly is substantial, it is different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action."); *CEC Energy Co.*, 891 F.2d at 1110 (noting that, although substantial, the burden of responding to an agency's inquiries does not give rise to final agency action).

Accordingly, given these considerations, and taking to heart the Supreme Court's emphasis on applying a "flexible" and "pragmatic" approach to finality, the Court concludes that the Informational Bulletin is not final agency action. The Court cannot see a pragmatic reason for Florida to bypass the FMR and CMS's investigatory and enforcement process, especially when that process could prove Florida's complaints unnecessary.[2]

### III. Florida's Motion for Preliminary Injunction and CMS's Motion to Dismiss

Having found no final agency action in this case, the Court next addresses the consequences of this finding on the pending motions.

### A. Florida's Motion for Preliminary Injunction Should be Denied

Regarding Florida's Motion for Preliminary Injunction, DE 10, Florida, as the movant, bears the burden of persuasion to establish the following four requisite elements:

> (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

---

[2] The Court acknowledges that a district court in Texas has found the Informational Bulletin to constitute final agency action. *See generally Texas v. Brooks-LaSure*, No. 6:23-CV-161-JDK, 2023 WL 4304749, at *7–8 (E.D. Tex. June 30, 2023). However, based on the circumstances surrounding Florida's challenge of the Informational Bulletin, the Court is not persuaded by the *Texas* court's ruling or Florida's reliance on that ruling.

*Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). Florida cannot meet the first element—substantial likelihood of success on the merits—because the lack of final agency action in this case prevents the Court from reaching the merits of the dispute. *See* 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."); *Nat'l Parks Conservation Ass'n*, 324 F.3d at 1236 ("[F]ederal jurisdiction is similarly lacking when the administrative action in question is not 'final' within the meaning of 5 U.S.C. § 704." (citing *Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 594 (D.C. Cir. 2001) ("[T]he requirement of a final agency action has been considered jurisdictional. If the agency action is not final, the court therefore cannot reach the merits of the dispute." (quotation omitted))). Having found Florida unable to meet the first element for a preliminary injunction, the Court need not address the remaining three elements. *See Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001) ("We have held on occasion that when a plaintiff fails to establish a substantial likelihood of success on the merits, a court does not need to even consider the remaining three prerequisites of a preliminary injunction."). Thus, Florida's Motion for Preliminary Injunction, DE 10, should be denied without prejudice.

### B. CMS's Motion to Dismiss Should be Granted

Concerning CMS's Motion to Dismiss, DE 40, it should be granted because the lack of final agency action in this case means there is no subject matter jurisdiction. *See Nat'l Parks Conservation Ass'n*, 324 F.3d at 1240 (noting "the 'final agency action' requirement implicates federal subject matter jurisdiction"; therefore, absent final agency action, a plaintiff's APA claim should be dismissed for lack of subject matter jurisdiction); *LabMD, Inc. v. F.T.C.*, 776 F.3d 1275, 1278 (11th Cir. 2015) (affirming dismissal of APA claim for lack of subject matter jurisdiction where challenged agency action was non-final); *Canal A Media Holding, LLC*, 964 F.3d at 1255

("In our circuit, dismissal for reason that the challenged action was not a final order is a dismissal for lack of subject-matter jurisdiction.").

## IV. Recommendation

Accordingly, for the foregoing reasons, the Court recommends that (1) Florida's Motion for Preliminary Injunction [DE 10] be **DENIED WITHOUT PREJUDICE**, (2) Defendants' Motion to Dismiss [DE 40] be **GRANTED**, and (3) the complaint be **DISMISSED WITHOUT PREJUDICE**.

Within fourteen days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations. 28 U.S.C. § 636(b)(1); S.D. Fla. Mag. R. 4(a). The parties are hereby notified that a failure to timely object waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions contained in this Report and Recommendation. 11th Cir. R. 3-1 (2014).

**DONE AND SUBMITTED** in Chambers at Fort Lauderdale, Florida, this 29th day of January, 2024.

PANAYOTTA AUGUSTIN-BIRCH
UNITED STATES MAGISTRATE JUDGE